CLERK'S OFFICE
A TRUE COPY
Apr 21, 2026
s/ vge
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
for the
**EASTERN DISTRICT OF WISCONSIN**

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

ALL FUNDS ON DEPOSIT IN CHARLES SCHWAB ACCOUNT ENDING IN 8151, WHICH OPERATES UNDER SAM P. STAIR

Case Number: 26-903M(NJ)

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

TO: **JEREMY DORN, an Agent with the Homeland Security Investigations (HSI), and any Authorized Officer of the United States**.

An application by a federal law enforcement officer or an attorney for the government requests that certain property be seized as being subject to forfeiture to the United States of America. The property is described as follows:

All funds on deposit in Charles Schwab account ending in 8151, which operates under Sam P. Stair

I find that the affidavit and any recorded testimony establish probable cause to seize the property.

**YOU ARE HEREBY COMMANDED** to search on or before May 5, 2026
*(not to exceed 14 days)*

❑ in the daytime – 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night, as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to United States Magistrate Judge Nancy Joseph.

❑ I find that immediate notification may have an adverse result listed in 18 U.S.C. §2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person, who, or whose property, will be searched or seized *(check the appropriate box)* ❑ for ____ days. *(not to exceed 30)*
❑ until, the facts justifying, the later specific date of ______

Date and time issued 4/21/ , 2026; 8:30a.m.

*Judge's signature*

City and state: Milwaukee, Wisconsin

THE HONORABLE NANCY JOSEPH
United States Magistrate Judge
*Name & Title of Judicial Officer*

## Return

| Case No: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| 26-903M(NJ) | 04/22/2026 8:12 a.m. | N/A |

Inventory made in the presence of:
N/A

Inventory of the property taken and/or name of any person(s) seized:

All funds on deposit were seized from associated account ending in X8151.

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the undersigned judge.

Date: ______________________________

JEREMY S DORN Digitally signed by JEREMY S DORN Date: 2026.07.01 16:55:50 -05'00'

*Executing officer's signature*

______________________________

*Printed name and title*

Subscribed, sworn to, and returned before me this date:

Date: ______________________________

______________________________

*United States Magistrate Judge*

CLERK'S OFFICE
A TRUE COPY
Apr 21, 2026
s/ vge
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

ALL FUNDS ON DEPOSIT IN CHARLES SCHWAB ACCOUNT ENDING IN 8151, WHICH OPERATES UNDER SAM P. STAIR

Case Number: 26-903M(NJ)

## APPLICATION FOR A WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, Jeremy Dorn, being duly sworn depose and say:

I am an Agent with the Homeland Security Investigations (HSI), and have reason to believe that in the Eastern District of Wisconsin there is now certain property, namely, all funds on deposit in Charles Schwab account ending in 8151, which operates under Sam P. Stair, that is (1) civilly forfeitable under 21 US.C. § 881(a)(6) and criminally forfeitable under 21 US.C. § 853, as proceeds of a conspiracy to distribute controlled substances committed in violation of 21 U.S.C. § § 841(a)(1), 846, 856, and 843(b), and (2) civilly forfeitable under 18 U.S.C. §§ 981(a)(1)(A) and 984, and criminally forfeitable under 18 U.S.C. § 982(a)(1), as proceeds of, and funds involved in, or traceable to funds involved in, money laundering offenses committed in violation of 18 U.S.C.§ 1956 , and which property is therefore also subject to seizure for purposes of civil forfeiture under 18 U.S.C. § 981(b), and for purposes of criminal forfeiture under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

The application is based on these facts:

✓ Continued on the attached sheet.

❑ Delayed notice of ____ days (give exact ending date if more than 30 days:_________ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Signature of Affiant
Jeremy Dorn, SA HSI

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone and email.

4/21/2026 8:30 a.m.
Date and time issued

at Milwaukee, Wisconsin
City and State

Nancy Joseph, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

**AND SEARCH AND SEIZURE WARRANTS**

I, Jeremy Dorn, Special Agent with the Homeland Security Investigations (HSI), being duly sworn, depose and state:

(A) a complaint seeking arrest warrants as follows:

| | **Target Subjects** | **Date of Birth** | **Phone # / Custody Status** | **Target Offenses** |
|---|---|---|---|---|
| 1. | Samuel P. STAIR | 03/11/1974 | 414-732-3682 – (TARGET TELEPHONE 3) | Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances;<br>Conspiracy to Maintain a Drug Trafficking Place;<br>Use of Communications Facilities to Facilitate Controlled Substance Felonies; and<br>Money Laundering<br>Title 18, United States Code, Sections 1956 and 2(a); Title 21, United States Code, Sections 841(a)(1), 846, 856, and 843(b); |
| 2. | Jeanette LOPEZ | 09/01/1988 | 414-439-8361 – (TARGET TELEPHONE 1)<br>414-639-1158 – (TARGET TELEPHONE 2) | Possession with Intent to Distribute and Distribution of Controlled Substances;<br>Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances;<br>Maintaining a Drug Trafficking Place;<br>Conspiracy to Maintain a Drug Trafficking Place;<br>Use of Communications Facilities to Facilitate Controlled Substance Felonies;<br>Possession of Firearms in Furtherance of Drug Trafficking; all in violation of Title 18, United States Code, Sections 924(c), and 2(a); Title 21, United States Code, Sections 841(a)(1), 846, 843(b), and 856 |
| 3. | Russell V. MCDADE Sr. | 11/13/1980 | IN CUSTODY | Possession with Intent to Distribute and Distribution of Controlled Substances;<br>Conspiracy to Possess with Intent to |

| | | | | |
|---|---|---|---|---|
| | | | | Distribute and Distribute Controlled Substances;<br>Maintaining a Drug Trafficking Place;<br>Conspiracy to Maintain a Drug Trafficking Place;<br>Use of Communications Facilities to Facilitate Controlled Substance Felonies; and<br>Possession of Firearms in Furtherance of Drug Trafficking<br>all in violation of Title 18, United States Code, Sections 924(c) and 2(a); Title 21, United States Code, Sections 841(a)(1), 846, 843(b) and 856 |
| 4. | Laura F. KNEZIC | 11/15/1981 | | Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances;<br>all in violation of Title 18, United States Code, Section 2(a); Title 21, United States Code, Sections 841(a)(1) and 846 |
| 5. | Stacey L. BERRY | 03/01/1988 | IN CUSTODY | Possession with Intent to Distribute and Distribution of Controlled Substances;<br>Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances;<br>Maintaining a Drug Trafficking Place;<br>Conspiracy to Maintain a Drug Trafficking Place; and Possession of Firearms in Furtherance of Drug Trafficking;<br>all in violation of Title 18, United States Code, Sections 924(c) and 2(a); Title 21, United States Code, Sections 841(a)(1), 846, and 856 |
| 6. | Javarius J. WILLIAMS “G” | 06/23/1994 | IN CUSTODY | Possession with Intent to Distribute and Distribution of Controlled Substances;<br>Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances;<br>Maintaining a Drug Trafficking Place;<br>Conspiracy to Maintain a Drug Trafficking Place; and Possession of |

| | | | | |
|---|---|---|---|---|
| | | | | Firearms in Furtherance of Drug Trafficking;<br>all in violation of Title 18, United States Code, Sections 924(c) 2(a); Title 21, United States Code, Sections 841(a)(1), 846, and 856 |
| 7. | Otis LOCKETT | 05/31/1984 | 414-324-5384 | Possession with Intent to Distribute and Distribution of Controlled Substances;<br>Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances;<br>Maintaining a Drug Trafficking Place;<br>Conspiracy to Maintain a Drug Trafficking Place;<br>Use of Communications Facilities to Facilitate Controlled Substance Felonies; and<br>Possession of Firearms in Furtherance of Drug Trafficking;<br>all in violation of Title 18, United States Code, Sections 924(c) and 2(a); Title 21, United States Code, Sections 841(a)(1), 846, 843(b), and 856 |
| 8. | Martin L. SINCLAIR | 02/02/1984 | 262-349-7108 | Possession with Intent to Distribute and Distribution of Controlled Substances;<br>Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances;<br>Maintaining a Drug Trafficking Place;<br>Conspiracy to Maintain a Drug Trafficking Place; and<br>Use of Communications Facilities to Facilitate Controlled Substance Felonies;<br>all in violation of Title 18, United States Code, Section 2(a); Title 21, United States Code, Sections 841(a)(1), 846, 843(b), and 856 |
| 9. | Ser Jimmy L. Shepherd | 04/10/1990 | | Possession with Intent to Distribute and Distribution of Controlled Substances;<br>Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances; |

| | | | | |
|---|---|---|---|---|
| | | | | Maintaining a Drug Trafficking Place; and<br>Conspiracy to Maintain a Drug Trafficking Place<br>all in violation of Title 18, United States Code, Section 2(a); Title 21, United States Code, Sections 841(a)(1), 846, and 856 |
| 10. | Larry A. Shepherd | 7/18/1986 | | Possession with Intent to Distribute and Distribution of Controlled Substances;<br>Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances;<br>Maintaining a Drug Trafficking Place; and<br>Conspiracy to Maintain a Drug Trafficking Place<br>all in violation of Title 18, United States Code, Section 2(a); Title 21, United States Code, Sections 841(a)(1), 846, and 856 |
| 11. | Shaeerah J. McKay | 02/25/1994 | | Possession with Intent to Distribute and Distribution of Controlled Substances;<br>Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances; and<br>Maintaining a Drug Trafficking Place<br>all in violation of Title 18, United States Code, Section 2(a); Title 21, United States Code, Sections 841(a)(1), 846, and 856 |
| 12. | Victoria T. ALLEN | 08/16/1976 | 262-330-2333 | Possession with Intent to Distribute and Distribution of Controlled Substances;<br>Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances; and<br>Use of Communications Facilities to Facilitate Controlled Substance Felonies<br>all in violation of Title 18, United States Code, Section 2(a); Title 21, United States Code, Sections 841(a)(1), 846, and 843(b) |
| 13. | Walter J. RINGERSMA | 03/04/1965 | 262-993-1683 | Possession with Intent to Distribute and Distribution of Controlled |

| | | | | |
|---|---|---|---|---|
| | | | | Substances;<br>Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances;<br>Maintaining a Drug Trafficking Place;<br>Conspiracy to Maintain a Drug Trafficking Place; and<br>Use of Communications Facilities to Facilitate Controlled Substance Felonies;<br>all in violation of Title 18, United States Code, Section 2(a); Title 21, United States Code, Sections 841(a)(1), 846, 843(b), and 856 |
| 14. | Cristal F. NOKES | 09/27/1980 | IN CUSTODY | Possession with Intent to Distribute and Distribution of Controlled Substances;<br>Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances;<br>Maintaining a Drug Trafficking Place; and<br>Conspiracy to Maintain a Drug Trafficking Place<br>all in violation of Title 18, United States Code, Section 2(a); Title 21, United States Code, Sections 841(a)(1), 846, and 856 |
| 15. | ABRAHAM M. Lopez | 01/06/1984 | 414-301-0354<br>414-888-0624<br>414-676-7540 | Possession with Intent to Distribute and Distribution of Controlled Substances<br>Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances; and<br>Use of Communications Facilities to Facilitate Controlled Substance Felonies;<br>all in violation of Title 18, United States Code, Section 2(a); Title 21, United States Code, Sections 841(a)(1), 846, and 843(b) |
| 16. | Kerry HOWELL Sr. | 11/23/1954 | 414-501-8151 | Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances;<br>all in violation of Title 18, United States Code, Section 2(a); Title 21, United States Code, Sections 841(a)(1), and |

| | | | | |
|---|---|---|---|---|
| | | | | 846 |
| 17. | Alberto L. BOFFIL, Jr. | 07/07/2004 | | Possession with Intent to Distribute and Distribution of Controlled Substances<br>Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances;<br>Maintaining a Drug Trafficking Place;<br>Conspiracy to Maintain a Drug Trafficking Place; and<br>Use of Communications Facilities to Facilitate Controlled Substance Felonies<br>all in violation of Title 18, United States Code, Section 2(a); Title 21, United States Code, Sections 841(a)(1), 846, 843(b), and 856 |
| 18. | Wesley R. BYNUM | 03/03/1993 | | Possession with Intent to Distribute and Distribution of Controlled Substances<br>Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances;<br>Maintaining a Drug Trafficking Place; and<br>Use of Communications Facilities to Facilitate Controlled Substance Felonies;<br>all in violation of Title 18, United States Code, Section 2(a); Title 21, United States Code, Sections 841(a)(1), 846, 843(b), and 856; |

(B) an application for a search warrant to seek evidence of Target Offense. The places to be searched pursuant to this warrant (collectively referred to as the Target Locations) are:

a. **11512 West Woodside Drive, Hales Corners, Wisconsin** (**Target Location 1**), to include an attached garage; a white Tesla bearing Wisconsin license plate, AEB-6163 (Tesla); and/or other vehicles owned by Target Subjects; and Regina STAIR and STAIR. **Target Location 1** is used by STAIR and Regina STAIR. It is two-story, single-family residence located on the north side of Woodside Drive. The exterior is described as having red brick with white trim and a gray shingle rooftop. The numbers

"11512" are affixed in a horizontal fashion in bold black numbers with a white border above the front door. The residence includes an attached garage with a white overhead door and a gray shingled roof. The front entry door faces south and has a glass exterior door in front of a red interior door. There is a side entry door on the north side of the residence.

b. **2925 West Lincoln Avenue, Milwaukee, Wisconsin (Target Location 2),** to include the attached garage, all associated common areas, basement, attic, common hallways, a white Tesla bearing Wisconsin license plate, AEB-6163 (Tesla) and/or other vehicles owned by Target Subjects. **Target Location 2** is the S2 Real Estate office sued by STAIR, LOPEZ, and others. STAIR is the owner of the business. **Target Location 2** is two-story, multi-purpose business/residence located on the south side of W. Lincoln Avenue. The exterior is described as having tan brick and a grayish green shingle rooftop. The numbers "2925" are affixed in a horizontal fashion in bold black numbers with a white border above the north facing glass front door. On the west of the glass front door there is a separate north facing tan entry door with a wooden brown handicap ramp leading up to the door. Located in the front yard of the business/residence is a large white and black business sign with the words "S2 Real Estate Apartment & Office Rentals." The sign lists the phone numbers "(414) 476-6063 or text (414) 533-7325," email "rentals@s2support.com," and the additional business "S2 Business Computer Support Inside." **Target Location 2** includes an attached garage in the back of business/residence and has side entry doors on the east and west sides that provide access to the business/residence. Based on the investigation, STAIR has access to the entire building.

c. **333 North 36th Street, Milwaukee Wisconsin** (**Target Location 3**), to include the detached garage, abandoned white vehicle and/or other vehicles owned by Target Subjects; and Jeanette LOPEZ, LOCKETT, and J.M.L. **Target Location 3** is used by LOPEZ, LOCKETT, and J.M.L. It is a single-family residence located on the west side of N. 36th St. The exterior is described as having white siding with white trim and a gray shingled roof. The residence has a five-step wooden stairway leading to the front entry door which consists of a black storm door and a white interior door. The numbers "333" are affixed in a horizontal fashion in white numerals over a black background north of the entry door.

d. **829 South 19th Street, #1, Milwaukee, Wisconsin (Target Location 4)** to include all associated common areas and hallways, basement, storage area associated with **Target Location 4**, attic; and/or other vehicles owned by Target Subjects; LOCKETT, ROSS, J.M.L. and LOPEZ. **Target Location 4** is used by LOCKETT and ROSS. **Target Location 4** is three-story, multi-family residence located on the west side of S. 19th Street. The exterior is described as having off-white/gray siding on the lower two-thirds of the residence and gray/blue siding on the upper third, with gray trim, green awnings, and brown/gray shingled rooftop. The numbers "829" are affixed in a horizontal fashion above the east-facing entry door to the building, in black

numbers on a white background. The exterior door to access Unit 1 is located on the south side of the residence. Upon entering this south side door, there is a common hallway that runs north. Once in the common hallway, immediately to the east is the door to access Unit 1, which is labeled with the numeral "1" written in black marker. The detached garage is situated to the west of the residence on the east side of a north-south alley. It is described as having white siding with gray trim, a white west-facing overhead garage door, and a gray-shingled rooftop.

e. **3923 B (Rear) S Pennsylvania Ave, St. Francis, Wisconsin (Target Location 5)** to include all associated common areas and hallways, basement, storage area associated with **Target Location 5**, attic, a red KIA Stinger with Wisconsin license plate AYB-3067 and/or other vehicles owned by Target Subjects and ABRAHAM Lopez. **Target Location 5** is used by ABRAHAM. It is two-story, single-family residence located on the west side of S. Pennsylvania Avenue. There are two buildings on the property, and 3923 B is the rear/westernmost building. The exterior is described as having brown brick with brown and white trim and a gray rubber rooftop. The east-facing side of the building has 4 overhead garage doors. The front entry door faces east and is directly north of the east-facing garage doors. The numbers "3923B" are affixed in a horizontal fashion to the south of the entry door in black numbers on a white background. The front entry door is a solid, white door, with a possible decorative window covered with paper. The utilities at **Target Location 5** are in the name of ABRAHAM Lopez.

f. **1966 B South 11th Street, Milwaukee, Wisconsin** (**Target Location 6**), to include all associated common areas and hallways, basement, storage location for **Target Location 6**, attic; and/or other vehicles owned by Target Subjects; BOFFIL and RINGERSMA. **Target Location 6** is used by BOFFIL and RINGERSMA has also been present at the location. **Target Location 6** is the rear cottage of the property, and is a single-family apartment unit located on the east side of S. 11th Street, adjacent to the north-south alley. The exterior is described as having white siding with white trim and a gray-shingled roof. The residence has a solid dark south-facing entry door near the east side of the cottage. The numerals "1966" are affixed to the residence directly east of this entry door.

g. **710 South 21st Street – Upper Unit, Milwaukee, Wisconsin (Target Location 7**), to include all associated common areas and hallways, basement, storage area associated with **Target Location 7**, attic, and/or other vehicles owned by Target Subjects; and BYNUM and ALLEN. **Target Location 7** is used by BYNUM and ALLEN. It is the upper unit of a multi-story, multi-family residence located on the east side of S. 21st Street. The exterior is described as having yellow/brown siding with brown trim and a brown-shingled roof. The residence has a six-step wooden staircase leading to the front porch which has two entry doors. The entry door to 710 S. 21st Street is the southernmost west-facing door and is comprised of an off-white exterior door with decorative glass. The numbers "710" are affixed in a horizontal fashion in black numerals affixed to the siding to the south of the entry door.

h. **2843 North 10th Street - LOWER, Milwaukee, Wisconsin (Target Location 8)** to include all associated common areas and hallways, basement, storage area associated with **Target Location 8**, attic, and/or other vehicles owned by Target Subjects; bronze, 2009 Nissan Murano, bearing Wisconsin temporary license plate Y5912J, also assigned Wisconsin license plate BCX-5254, VIN: JN8AZ18W99W152835 (Murano); and ALLEN. **Target Location 8** is used by ALLEN. **Target Location 8** is described as two story duplex with grey siding and white trim windows and grey asphalt shingles. The front of the residence has an entrance door on the east facing door and brown wooden railing porch that run along the east side of the building. On the southeast corner of the building there is a pillar at the outside of the porch with a stone base and wooden top and above the stone base are affixed the numbers "2843" with black numbers on white tiles. There is a second entrance to the residence on the south side of the structure that has a wooden stairway leading to the door. There is alley access and no detached garage.

i. **1022 South 60th Street, West Allis, Wisconsin (The Blaque Bar and Bites)** (**Target Location 9**), to include all and/or other vehicles owned by Target Subjects; a white 2026 Hyundai Sonata, bearing Wisconsin license plate BBY-2130 (Sonata); a white Mercedes bearing Wisconsin license plate AHE-2136 (Mercedes); a 2015 brown Hyundai Genesis, bearing Wisconsin license plates BAX-6043; a white 2019 Mazda CX-5 SUV, bearing Wisconsin license plate ATC-9675 (Mazda); a white 2014 Dodge Durango, later identified with Wisconsin license plate BCJ-3085 (Durango) and/or other vehicles owned by Target Subjects; and SINCLAIR and Jennifer PIERCE. **Target Location 9** is a tavern run by SINCLAIR and PIERCE. It is a single-story business located on the east side of S. 60th Street. The exterior is described as having a cream-colored Lannon stone façade on the west-facing side and crème siding on the north and south sides. The windows on the west-facing side have orange awnings. The building does not have address numbers affixed to it, however the two west-facing windows, south of the entry door, have "BLAQUE BAR & BITES" displayed with decals or paint. The front entry door faces west and has a black wooden exterior door. There is a side entry door on the north side of the building**.**

j. **5047 W. Jackson Park Drive, Milwaukee, Wisconsin** (**Target Location 10**), to include an attached garage; a white 2026 Hyundai Sonata, bearing Wisconsin license plate BBY-2130 (Sonata); a white Mercedes bearing Wisconsin license plate AHE-2136 (Mercedes); a 2015 brown Hyundai Genesis, bearing Wisconsin license plates BAX-6043; a white 2019 Mazda CX-5 SUV, bearing Wisconsin license plate ATC-9675 (Mazda); a white 2014 Dodge Durango, later identified with Wisconsin license plate BCJ-3085 (Durango) and/or other vehicles owned by Target Subjects; and SINCLAIR and Jennifer PIERCE. **Target Location 10** is the residence of SINCLAIR and PIERCE. It is a single-story, single-family residence with an attached garage, located on the south side of W. Jackson Park Drive. The residence is described as having a Lannon stone exterior with white trim and a gray-shingled roof. The numbers "5047" are affixed in a horizontal fashion in

bold black numbers with a white background on the north-facing façade. The front entry door faces east and has a glass exterior door in front of a yellow interior door.

k. **8501 North 107th Street, Milwaukee, Wisconsin (Target Location 11)** to include an attached garage, any storage area associated with **Target Location 11**; a white 2026 Hyundai Sonata, bearing Wisconsin license plate BBY-2130 (Sonata);; a 2015 brown Hyundai Genesis, bearing Wisconsin license plates BAX-6043; a white 2019 Mazda CX-5 SUV, bearing Wisconsin license plate ATC-9675 (Mazda); a white 2014 Dodge Durango, later identified with Wisconsin license plate BCJ-3085 (Durango); a red 2015 Jaguar XF, bearing Wisconsin license plate BAF-5500, (red Jaguar); black unregistered Jaguar SUV (Jaguar SUV) and/or other vehicles owned by Target Subjects; and L. SHEPHERD and S.J. SHEPHERD. **Target Location 11** is used by L. SHEPHERD and S.J. SHEPHERD. **Target Location 11** is the upper unit of a multi-unit building located on the south west corner of a multi-unit building with a door that opens to the south of the at the southwest corner. The exterior brown and tan brick fascia on the west side of the building has an off white siding and grey asphalt roof. On the west wall directly south of the door are the numbers 8501 affixed to the siding with black numbers on white tiles in a horizontal fashion.

l. **4358 North 65th Street, Milwaukee, Wisconsin (Target Location 12)** to include an attached garage, a white 2026 Hyundai Sonata, bearing Wisconsin license plate BBY-2130 (Sonata);; a 2015 brown Hyundai Genesis, bearing Wisconsin license plates BAX-6043 (Hyundai Genesis); a white 2019 Mazda CX-5 SUV, bearing Wisconsin license plate ATC-9675 (Mazda); a white 2014 Dodge Durango, later identified with Wisconsin license plate BCJ-3085 (Durango); black unregistered Jaguar SUV (Jaguar SUV) and/or other vehicles owned by Target Subjects; and L. SHEPHERD and S.J. SHEPHERD. **Target Location 12** is an orange brick single family residence with white trim around the windows, grey asphalt shingle roof and a small porch entrance on the southwest corner of the residence. There are numbers affixed to the south of the entrance door on the south west corner, they are black numbers on white tiles: “4358”. There is also a detached garage at the east side of the property with alley access. The detached garage has white siding with a grey asphalt roof.

(c) an application for seizure warrant of (collectively referred as the Target Accounts):

a. TriCity Bank account ending in # x2329, held under S2 Real Estate Group 2 LLC; and
b. Charles Schwab account ending in # x0260, which operates under Sam P. Stair.
c. Charles Schwab account ending in # x8151, which operates under Sam P. Stair.

## I. Introduction and Background

1. I am a Special Agent of the United States Department of Homeland Security, Homeland Security Investigations/U.S. Immigration and Customs Enforcement (HSI/ICE), assigned to the Resident Agent in Charge (RAC) Milwaukee, Wisconsin. I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I have been a federal law enforcement agent for over ten years.

2. I have received basic criminal investigative training, including thirty-six weeks at the Federal Law Enforcement Training Center (FLETC). In the course of my work, I have become knowledgeable with the enforcement of federal narcotics laws. I am currently a member of the Homeland Security Task Force as an investigator specializing in the smuggling, trafficking, and distribution of dangerous and controlled substances. I have participated in drug trafficking investigations conducted by HSI/ICE, the Drug Enforcement Administration (DEA), Federal Bureau of Investigation (FBI), the United States Postal Service (USPS) and other law enforcement agencies, which resulted in the arrest of subjects, and the seizure of property, assets, and controlled substances. As a narcotics investigator, I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover operations, court-ordered wiretaps, analysis of phone and financial records, and the arrests of numerous drug traffickers. I am familiar with various methods of smuggling and trafficking narcotics and other controlled substances and the proceeds from sale of such substances. I am also familiar with methods used to evade detection of both the controlled substances and the proceeds from their sale that are used by drug traffickers. I have participated in investigations involving Title 21 offenses and am familiar with the Interagency Cooperation Agreement between the DEA and HSI. I have also been the affiant of search warrants.

3. I investigate criminal violations of the Federal laws, including, but not limited to Title 18, United States Code, Sections 1956 and 1957 and Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances. I have participated in the execution of multiple federal search warrants.

4. I have also received more general training and gained experience in interviewing techniques, search warrant applications, the execution of searches and seizures, and the seizure, processing, and identification of electronic devices.

5. I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of state and federal narcotics laws. I have participated or assisted in numerous federal and state search warrants for narcotic related offenses that have resulted in the seizure of United States Currency, vehicles, real estate, and jewelry from individuals involved in narcotic trafficking.

6. I have authored and/or aided in investigations that have led to the issuance of numerous search warrants involving violations of both state and federal narcotic laws. These warrants involved the search of locations including: residences of targets, businesses their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, and various assets that were purchased with the proceeds of drug trafficking.

7. Through training, experience, and discussions with other experienced agents:

a. I have learned about how individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

b. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine and crack cocaine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

c. I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

d. I know drug dealers often put telephones in the names of others (nominees) or obtain pre-paid cellular telephones from companies where no subscriber name or address is required to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

e. I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

f. I know large-scale drug traffickers must maintain, on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;

g. I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments, and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

h. I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, their businesses, and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities or rival drug traffickers. These secure locations include, but are not limited to safes, briefcases, purses, locked filing cabinets, and hidden storage areas in natural voids of a residence;

i. I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transferring, concealing and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These

items are maintained by the traffickers within residences (including attached and unattached garages), businesses or other locations over which they maintain dominion and control;

j. I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k. I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

l. I know drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization;

m. I know drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their drugs. These traffickers usually maintain these photographs in their possession; and

n. I know a "controlled buy" (and/or controlled contact) is a law enforcement operation in which an informant purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded buy money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded.

o. In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

8. Further, I am aware through training and experience, as well as numerous conversations with both users of controlled substance and dealers of controlled substances, that drug traffickers may also establish stash houses. I am aware that stash houses are established as places

where drug traffickers store large quantities of controlled substances, firearms, and cash. Drug traffickers may establish a trap house and a separate location as a stash house, where drug traffickers do not engage in sales to drug customers at the location, but use the location primarily for storage. Similar to trap houses, stash houses also serve the purpose of concealing this illegal conduct from the view of law enforcement and make it difficult to attribute possession of any drugs, firearms, or cash found within the stash house to a particular individual during a search conducted by law enforcement. For example, stash houses allow the trafficker to store a large amount of controlled substances at a location separate from their residence. Stash houses are often not in the drug trafficker's name, have minimal furniture, minimal signs of typical residential activity, lack items inside connecting the location to the drug trafficker, and are generally a quiet location with limited activity, which avoids drawing complaints or concerns from neighbors or law enforcement.

9. Further, I am aware through training and experience, as well as numerous conversations with both users of controlled substance and dealers of controlled substances, that often drug houses, also called trap houses, are established as places where a variety of drug-motivated crime can occur at a single location. This includes serving as a place where (1) drugs are stored, processed/packaged, sold, and/or used; (2) commercial sex acts are performed in exchange for drugs or money to purchase drugs; (3) stolen goods are sold/traded for drugs or money to purchase drugs; and (4) drug proceeds are stored before they are able to be laundered by the organization. Further, trap houses, also serve the purpose of concealing this illegal conduct from the view of law enforcement. For example, open-air drug markets where drugs are bought and sold on a street corner allow law enforcement to observe hand-to-hand transactions and more easily identify illegal conduct. By contrast, trap houses allow the trafficker to conduct drug sales behind closed doors and to control who is allowed access to the residence. These types of trap houses are commonly run by persons who are trusted to hold drugs and money and who are usually armed or given armed protection to perform this task. Oftentimes, these trap house operators as well as multiple drug users

and others will be within the trap house so as to make it difficult to attribute possession of any drugs found within the trap house during a search conducted by law enforcement.

10. This affidavit is submitted in support of an application for a criminal complaint, arrest warrants, and search and seizure warrants for property described in Attachment A, for violations of federal law, including the Target Offenses.

11. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

12. Information within this affidavit comes from the following sources and criminal indices: observations made during physical and electronic surveillance, analysis of phone tolls, the installation of pen register/trap and trace devices, interviews conducted with reliable confidential source(s) (CS), information obtained from other law enforcement officers, controlled evidence purchases, location data for cellphones, subpoenaed records, recorded calls from the Wisconsin prison system and local jails, information gathered via consent recordings, and Title III interceptions over TARGET TELEPHONE 1, TARGET TELEPHONE 2, and TARGET TELEPHONE 3.

13. The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations set forth above occurred, to establish the basis for seizure of funds that were involved in, or are traceable to funds involved in, money laundering transactions, and to establish that probable cause exists to believe that the property described in Attachment A, incorporated herein by reference, contain the items that are described in Attachment B.

14. For the reasons discussed herein, there is probable cause to believe that evidence of the above-referenced Target Offenses will be located at, and in, the following properties, more fully

described in Attachment A, and collectively referred to as "Target Locations are items that contain evidence of the Target Offenses."

15. This affidavit is in support of the seizure of all funds in the Target Accounts. For the reasons set forth below, I submit that the funds sought to be seized are funds that were involved in, or are traceable to funds involved in, money laundering transactions in violation of 18 U.S.C. §§ 1956, and therefore are subject to civil forfeiture under 18 U.S.C. §§ 981(a)(1)(A) and 984, and subject to criminal forfeiture under 18 U.S.C. § 982(a)(1). The funds are subject to seizure via a civil seizure warrant under 18 U.S.C. § 981(b)(2) and via a criminal seizure warrant under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

## II. SUMMARY OF Target Subjects

16. **Samuel P. STAIR, a.k.a. "Sam"** (hereinafter "STAIR"). As recounted in more detail herein, STAIR is the principal and registered agent of S2 Real Estate Group LLC and a number of other related LLCs including: S2 Real Estate Group I LLC, S2 Real Estate Group 2 LLC, S2 Real Estate Group 3 LLC, S2 Real Estate Group 4 LLC, S2 Real Estate Group 5 LLC, S2 Real Estate Group 6 LLC, S2 Real Estate Group 7 LLC, S2 Real Estate Group 8 LLC, S2 Real Estate Group 9 LLC, S2 Real Estate Group 10 LLC, 9330 W Lincoln S2 LLC, S2 Real Estate 10101 W Capitol Dr LLC, S2 Real Estate 1700 Lincoln LLC, S2 Real Estate; 1957 Congo LLC, S2 Real Estate 2033 S 17th LLC, S2 Real Estate 2126 S 17th LLC, S2 Real Estate 2319 2327 Michigan LLC, S2 Real Estate 2509 W Becher LLC, S2 Real Estate 2612-20 W Greenfield LLC, S2 Real Estate 2903-05 W Pierce LLC, S2 Real Estate 4631 Sonseeahray LLC, S2 Real Estate 5916 W Burnham LLC, S2 Real Estate 605 N 30th LLC, S2 Real Estate 729 21st LLC, S2 Real Estate 7505 W Bradley LLC, S2 Real Estate 7601 W Becher LLC, S2 Real Estate Group 2323 S 5th LLC, S2 Real Estate 2333-2345 S 9th Pl LLC, S2 Real Estate Group 829 S 19th St LLC, S2M2 Real Estate 2804 W Kilbourn LLC, 9330 W Lincoln S2 LLC, HMS2 Real Estate LLC, ISCIRCLEPRAXIS LLC, S2 1613 Bolivar LLC, S2 Real Estate 9730 LLC, S2 Real Estate 1206-8 S 5th Pl LLC, S2 Real Estate 1517 S 23rd LLC, S2

Real Estate 1630 S 32nd LLC, S2 Real Estate 1815 1733 LLC, S2 Real Estate 2224 LLC, S2 Real Estate 2925 Lincoln LLC, S2 Real Estate 6900 W Lincoln LLC, S2 Real Estate Group 1836 LLC, S2 Real Estate Group 251927 LLC, S2 Real Estate LLC, S2 Real Estate Group Partners LLC/Ellen Amerikan.

17. These LLCs primarily hold real estate and STAIR operates as a landlord in the city of Milwaukee. Part of STAIR's business model is to rent properties directly to drug traffickers for their use as "stash houses" (places to store controlled substances intended for distribution) and "trap houses" (places from which to distribute controlled substances. STAIR seeks out drug traffickers as renters because doing so guarantees a steadier stream of rental income than he would otherwise obtain in legitimate rental arrangements. In some instances, STAIR also relies on these drug traffickers to manage other rental units owned by STAIR by, among other things, finding drug addicts to whom the rental units can be rented. This further guarantees rental income as it allows for traffickers to withhold controlled substances to which the renters are addicted if they do not pay rent. Upon receipt of drug-trafficking proceeds from the maintenance of these drug-involved premises, STAIR deposits the funds into bank accounts that he maintains as part of his legitimate rental business, thereby comingling proceeds of lawful business activity with proceeds of drug trafficking for the purpose of concealing the nature and source of the illicit funds. STAIR also utilizes the drug traffickers with whom he conspires to maintain premises for the purpose of drug trafficking as employees of his company who provide, among other things, services such as "security," which STAIR uses as a euphemism for conducting forcible and illegal evictions. And, in some instances, STAIR directly conspires with others to distribute controlled substances.

18. STAIR was arrested for Possession of THC and Possession of Amphetamine / LSD / Psilocybin by the Jefferson County Sheriff's Office on September 17, 1992. STAIR does not have any prior convictions.

19. **Jeanette LOPEZ** (hereinafter "LOPEZ"). As recounted in more detail herein, LOPEZ is an employee of S2 Real Estate. In her role at the business, LOPEZ assists STAIR in renting properties to drug traffickers so that the traffickers can use the properties as stash houses" (places to store controlled substances intended for distribution) and "trap houses" (places from which to distribute controlled substances. LOPEZ arranges paperwork and utilities on those properties to ensure that the drug traffickers do not have to have their names associated with the rentals. For her services in locating and setting up these drug-trafficking rentals, LOPEZ charges a percentage of drug trafficking proceeds in addition to standard monthly rents.

20. LOPEZ also works with LOCKETT, J.M.L., ABRAHAM Lopez, and ROSS to distribute controlled substances such as marijuana and cocaine. She appears to use telephones, vehicles, and residences to engage in this distribution and uses firearms in furtherance of the distribution of controlled substances. During the course of this investigation, LOPEZ has been recorded on phone calls arranging for the distribution of controlled substances, directing others to distribute controlled substances, and discussing payment arrangements for controlled substance distribution same. LOPEZ has been observed arranging for the distribution of controlled substances from the residence she rents from STAIR, 333 North 36th Street, Milwaukee, WI and is known to store the proceeds of her drug trafficking at that residence and in vehicles parked there.

21. LOPEZ's criminal history consists of a conviction for Resisting or Obstructing an Officer (Date of Conviction: 12-03-2009). LOPEZ has also been arrested for Harboring/Aiding a Felon, Battery, and Burglary of a Building or Dwelling.

22. **Russell V. MCDADE Sr.,** a.k.a. "Ro" (hereinafter "MCDADE"). As recounted in more detail herein, MCDADE operated multiple trap houses from properties owned by STAIR from which MCDADE and his associates distributed controlled substances, including cocaine, fentanyl, and marijuana. MCDADE's drug-trafficking organization, which included BERRY, HOWELL, WILLIAMS, RINGERSMA, BOFFIL, KNEZIC, ALLEN, JONES, dealt in kilogram-quantities of

cocaine. MCDADE used telephones, vehicles, and STAIR's residences for drug distribution and his distribution was connected to at least two overdoses. MCDADE was captured on video distributing cocaine and Percocet pills to STAIR's wife, Regina Stair, and was involved in two controlled buys of fentanyl by a confidential source.

23. MCDADE has a criminal history including Manufacture/Deliver Heroin (Date of Conviction: 11-17-2021); Possess with Intent to Deliver Cocaine (Date of Conviction: 09-24-2008); Possess with Intent to Deliver Cocaine (Date of Conviction: 01-10-2003); False Imprisonment (Date of Conviction: 11-07-2001); Disorderly Conduct (Date of Conviction: 02-12-2015); and Battery, Use of Dangerous Weapon and Bail Jumping-Misdemeanor (Date of Conviction: 7-10-2000). MCDADE has also been arrested for the following offenses: False Imprisonment; Possession with Intent to Deliver Narcotics, Possession with Intent to Deliver Heroin (<=3 grams); and 1st Degree Reckless Homicide / Delivery. MCDADE has pending felony charges in the Milwaukee County Circuit Court for Possession with Intent to Deliver Cocaine, Second or Subsequent Offense, Party to a Crime; Possession with Intent to Deliver Fentanyl, Second or Subsequent Offense, Party to a Crime; Maintain Drug Trafficking Place; and Resisting or Obstructing an Officer. MCDADE is currently in custody related to this pending matter.

24. **Laura F. KNEZIC** (hereinafter "KNEZIC"). As recounted in more detail herein, Laura KNEZIC works for the MCDADE DTO. On March 19, 2025, KNEZIC was arrested in a hotel room where she was found with Walter RINGERSMA and over 2,000 grams of cocaine. KNEZIC distributes controlled substances procured by MCDADE on behalf of the MCDADE DTO. KNEZIC has prior convictions of Carrying a Concealed Weapon (Date of Conviction: 11/22/2006); and Possession of THC (Date of Conviction: 5/4/2007). KNEZIC also has a pending criminal case, Milwaukee County Case 2025CF1435, Possession with Intent -Cocaine.

25. **Stacey BERRY** (hereinafter "BERRY"). As recounted in more detail herein, BERRY works for the MCDADE DTO. Prior to her current incarceration, BERRY assisted in the

operation of MCDADE's stash and trap houses, including at 1425 West Greenfield and 1512 South 21st Street on behalf of the MCDADE DTO. She distributed controlled substances, including cocaine, fentanyl, and marijuana on behalf of the DTO. BERRY was arrested on September 23, 2025, after fleeing 1512 South 21st Street. On her person, law enforcement located fentanyl, cocaine, marijuana, as well as a handgun, digital scales, hypodermic needles, many doses of Naloxone and other indicators of drug trafficking. BERRY has prior convictions of Disorderly Conduct (Date of Conviction: 10/5/2005); Manufacture/Deliver Narcotics, Conspiracy (Date of Conviction: 5/28/13); Manufacture/Deliver Narcotics, Conspiracy and Possess with Intent to Deliver Narcotics (Date of Conviction: 10/17/2012); Felony Retail Theft (Date of Conviction: 9/23/2022); Felony Retail Theft (Date of Conviction: 2/27/2023); Misappropriate ID Info (Date of Conviction: 2/27/2023). BERRY also has a pending criminal case, Milwaukee County Case 2025CF4512, which is related to her drug trafficking conduct.

26. **Cristal F. NOKES** (hereinafter "NOKES"). As recounted in more detail herein, NOKES works for the MCDADE DTO. Prior to her current incarceration, NOKES assisted in the operation of MCDADE's stash and trap houses. She was arrest with MCDADE while at the MCDADE DTO's trap house at 1425 West Greenfield. Law enforcement located fentanyl, cocaine, marijuana, as well as handguns, digital scales, hypodermic needles, many doses of Naloxone and other indicators of drug trafficking during the search of this trap house. NOKES have a prior conviction for Prostitution (Date of Conviction: 4/1/2026) and two pending matters, Waukesha County Case 2025CM616 for Bail Jumping and Possess Drug Paraphernalia and Milwaukee County Case 2025CF4893, which is related to her drug trafficking conduct.

27. **Javarius J. WILLIAMS "G"** (hereinafter "WILLIAMS"). As recounted in more detail below, WILLIAMS is a member of the MCDADE DTO. WILLIAMS assisted in the operation of a trap house located at 1512 South 21st Street and 1425 W. Greenfield Avenue. Williams was arrested shortly after leaving 1512 South 21st Street on September 23, 2025. Upon his arrest, law

enforcement located nearly $2,000 in small denominations (indicative of drug sales) as well as 1.7g of marijuana on Williams' person. In the residence, law enforcement found numerous indicators of drug trafficking as well as cocaine, marijuana, and firearms.

28. WILLIAMS' criminal history consists of the following state felony convictions: Burglary – Building or Dwelling (Conviction Date: 5-21-13), Operate Vehicle without Consent (Conviction Date: 3-6-15), Armed Robbery Threat of Force (Conviction Date: 3-6-15), Retail Theft – Felony (Conviction Date: 8-31-21).

29. Williams utilized telephones, vehicles, and residences to engage in drug trafficking and was observed by law enforcement carrying a firearm while engaging in hand-to-hand drug transactions in the alley of 1425 W. Greenfield Avenue.

30. **Kerry HOWELL Sr.** (hereinafter "HOWELL"). HOWELL is a member of MCDADE DTO and was present at trap houses where controlled substances where located and distributed, including cocaine, fentanyl, and marijuana. HOWELL was connected to the initial overdose death that began the investigation into the MCDADE DTO. Based on record jail calls, HOWELL appears to continue to drug trafficking for the MCDADE DTO while MCDADE is in custody. HOWELL's criminal history consists of Possess Drug Paraphernalia (Date of Conviction: 1/22/2025); HOWELL has pending matter in Milwaukee County Case 2024CM2006 for Possession of Cocaine and Milwaukee County Case 2024CM2791 for Possession of Cocaine and Operating While Revoked.

31. **Walter J. RINGERSMA, a.k.a. "Wally"** (hereinafter "RINGERSMA"). RINGERSMA is a member of MCDADE DTO and has been present at trap houses where controlled substances where located and distributed, including cocaine, fentanyl, and marijuana. RINGERSMA was present when over 2 kilograms of cocaine were seized at a hotel. RINGERSMA's criminal history consists of Possession of Cocaine (Date of Conviction: 08-19-2025); Operating While Under the Influence (3rd) (Date of Conviction: 09-03-2010); and Battery (Date of Conviction: 08-28-2006).

RINGERSMA has also been arrested for Maintain Drug Trafficking Place; Possession of a Controlled Substance; Possession of Illegally Obtained Prescription; Operating While Revoked; Resisting or Obstructing an Officer; Hit and Run Un-Attended Vehicle; Disorderly Conduct; Operate without a License; Child Abuse; Possession of Marijuana; Possession of Drug Paraphernalia; and Criminal Damage to Property.

32. **Alberto L. BOFFIL Jr.** (hereinafter "BOFFIL"). BOFFIL is a member of MCDADE DTO and has been present at trap houses where controlled substances where located and distributed, including cocaine, fentanyl, and marijuana. BOFFIL took over MCDADE's operation when MCDADE was arrested. Based on surveillance and record jail calls, BOFFIL continues to engaged in drug trafficking. BOFFIL has pending misdemeanor charges through the Milwaukee County Circuit Court for Battery, Domestic Abuse, and Disorderly Conduct, Domestic Abuse.

33. **Victoria T. ALLEN** (hereinafter "ALLEN"). ALLEN is a member of MCDADE DTO and is believed to obtained large amounts of controlled substances from the DTO source on behalf of MCDADE. ALLEN also appears to assist MCDADE while he is in custody to run the DTO. ALLEN has also be present near BYNUM location, where surveillance has observed drug trafficking activities. MCDADE has also discussed the large amount of money ALLEN is receiving for her illegal conduct. ALLEN's criminal history consists of Burglary, Party to a Crime (Date of Conviction: 9/14/2004); and Maintain Drug Trafficking Place, Party to a Crime (Date of Conviction: 1/12/2009).

34. **Wesley R. BYNUM** (hereinafter "BYNUM"). BYNUM is a member of MCDADE DTO and appears to operate his trap house from his residence. Case agents have observed numerous drug trafficking conduct during surveillance. Case agents have also reviewed jail calls in which MCDADE refer to BYNUM's illegal conduct. BYNUM's criminal history consists of Possession with Intent - THC (Date of Conviction: 3/7/2012); Substantial Battery, Party to a Crime (Date of Conviction 1/6/2014); and Possession of Cocaine (Date of Conviction: 4/13/2015).

35. **Otis LOCKETT III,** (hereinafter "LOCKETT"). As recounted in more detail below, LOCKETT operates a drug-trafficking organization in which he and LOPEZ, J.M.L., ABRAHAM, and ROSS engage in the distribution of controlled substances, including cocaine and marijuana from their vehicles as well as from residences located at 333 North 36th Street, Milwaukee, Wisconsin and 829 South 19th Street, Milwaukee, Wisconsin.

36. LOCKETT directed members of his DTO to engage in trafficking of cocaine and marijuana while he was incarcerated and continued to personally engage in the distribution of controlled substances upon his release from custody. LOCKETT utilizes telephones, vehicles, and residences to distribute controlled substances. LOCKETT is known to possess firearms and was recorded discussing using a firearm in furtherance of his drug trafficking offenses. LOCKETT's criminal history consists of the following criminal convictions: Manufacture / Deliver Cocaine (<=5 grams) - Party to a Crime (Date of Conviction: 09-25-2002); Possession of THC (2nd + Offense) (Date of Conviction: 10-20-2004); Possession of Firearm by Felon (Date of Conviction: 05-02-2007); Burglary – Building or Dwelling (Date of Conviction: 11-23-2009); Attempt Theft (Date of Conviction: 02-08-2013); Possession of Firearm by a Felon and Possession of THC (2nd + Offense) (Date of Conviction: 04-30-2018); and Disorderly Conduct, Domestic Abuse and Resisting or Obstructing (Date of Conviction: 07-07-2025) which he is currently serving a sentence. LOCKETT has a criminal history that includes arrests for Probation Violation, Vehicle Operator Flee / Elude an Officer, 2nd Degree Recklessly Endangering Safety, Possession of Cocaine, Disorderly Conduct, Battery or Threat to a Judge, Resisting or Obstructing an Officer, Possession of a Firearm – Convicted Felon, Manufacture Deliver Cocaine, Retail Theft, Possession of Drug Paraphernalia, Possession THC, Trespass to Land or Dwelling, Theft Moveable Property, Endangering Safety Use of a Dangerous Weapon, Carrying a Concealed Weapon, and Possession with Intent – Cocaine.

37. **Martin L. SINCLAIR (**hereinafter "SINCLAIR")**.** As recounted in more detail below, SINCLAIR distributes controlled substances from, among other places, the Blaque Bar in

West Allis. SINCLAIR was found to have deposited cash into STAIR's account, which cash was later examined by a drug-detection canine which alerted to the presence of controlled substances on the money. SINCLAIR works with other members of his DTO including L. SHEPHERD, J.S. SHEPHERD, and MCKAY to distribute kilogram-quantities of controlled substances. Sources have alerted law enforcement that SINCLAIR is a supplier of distribution quantities of cocaine, fentanyl, and marijuana.

38. SINCLAIR and vehicles associated with him have been observed engaging in behavior consistent with drug trafficking at 3261 North 30th Street. A search warrant at that residence on March 16, 2026 resulted in law enforcement finding ammunition, indicators of drug trafficking such as digital scales with drug residue as well as over 1,000 grams of cocaine, hundreds of grams of fentanyl, Oxycodone, and marijuana.

39. SINCLAIR's criminal history consists of First Degree Recklessly Endangering Safety, Use of Dangerous Weapon (Date of Conviction: 07-15-2002). SINCLAIR also has an arrests for: additional arrests for 1st Degree Recklessly Endangering Safety, 2 arrests for 1st Degree Intentional Homicide, Prohibited Possession of a Firearm, Possession with Intent Cocaine, Manufacture / Deliver Cocaine, Resisting or Obstructing the Police, Bomb Scares, Theft Carry a Concealed Weapon and Operating a Firearm while Intoxicated.

40. **Larry SHEPHERD Jr.** (hereinafter "L. SHEPHERD) work with SINCLAIR, S.J. SHEPHERD, and MCKAY to distribute kilogram-quantities of controlled substances. L. SHEPHERD and vehicles associated with him have been observed engaging in behavior consistent with drug trafficking at 3261 North 30th Street, 8501 North 107th Street, and 4358 North 65th Street. A search warrant at 3261 North 30th Street on March 16, 2026 resulted in law enforcement finding ammunition, indicators of drug trafficking such as digital scales with drug residue as well as over 1,000 grams of cocaine, hundreds of grams of fentanyl, Oxycodone, and marijuana. L. SHEPHERD's criminal history consists of Possession of THC and Possess with the Intent – Cocaine

(Date of Conviction: 1/6/2005); Felony Bail Jumping (Date of Conviction: 1/6/2005); Possession of Cocaine (2+) (Date of Conviction: 8/8/2011); Possess with the Intent – Cocaine and Felony Bail Jumping (Date of Conviction: 8/8/2011); and Possess with the Intent – Cocaine (Date of Conviction: 12/9/2022).

41. **Ser Jimmie L. SHEPHERD** (hereinafter "S.J. SHEPHERD) work with SINCLAIR, L. SHEPHERD, and MCKAY to distribute kilogram-quantities of controlled substances. S.J. SHEPHERD and vehicles associated with him have been observed engaging in behavior consistent with drug trafficking at 3261 North 30th Street, 8501 North 107th Street, and 4358 North 65th Street. A search warrant at 3261 North 30th Street on March 16, 2026 resulted in law enforcement finding ammunition, indicators of drug trafficking such as digital scales with drug residue as well as over 1,000 grams of cocaine, hundreds of grams of fentanyl, Oxycodone, and marijuana. S.J. SHEPHERD's criminal history consistent of Possession of Cocaine (Date of Conviction: 11/18/2009); Fleeing (Date of Conviction: 11/18/2009); Possession with Intent -THC (Date of Conviction: 11/18/2009); and Possession of Cocaine and THC (2+) (Date of Conviction: 10/20/2016). He also have a pending matter in Waukesha County Case 2025CM1828 for Possession of THC.

42. **Shaeerah J. MCKAY (**hereinafter "MCKAY") work with has been observed engaging in behavior consistent with drug trafficking at 3261 North 30th Street. Case agents observed MCKAY carry in items to 3261 North 30th Street that were later determined to contain controlled substances. A search warrant at 3261 North 30th Street on March 16, 2026 resulted in law enforcement finding ammunition, indicators of drug trafficking such as digital scales with drug residue as well as over 1,000 grams of cocaine, hundreds of grams of fentanyl, Oxycodone, and marijuana. MCKAY's appears to have no prior criminal convictions.

## III. Summary of Target Locations

43. **11512 West Woodside Drive, Hales Corners, Wisconsin** (**Target Location 1**) STAIR and Regina STAIR residence. MCDADE provided controlled substances to Regina STAIR at **Target Location 1**, which was captured on video. CS#2 delivered suspected contraband from MCDADE's trap house to STAIR at **Target Location 1**. From review of records, STAIR provided **Target Location 1** for the address on vehicles associated to S2 Real Estate and other business documentation. Throughout the past 4 months STAIR's phone tower communications have consistently shown that when he leaves S2 Real Estate at 2925 W Lincoln Ave, Milwaukee, Wisconsin (**Target Location 2**) in his white Tesla, which is captured on pole camera, his phone tower communications begin to leave the area as well. STAIR's white Tesla is consistently captured on pole camera arriving at his residence of 11512 West Woodside Drive, Hales Corners, Wisconsin **(Target Location 1)** along with his phone tower communications moving to the general area as well. Between the evening hours of midnight to 7 AM STAIR's phone tower communications have also shown use consistently with the towers in the area of 11512 W Woodside Drive, Hales Corners, Wisconsin (**Target Location 1)**.

44. **2925 West Lincoln Avenue, Milwaukee, Wisconsin (Target Location 2),** is the S2 Real Estate office used by STAIR, LOPEZ, and others. As described in detail below, STAIR uses **Target Location 2** to engage in the Target Offenses. DTO members provide payments to STAIR and deliver the payment to **Target Location 2.** LOPEZ has met with CS#2 to discuss drug trafficking matters at the location. Further other members of the DTO are present at various times at **Target Location 2.**

45. **333 North 36th Street, Milwaukee Wisconsin** (**Target Location 3**), used by LOPEZ, LOCKETT, and J.M.L. **Target Location 3** appears to be LOPEZ's, LOCKETT's and J.M.L.'s residence. Case agents have identified that LOCKETT DTO has engaged in drug trafficking from **Target Location 3** on several occasions. Further LOCKETT and LOPEZ have

discussed drug trafficking proceeds being stored at the location and/or in a vehicle at the location. LOPEZ, LOCKETT, and J.M.L. have also store firearms at this location.

46. **829 South 19th Street, #1, Milwaukee, Wisconsin (Target Location 4)** is used by LOCKETT and ROSS for drug trafficking. LOCKETT discussed his historical drug trafficking from this building and during the investigation, LOCKETT rented **Target Location 4,** which LOPEZ captured in a receipt. LOCKETT has also discussed his drug trafficking conduct from this location and ROSS being present at times.

47. **3923 B (Rear) S Pennsylvania Ave, St. Francis, Wisconsin (Target Location 5)** is ABRAHAM's residence. Case agents have identified that ABRAHAM has received controlled substances from J.M.L. at **Target Location 5** and further discusses distributing the controlled substances further from **Target Location 5.** Further, case agents have conducted surveillance at **Target Location 5** and have observed ABRAHAM at this location several times, as well as vehicles associated with ABRAHAM.

48. **1966 B South 11th Street, Milwaukee, Wisconsin** (**Target Location 6**), is used by BOFFIL and RINGERSMA. BOFFIL is known to residence and engage in drug trafficking at T**arget LOCATION 6.** Based on the investigation, case agents have identified BOFFIL engaged in drug trafficking from **Target Location 6.**

49. **710 South 21st Street – Upper Unit, Milwaukee, Wisconsin (Target Location 7**), is BYNUM's residence. BYNUM and ALLEN use **Target Location 7** to engage in drug trafficking. As described below, surveillance has observed BYNUM engaging in hand to hand drug transactions with other individuals at this residence. Further case agents have identified ALLEN also being in the area of **Target Location 7** and jail calls consistent with them both participating in the MCDADE DTO.

50. **2843 North 10th Street - LOWER, Milwaukee, Wisconsin (Target Location 8)** is ALLEN's residence. Case agents have identified ALLEN and ALLEN's vehicle at **Target Location 8** and traveling to other DTO location, like **Target Location 7.**

51. **1022 South 60th Street, West Allis, Wisconsin (The Blaque Bar and Bites) (Target Location 9)** is the tavern run by SINCLAIR and PIERCE. There have been numerous law enforcement drug and firearm investigation connected to **Target Location 9.** STAIR contacted SINCLAIR and PIERCE when notified by law enforcement regarding a drug investigation. SINCLAIR has been involved in ongoing drug trafficking with SINCLAIR DTO. Surveillance has provided SINCLAIR continues to access **Target Location 9.**

52. **5047 W. Jackson Park Drive, Milwaukee, Wisconsin** (**Target Location 10**), is SINCLAIR's and PIERCE's residence. Through the investigation, case agents have identified SINCLAIR's telephone appears to spend night at **Target Location 10,** consistent with it being his residence. Case agents have also vehicle associated to PIERCE and SINCLAIR at the residence.

53. **8501 North 107th Street, Milwaukee, Wisconsin (Target Location 11)** is used by L. SHEPHERD AND S.J. SHEPHERD. Based on the investigation into SINCLAIR DTO case agents believe L. Shepherd resides at **Target Location 11**. Case agents have also observed S.J. Shepherd at this location and SINCLAIR's telephone in the area. Case agents have observed drug trafficking from **Target Location 11** also during the investigation.

54. **4358 North 65th Street, Milwaukee, Wisconsin (Target Location 12)** is used by L. SHEPHERD and S.J. SHEPHERD. Case agents have observed vehicle associated with the SINCLAIR DTO at this location. Case agents have also observed suspected drug trafficking conduct outside of this location and have identified associates to S.J. SHEPHERD residing at the location and using S.J. SHEPHERD drug trafficking vehicles.

## IV. Probable Cause

### A. Background and Summary of Investigation

55. Since approximately May 2024, HSI, Drug Enforcement Administration (DEA), Wisconsin Department of Justice – Department of Criminal Investigation (DCI), West Allis Police Department (WAPD) and other local agencies have been investigating several related drug trafficking organizations (DTOs) on the southside of Milwaukee, Wisconsin that distribute fentanyl and cocaine. The DTOs are connected because they operate by renting properties from S2 Real Estate properties, with the express acquiescence and assistance of S2 Real Estate's owner, Sam STAIR and STAIR's employees. As detailed below, STAIR and his employees, including LOPEZ affirmatively seek out drug traffickers to rent them S2 Real Estate properties[1]. STAIR, and his employees rent properties specifically to drug traffickers to generate additional rental income knowing that the DTOs renting S2 Real Estate properties are engaged in drug trafficking. The DTOs pay STAIR for the properties and his assistance in evading law enforcement detection and STAIR deposits the proceeds of his unlawful drug-trafficking enterprise into bank accounts he controls. STAIR also deposits his legitimate rental income into those accounts, thereby co-mingling legitimate income with proceeds of drug trafficking in an effort to conceal the source and nature of his drug-trafficking activity.

56. Through the course of the investigation, case agents identified at least three DTOs working with STAIR including MCDADE DTO, LOCKETT DTO, and SINCLAIR DTO.

57. As part of the investigation, case agents have reviewed numerous recorded jail and prison calls, conducted electronic and physical surveillance, engaged in undercover operations, conducted controlled buys and payments, reviewed court authorized wire and electronic intercepts, and other investigative tools.

[1] As demonstrated by STAIRS social media on August 6, 2025, "the neighborhood drug dealer appreciates all the small bills you give to the corner beggers, so he can pay rent."

***Title III Interceptions Authorized***

58. On December 19, 2025, the Honorable J.P. Stadtmueller, United States District Judge, Eastern District of Wisconsin, entered an order authorizing the initial interception of wire and electronic communications to and from (414) 439-8361 (TARGET TELEPHONE 1), and initial interception of wire communications to and from (414) 639-1158 (TARGET TELEPHONE 2), used by LOPEZ. On January 16, 2026, interceptions of TARGET TELEPHONE 1 and TARGET TELEPHONE 2 were extended and were seized by case agents on February 13, 2026. Also on January 16, 2026, the Honorable J.P. Stadtmueller, United States District Judge, Eastern District of Wisconsin, entered an order authorizing the initial interception of wire and electronic communications to and from (414) 732-3682 TARGET TELEPHONE 3, used by STAIR. On February 13, 2026 and March 14, 2026, interceptions of (414) 732-3682 TARGET TELEPHONE 3 was extended and expired on April 11, 2026.

**B. STAIR and LOPEZ Drug Trafficking with S2 Real Estate**

59. STAIR owns S2 Real Estate, and several other LLCs in similar names. During the investigation into STAIR, case agents have discovered at least 43 LLC's bearing an "S2" related name. The investigation has revealed that STAIR, through his businesses owns over 150 rental properties, predominantly on the Southside of Milwaukee, which can be roughly described as the area south of the I-94 Hwy and East of Hwy 100.

60. Based on Wisconsin DFI records, and the investigation to date, STAIR is the owner and acting Chief Executive Officer of S2 Real Estate and works to manage multiple legitimate rentals for himself and others in this area. STAIR manages several properties owned by third parties. As part of his business, STAIR employs several individuals, including Jeanette LOPEZ. LOPEZ serves as STAIR's primary assistant. STAIR also employs property managers who manage rental units and collect rent. Dianne DALLAS is one such property manager, responsible for 2319 West Michigan Street, Milwaukee, Wisconsin.

61. During this investigation law enforcement conducted covert operations to determine the scope of STAIR's rental of drug-involved premises to DTOs. Case agents and local officers have received information concerning at least two confidential human sources (CS #1 and CS #2). CS #1 engaged in controlled buys with the MCDADE DTO and CS#2 conduct controlled rental for a stash house from LOPEZ and STAIR:

a. CS #1 has given information concerning individuals involved in illegal activities, which has been independently verified through this investigation. The information has been verified through controlled buys, video recordings obtained during the controlled buys, queries through law enforcement databases, and surveillance. CS #1 began cooperating with law enforcement for consideration on pending criminal drug charges in Forest County beginning in approximately March 2025. CS #1 has had past arrests or convictions for felony drug offenses, felony family support offenses, felony and misdemeanor bodily harm offenses, resisting/obstruction, traffic offenses and noncriminal retail theft offenses. Further, during CS #1's cooperation, on May 30, 2025, CS #1 was re-arrested on drug offenses by State Patrol in Outagamie County, and his cooperation ended. This drug conduct was not at the direction of law enforcement and was contrary to CS #1's cooperation agreement. Within the context of the information detailed and relied upon for purposes of this application, I believe that CS #1 is credible and that CS #1's information is reliable notwithstanding CS #1's violation of CS #1's cooperation agreement.
b. CS #2 reported to the case agents with the FBI from approximately March of 2025 to the end of May 2025. In May 2025, CS #2 began cooperating with HSI. CS #2 was initially cooperating with FBI and other law enforcement officers in hopes of receiving third-party consideration for a family member on a felony criminal matter, until May 2025. No consideration has been provided to that family member. CS #2 is now cooperating in exchange for monetary consideration. To date, CS #2 has received one monetary payment of $10,000 for CS #2's cooperation with HSI. Certain information provided by CS #2 concerning this investigation has been corroborated from external sources, including consensually recorded audio and visual recordings, and a review of information contained within law enforcement databases. CS #2 is a convicted felon and has a criminal history that includes prior misdemeanor convictions for traffic offenses, Bail Jumping, Disorderly Conduct, Possession of THC, Resisting an Officer, and Retail Theft. CS #2 has prior felony convictions for Robbery and Manufacture / Deliver Cocaine. I have discussed CS #2's cooperation with the law enforcement officer with whom CS #2 was working in exchange for third-party consideration. The officer indicated that CS #2 has provided reliable cooperation to that agency and believes that CS #2 is reliable. At no time during CS #2's cooperation with HSI have I found CS #2 to have provided false information or engaged in untruthful or deceptive behavior. As further detailed below, during controlled operations, the basis of CS #2's information has been confirmed by case agents and determined to be truthful and reliable. Further, CS #2's information is based on CS #2's own personal observations and participation in surveilled controlled operations. Within the context of the information detailed and relied upon for

purposes of this application, I believe that CS #2 is credible and that CS #2's information is reliable.

62. In August 2025, case agents met with CS#2 to speak about information concerning S2 Real Estate, STAIR and MCDADE.

63. CS#2 was familiar with the operation of drug dealers at the S2 Real Estate business and was able to ask for a rental property for use as a drug trafficking premises. CS#2 stated that STAIR was aware of the drug trafficking that was taking place, but that LOPEZ handled the logistics of rentals for drug trafficking.

64. In July 2025, STAIR provided CS#2 a $10,000 loan. CS#2 has been making payments to STAIR for that loan. STAIR currently has the title of CS-2's property as collateral for the loan. CS#2 is not behind in any payments to STAIR; STAIR to date has assumed ownership of the collateral property.

65. CS#2 explained that MCDADE was a known employee of S2 Real Estate prior to his arrest and detention. CS#2 knows that MCDADE and the owner of S2 Real Estate, "Sam" STAIR have known each other for approximately 4-5 years.

66. CS#2 detailed that approximately 4 years ago, CS#2 witnessed MCDADE asking STAIR for between $20,000 to $30,000 to purchase a kilogram of cocaine. CS#2 stated STAIR was known to use cocaine recreationally, but this was the first time CS#2 knew of STAIR financing drug dealing. CS#2 explained that MCDADE was known as a "security employee" for S2 Real Estate. CS#2 stated that MCDADE's true role was to run drug-trafficking and prostitution operations from S2 Real Estate buildings.

67. CS#2 stated STAIR has requested that CS#2 make pick-ups of packages from trap houses STAIR rented to MCDADE and deliver them to STAIR's home residence in Hales Corner, Wisconsin. CS#2 stated that in July 2025 STAIR asked the CS#2 to pick up an item from MCDADE at 1512 South 21st Street, Milwaukee, Wisconsin, which was concealed in an insulated pizza container. CS#2 believed that the container was too heavy for pizza and was consistent with being

money and/or drugs. STAIR instructed CS#2 not to inspect such deliveries. CS#2 complied and delivered this package to STAIR at his home in Hales Corner, Wisconsin.

68. In a follow up interview, CS#2 stated that STAIR paid CS#2 $2,000 cash just prior to the delivery as a payment for the task. Based on my training and experience, a payment that large for a simple delivery of a package, would be consistent with the package containing items connected to illegal drug trafficking. For example, the risk of being caught with a large amount of illegal controlled substances or illegally obtained drug proceeds would likely make individuals unwilling to assist in delivering such packages. To incentivize the risk and disincentivize theft from the drug traffickers, drug traffickers will often provide excess compensation.

69. CS#2 stated that in July 2025 STAIR dispatched STAIR to fix security cameras 1425 West Greenfield Avenue, Milwaukee, Wisconsin. CS#2 described what he observed during that visit, which included: approximately six males, all with semi-automatic firearms and extended magazines hanging from their pockets in the front sitting room; two females, MCDADE, and six additional males in the kitchen. CS#2 stated that MCDADE had an assault style rifle leaning against the wall next to him and the six males were armed in the same manner as the males in the sitting room. CS#2 observed that MCDADE was in the process of cooking approximately 250 grams of cocaine in the microwave to make crack cocaine. CS#2 also observed a Quart Pyrex measuring cup with baking soda and water. CS#2 was able to smell the substance in the microwave and was able to see and smell that the substance was cocaine. In a rear room, CS#2 also observed approximately 15 people, most of whom were female. CS#2 described that three of these women were actively smoking from glass crack cocaine pipes. CS#2 believed there was rear access to the residence from this room, and that drug customers were brought to this room through the rear door. CS#2 observed some individuals in this room were also armed with firearms.

70. CS#2 observed the cameras STAIR sent him to fix in the rear, pantry-style room off the kitchen. This room consisted of a large approximately 50 inch TV with multiple camera screens

playing live views. There was a mouse attached what CS#2 believed was the hard drive. CS#2 believed there were approximately 15 camera views playing simultaneously on the screen, which views appeared to capture the entire block. CS#2 explained that someone was monitoring the screen and appeared to be assigned to do so. Based on training and experience, the security system established at 1425 West Greenfield Avenue, Milwaukee, Wisconsin, described by CS#2, which STAIR directed CS#2 to fix, was not consistent with security for a legitimate residential property. Instead, the set-up as described by CS#2 is consistent with the protection of a drug stash house.

71. When CS#2 left 1425 West Greenfield Avenue, Milwaukee, Wisconsin, CS#2 was escorted to CS#2's car, which was parked about a block away. CS#2's escort was an armed individual from inside the residence of 1425 West Greenfield Avenue, Milwaukee, Wisconsin. CS#2's escort escorted CS#2 to CS#2's car, entered it, and was driven back to 1425 West Greenfield Avenue, Milwaukee, Wisconsin, before CS#2 left the area.

72. CS#2 knew MCDADE by the nickname of "Ro" and knew "Ro" to use the phone number of 414-439-7468 and STAIR to use 414-732-3682 (TARGET TELEPHONE 3).

73. At the direction of law enforcement, CS#2 approached LOPEZ to inquire about renting both a trap house and a stash house from STAIR.

74. On November 28, 2025, CS#2 first approached LOPEZ while CS#2 was at S2 Real Estate to do maintenance work. CS#2 reported that CS#2 and LOPEZ discussed CS#2 acquiring two "Dope spots," and LOPEZ stated that the cost would be rent plus 15% of the profits from drugs sold at the location. CS#2 stated that the conversation took place at approximately 10:20 am as CS#2 and LOPEZ walked to the gas station and LOPEZ purchased a drink.

75. Pole camera footage corroborated CS#2's account as it showed CS#2 approach S2 Real Estate on foot at 9:47 a.m., on November 28, 2025, and enter the building at 9:49 am. At 10:17 a.m. footage showed CS#2 exit the front door of S2 Real Estate and walk across Lincoln out of the view of the camera. Case agents confirmed that the location of the pole camera would not capture

the path between Case agents also observed CS#2 re-enter the building at 10:57 am and exit again at 11:08 am. Because the interaction was not planned, CS#2 was not equipped with a recording device.

76. LOPEZ's call records for TARGET TELEPHONE 1 show that she placed two outgoing calls to STAIR's telephone number (414) 732-3682 (TARGET TELEPHONE 3) using TARGET TELEPHONE 1 during the interaction discussed rental of properties for drug trafficking. The first call was placed at 10:32 a.m. and lasted 3 minutes and 23 seconds. The second call was at 10:43 a.m. and lasted 2 minutes and 48 seconds.

77. Based on my training, experience, investigation into the DTO, review of the pole camera and the call detail records, and CS#2's statement, I believe CS#2 spoke with LOPEZ regarding obtaining two locations to rent from STAIR / S2 Real Estate for drug trafficking, specifically "girl" (which I know is a slang term CS#2 uses for cocaine). I believe that following the conversation between LOPEZ and CS#2, LOPEZ contacted STAIR to further discuss CS#2's request for drug trafficking rental properties with STAIR. This belief is further supported by later recorded calls between CS#2 and LOPEZ outlined below. Further, I believe that the calls from LOPEZ to STAIR are also consistent with LOPEZ requiring STAIR's approval for rentals for drug-trafficking purposes. I believe that STAIR and LOPEZ are knowingly renting properties to individuals for the purpose of storing, selling, and using controlled substances. Further, I believe STAIR and LOPEZ are profiting from the drug traffickers' illegal conduct. As the investigation continued, case agents also learned LOPEZ would charge extra fees to locate the best stash / trap houses that would assist in evading law enforcement, as further below.

78. On December 1, 2025, at the direction of the case agents, CS#2 arranged a meeting with LOPEZ at S2 Real Estate, to further discuss the rental of a drug trafficking house (trap house) and stash house (location to store large amounts of controlled substances). This meeting was audio recorded using a covert recording device. Case agents conducted surveillance at S2 Real Estate during the interaction and heard audio of the conversation in real-time.

79. The recording captured CS#2, STAIR, LOPEZ and another individual discussing building maintenance issues that CS#2 had been dealing with and other rental business matters. During the conversation, LOPEZ made a joke about the only line on a credit card being cocaine. At approximately 12:51 pm, CS#2 and LOPEZ exited the building to discuss the drug trafficking business. Once outside, CS#2 confirmed with LOPEZ that there were no cameras outside of S2 Real Estate (CS#2 previously informed case agents that S2 Real Estate is equipped with cameras that record video and audio). The following is an excerpt of the CS#2's consensually recording conversation between CS#2 and LOPEZ:

**LOPEZ**: We're good. Alright, we're good.
**CS#2**: But ….(unintelligible) on his way either tonight or tomorrow. That's today.
**LOPEZ**: Okay.
**CS#2**: (unintelligible) – two spots
**LOPEZ**: I thought we're gonna start with one
**CS#2**: Where am I gonna stash my shit? At a hotspot. What the fuck?
**LOPEZ**: Right.
**CS#2:** I need a safe spot. Something safe. I don't care, you know. We'll pay you. You…I don't have a problem with that.
**LOPEZ**: I have a place, buddy. Yeah, I think, I think we should put it over. Yeah, I got place call.
**CS#2**: Call me tell me how much I need?
**LOPEZ**: Okay. Address is…Yeah, call me. That's what I said. Let me…
**CS#2:** I know you have another number.
**LOPEZ**: Uh, that's the number. Call it. We're talking business now. We're talking money. I'll answer.
**CS#2**: So anyway, listen you want 15 % powder or cash.
**LOPEZ**: It depends. It depends on how good it is because I got, I mean, I could do, I could do either or…
**CS#2**: but this motherfucker, he gonna shut me up in the middle of my operation. And should we just shut him off?
**LOPEZ**: No, we'll be good.
**CS#2**: Sure?
**LOPEZ**: I'm sure.
**CS#2**: He's not gonna fuck me up, right?
**LOPEZ**: No.
**CS#2**: ..he does. I'm get on your ass. Alright.
**LOPEZ**: Talk to you later.

80. Based on my training, experience, and investigation into the DTO, I believe this conversation involved LOPEZ renting CS#2 a trap house ("hotspot") where CS#2 could sell drugs and a stash house where CS#2 can store large amounts of drugs. I further believe that during this

call, LOPEZ and CS#2 discussed an additional payment LOPEZ would receive for allowing CS#2 to engage in drug trafficking at the S2 Real Estate properties and whether LOPEZ wanted that payment in cash or in cocaine (referred to as "powder," which I know is a slang term used by drug traffickers to refer to cocaine that is of a higher purity and not yet mixed or "cooked" with other substances. I know, based on my training and experience, that higher purity cocaine allows drug traffickers to cut or cook the powder cocaine with another substance and, therefore, turn a higher profit. Therefore, I believe that LOPEZ's question concerning the quality of the powder cocaine ("how good") showed LOPEZ's knowledge that cocaine purity equates to profitability. Further, I believe that CS#2's reference to "motherfucker" referred to STAIR and CS#2's concerns that STAIR would stop CS#2 from drug trafficking in STAIR's properties. Based on my training, experience, discussions with CS#2 and investigation into the DTO, I believe that LOPEZ's reassurance that STAIR would not shut down the operation is because of STAIR's knowing involvement in the renting S2 Real Estate properties for drug trafficking operations. That belief is also based on other communications involving LOPEZ, as further described below.

81. On December 1, 2025, at approximately 6:31 p.m., at the direction of case agents, CS#2 contacted LOPEZ at TARGET TELEPHONE 2. CS#2 attempted to call LOPEZ twice and then texted LOPEZ at TARGET TELEPHONE 2. At approximately 6:43 p.m., LOPEZ called CS#2 using TARGET TELEPHONE 2, as confirmed by pen register/trap and trace data. This call was received in the presence of case agents and recorded. During the telephone call, LOPEZ and CS#2 further discussed their drug trafficking operations, including possible locations for the trap house and stash house, as outlined in the below paragraphs. This call began with LOPEZ discussing a few places she believed would be good for CS#2 to engage in drug trafficking:

> **LOPEZ**: Yeah, I was thinking about it. I got maybe a couple places you guys, they can go take a look at tomorrow and then just check out the scenery where and see what they think before they jump into something, you know?

82. Based on my training and experience, I believe LOPEZ was discussing CS#2 and CS#2's drug-trafficking partner going to view rentals she has picked out (e.g., "I got maybe a couple places you guys…") to determine their suitability for drug trafficking (e.g., "they can go take a look at tomorrow and then just check out the scenery"), prior to setting up a trap house and stash house (e.g., "see what they think before they jump into something"). I believe this is consistent with LOPEZ's later statements described below, discussing "Ro" [MCDADE] drug trafficking in the same area, but warning CS#2 to conduct his drug trafficking business discretely (e.g. "No, not really. 'cause you're in that, you hear what I mean? But you, they just can't be sloppy, you know?"). CS# 2 and LOPEZ arranged for CS#2 to obtain keys the following day for different S2 properties for CS#2 to tour as possible locations for CS#2's drug trafficking operation. During the same call, LOPEZ discussed a location for the stash house near 23rd Street and College Avenue, Milwaukee, Wisconsin and indicated it would be a good location:

> **LOPEZ:** Oh, okay. Yeah. So I think that'll be the safest 'cause it'll be close to you. Easy access.
> **CS#2:** Yeah. It's a quiet spot.
> **LOPEZ**: Right?
> **CS#2:** Yeah, it is.

83. Based on my training, experience, and investigation into the DTO, I believe LOPEZ discussed the location as being the "safest" because it is close to where LOPEZ believes CS#2 lives, which is why LOPEZ stated it would provide CS#2 with "easy access" to be able to conveniently bring large amounts of controlled substances to the stash house. I also believe that CS#2's confirmation of that location being a "quiet spot" is consistent with the use of the location as a stash house because, based on my training and experience, stash houses are typically best situated in locations with fewer people coming and going because that decreases the risk of negative attention from neighbors and/or law enforcement.

84. During this same call via TARGET TELEPHONE 2, LOPEZ also discussed placing the trap house in a "high traffic" area, but and warned CS#2 that "basically people are watching, so

you gotta to be careful." Based on my training, experience, and investigation into the DTO, I believe this statement is consistent with LOPEZ warning CS#2 that law enforcement heavily patrols the area of this potential stash house. LOPEZ and CS#2 continued:

> **CS#2**: Oh yeah, I got on that part. I'm cool on the security part, but you know, I just need, I just need the people in
> **LOPEZ**: Remember the guy that was over on Greenfield.
> **CS#2**: Huh?
> **LOPEZ**: Remember the other guy that was over in Greenfield? I had you go over there a couple times.
> **CS#2**: Oh yeah,
> **LOPEZ**: Yeah. Well, yeah, he, they got all like all two, like three of his spots.
> **CS#2**: How …? I mean, am I gonna have problems with them.
> **LOPEZ**: I dunno how I stopped fucking with them. So I dunno how, but I know they did.
> **CS#2**: Okay. But I'm saying, uh, you know, we're not gonna have a problem with these people. Right. They're just, nobody gives a shit.
> **LOPEZ**: No, not really. 'cause you're in that, you hear what I mean? But you, they just can't be sloppy, you know?
> **CS#2**: Okay, I got you.
> **LOPEZ**: So, Yeah. So,…. tomorrow….
> **CS#2**: You're talking about where Ro was?
> **LOPEZ**: Yep.
> **CS#2**: Okay. Hey, that's a nice. Hey, nice, nice spot.
> **LOPEZ**: I was like, it's that spot. But if you don't want that one, there's one right across the street basically in the back. It's a little one bedroom. It's that one. Uh, 'cause they don't need something too big, you know what I mean?
> **CS#2**: No, no, not at all. Just doesn't even, I'm not gonna even have the crowds either.
> **LOPEZ**: Right. So basically, but it's a good, a good area, you know.
> **CS#2**: Okay.
> **LOPEZ**: Easy access.

85. Based on my training, experience, and investigation into the DTO, I know that the "guy on Greenfield" and "Ro" to be a reference to MCDADE and his operation of a trap house at 1425 West Greenfield Avenue. That CS#2 and LOPEZ's discussion about the "other guy on Greenfield" was about MCDADE is further confirmed by the fact that on October 14, 2025, MCDADE was arrested on drug offenses during an Milwaukee Police Department (MPD) drug-related search warrant executed at 1425 West Greenfield Avenue. During the execution of that search warrant, STAIR, who owns the property, also responded and stated that, in addition to owning 1425 West Greenfield, he also managed a property across the street that his brother owned.

STAIR also provided several names of individuals who were supposed to be renting 1425 West Greenfield Avenue during that time and none were MCDADE, though the investigation demonstrated STAIR was aware that MCDADE was renting that location.

86. Based on my training, experience, and investigation into the DTO, I believe LOPEZ discussed that the new potential trap house for CS#2 was located near MCDADE's old trap house. I further believe that LOPEZ told CS#2 that this is a desirable area for CS#2 to establish a trap house because of drug customers' historic familiarity with the area due to MCDADE's use of 1425 West Greenfield Avenue to sell drugs.

87. At the end of the conversation, CS#2 and LOPEZ discussed STAIR's awareness of the CS#2's rental of the properties for drug trafficking::

> **CS#2**: Cool. Hey, so yeah, one more thing. Like the money for the, for the rent and the deposit. Do I give it to you or just I bring it, you know, do I give it to him? To Sam?
> **LOPEZ**: It'll be the same thing with Sam.
> **CS#2**: Oh, okay. So either give it to you or him, it wouldn't matter.
> **LOPEZ**: Well, yeah, the same thing. We'll go through Sam the same thing. I mean he doesn't, you know.

88. Based on my training, experience, and investigation into the DTO, I believe these statements are consistent with STAIR knowingly engaging in renting properties for the purpose of drug trafficking because LOPEZ describes making the payments to her or to STAIR as being "the same thing" and confirms that CS#2 can provide payment to LOPEZ or STAIR interchangeably ("So either give it to you or him, it wouldn't matter"). Further, when this portion of LOPEZ and CS#2's conversation is considered in light of LOPEZ's earlier statement during their in-person meeting that LOPEZ would accept the 15% drug-proceed profit in cash or cocaine, I believe LOPEZ's statement that paying STAIR is the same as paying her is affirming that STAIR will also accept payment in drugs.

89. On December 2, 2025, at the direction of case agents, CS#2 went to S2 Real Estate and obtained keys to tour two rental properties for CS#2's drug trafficking operations. CS#2 later

called LOPEZ at TARGET TELEPHONE 2 to discuss the rental price. This call was done in the presence of law enforcement and was consensually recorded. I verified that this call occurred using TARGET TELEPHONE 2 by reviewing the pen register/trap and trace data for TARGET TELEPHONE 2. During the call, LOPEZ is heard speaking to someone, whom I believe to be STAIR given her referencing Sam to CS#2, in the background.

**CS#2**: Hey Jeanette.
**LOEPZ**: Hey what's going on?
**CS#2:** (Unintelligible) Right. Yeah, I checked them out. It's nice. I liked it.
**LOPEZ**: I thought so.
**CS#2:** So hey, what is the ticket on that?
**LOPEZ**: Um, take a look real quick. (typing) $725 over which, let me ask what, him, the deposit be like, probable be like, hm, $200 more.
**CS#2**: Ok.
**LOPEZ**: What do you say?
**CS#2**: That's fine. Together, how much it is? Let me know, so I can get the money together.
**LOPEZ**: Oh, okay, okay, let me ask (unintelligible). Because we have a lot of vacancy, that place has be vacant for all time, so I don't think that we post it. (Unintelligible) [CS#2]'s cousin in the little one bedroom on 14th and Greenfield – right?
**CS#2**: Yeah.
**LOPEZ**: It's been vacant, the crackheads just broke in last night, busted the window (unintelligible) brand new window. Um, it's been vacant for months. But [CS#2] has a cousin that he said, um, would take it. Yea. Sam said great.
**CS#2**: Cool.
**LOPEZ**: Ok.
**CS#2**: And, a, hey.
**LOPEZ**: Um.
**CS#2**: Together the one on 23rd and College.
**LOPEZ**: Oh, I don't know, I'm going to ask (unintelligible). I didn't see what that was. So, probably for you, cause they want 1100 for it, but for one of them I'll have them give it to you for $1000 a month.
**CS#2**: Okay.
**LOPEZ**: Let me do, let me talk to, Sam just said yeah. So, I'll talked to (unintelligible) and let her know and send you the numbers.
**CS#2:** Okay. You just text me. Tell me the numbers so I'll, I'll be able to get it together and come see you.
**LOPEZ**: Yep. Okay.
**CS#2:** Appreciate Jeanette, I'll see you soon.
**LOPEZ**: No problem.

90. Based on surveillance, I believe STAIR and LOPEZ were located at S2 Real Estate building at the time of the call. Based on the investigation into the DTO, I am aware that inside the S2 Real Estate building it is equipped with surveillance cameras that record audio and video. Based

on conversations with CS#2 and observations made during the investigation, I believe that members of the DTO limit conversations regarding their illegal conduct inside S2 Real Estate building due to this surveillance system and the presence of other individuals. Further based on my training, experience, and investigation into the DTO, I believe that STAIR is very cautious when discussing illegal matters over the phone or around other individuals while at S2 Real Estate. CS#2 also told case agents that, following MCDADE's arrest, STAIR became more cautious with his illegal drug trafficking operation. Therefore, I believe that LOPEZ's statement that a "cousin" wanted to rent the property is a purposeful falsehood by LOPEZ and STAIR to cover up the real purpose of the rental, to be a trap house for CS#2. This is consistent with LOPEZ's prior recorded call with CS#2, when LOPEZ indicated CS#2 could pay with cash or cocaine and that CS#2 could pay LOPEZ or STAIR. I am aware that, as part of CS#2's story to LOPEZ for the rentals of the drug operation, CS#2 identified having a drug trafficking partner. Further, based on my investigation and review of the conversations between CS#2 and LOPEZ, I believe that STAIR authorizes LOPEZ to rent properties to drug traffickers in return for additional fees.

91. Based on my training, experience, and investigation into the DTO, I believe that LOPEZ confirmed that STAIR had approved that CS#2's "cousin" could rent the property on Greenfield Avenue ("Sam said great!"). I believe that LOPEZ also stated that STAIR approved the rental price of $1000 per month for the second drug rental property ("Sam just said yeah."). I further believe that this shows that LOPEZ and STAIR work together to knowingly rent properties for the purpose of drug trafficking.

92. On December 3, 2025, CS#2 texted LOPEZ at TARGET TELEPHONE 2 regarding the stash house, which was consensually recorded by case agents. CS#2 texted TARGET TELEPHONE 2 at approximately 6:06 PM about bringing the cash to rent the location and "can you keep them listed as vacant with no name on it?" At 7:46 PM, CS#2 texted LOPEZ at TARGET TELEPHONE 2 "?" TARGET TELEPHONE 2 texted back "I'm not sure how we'll do that we'll

just tell Sam they don't have papers so they can't put in a name." I verified that these electronic communications occurred with TARGET TELEPHONE 2 by reviewing the pen register/trap and trace data for TARGET TELEPHONE 2.

93. I believe the message from LOPEZ further demonstrates STAIR directing the rental of the stash house and demonstrates STAIRS's efforts to evade law enforcement, which include requiring DTO members to provide a renter's name and sign paperwork for rentals I believe STAIR requires DTO members to do this in order for STAIR to evade law enforcement. This is consistent with information provided by CS#2, prior messages between STAIR's telephone TARGET TELEPHONE 3 and MCDADE's phone seized during his arrest, described in more detail below.

94. On December 4, 2025, at the direction of case agents, CS#2 met with STAIR to provide a cash payment for the stash house that CS#2 arranged to rent from STAIR through LOPEZ. The stash house's address is 6290 South 23rd Street, Apartment 8, Milwaukee, Wisconsin (hereinafter "23rd Street House.") CS#2 was equipped with recording equipment and provided with pre-marked money to provide to STAIR during the meeting. Case agents conducted surveillance of CS#2 and observed CS#2 enter the S2 Real Estate building. Based on the recording and information later provided by CS#2, I am aware that there was another unknown individual at S2 Real Estate building during the meeting. Based on my training and experience, and the investigation to date, I believe that STAIR is cautious about discussing the drug-trafficking portion of his business in front of uninvolved persons and that, as a result, STAIR used coded and vague language during this interaction.

95. For example, when CS#2 spoke with STAIR about making payment for the 23rd Street House, STAIR stated he was doing a bachelor pad in the basement of that location. Based on my training, experience, and investigation into the DTO, I believe that STAIR made this statement to disguise the illicit nature of the CS#2's rental of the residence. Similarly, when CS#2 indicated to STAIR that CS#2 had been making arrangements with "Jeanette" regarding the 23rd Street

House, STAIR discussed his management of the building and asked if the payment was for "April Moore," implying that “April Moore” would be renting the apartment. Shortly after, STAIR stated, “I just put her in on 37th Street.” Based on my training, experience, and investigation into the DTO, I believe given the presence of another person at the S2 Real Estate building, and STAIR’s general caution when discussing drug trafficking matters, STAIR provided a false name for the renter of stash house (“April Moore”).

96. CS#2 and STAIR then discussed the location and payment. STAIR asked, “Who is the person moving in?” CS#2 told STAIR to speak with LOPEZ regarding the 23rd Street House. STAIR stated, “Ok.” CS#2 then stated, “…you know, no paperwork (unintelligible).” STAIR responded, “We just need, I mean, I don’t care, we just need their name and contact number and stuff.” CS#2 stated again no papers. STAIR suggested that that CS#2 put the residence in CS#2’s name and laughed. Based on my training and experience, there would be no reason to laugh about putting a rental in CS#2’s name if the rental was being used for legitimate purposes. CS#2 responded to that suggested by saying “No you don’t…,” “No…,” and "Hell no." Based on my training and experience, I know that those engaged in criminal conduct will often use false names for trap houses, stash houses, or other locations used for drug trafficking in order to evade law enforcement detection and to distance the drug trafficker from the location. Given STAIR’s lack of surprise to CS#2’s adamant refusal to use his own name as well as STAIR’s laughter at his own suggestion to that effect, I believe that this conversation makes it clear that STAIR is aware that CS#2 intends to use the 23rd Street House for illegal purposes.

97. STAIR then further confirmed his knowledge about the use of this property by asking CS#2 if “they got money” and telling CS#2 not to "fail" STAIR. Given CS#2’s explicit conversation’s with LOPEZ about CS#2’s plan to use these properties for drug trafficking with another individual, I believe STAIR’s reference to “they” refers to CS#2’s drug trafficking partner

and STAIR's reference to not "fail[ing]" refers to having a successful drug-trafficking operation to allow for payment to STAIR.

98. At approximately 5:10 pm, CS#2 left the S2 Real Estate building. Once outside, CS#2 received a call from STAIR from TARGET TELEPHONE 3. Only CS#2's side of the conversation could be heard by case agents. CS#2 later told case agents that STAIR discussed having someone sign paperwork for the 23rd Street House. On the recording, CS#2 can be heard telling STAIR that CS#2 will speak to "Jeanette" [LOPEZ].

99. At the direction of case agents, CS#2 texted LOPEZ at TARGET TELEPHONE 2 after the meeting with STAIR, which was consensually recorded by case agents. STAIR wrote: "I just paid Sam for the apt on 23rd and college he is asking about a name I told him I'll talk to you, let me know when to pick up the key so I could put my stash in." CS#2 then followed up with a call to LOPEZ at TARGET TELEPHONE 2. This text message and call were placed in the presence of law enforcement and were recorded.

100. During the call with LOPEZ, CS#2 confirmed payment for the 23rd Street House and discussed that STAIR "tried to push" for a name for the location, but CS#2 told STAIR to discuss the matter the LOPEZ. CS#2 confirmed the agreement that no names would be listed to the location, noting: "just like you said, no paper". CS#2 also discussed that STAIR indicated CS#2 "should make up a name". CS#2 stated that CS#2 would leave that up to LOPEZ. LOPEZ stated, "okay, okay." CS#2 also discussed not feeling safe with "it" and "stuff" at CS#2's residence and that CS#2 wanted to place it at the 23rd Street House. LOPEZ responded, "kay, for sure. Pick it up tomorrow." Based on my training, experience, and investigation into the DTO, I believe that CS#2 conveyed to LOPEZ that CS#2 wanted to take possession of the 23rd Street House quickly because CS#2 did not want to store controlled substances at CS#2's home and that this call indicated LOPEZ's knowledge of the intended use of the property for purposes of drug trafficking given the discussion of "it" and "stuff"

as referring to controlled substances and the request that no names connecting CS#2 would be on the paperwork associated with that residence.

101. On December 5, 2025, at approximately 9:07 AM, CS#2 texted LOPEZ at TARGET TELEPHONE 2 regarding the 23rd Street House. CS#2 messaged, "Hi Could I pick up the key on Monday". This text message was placed in the presence of law enforcement and was recorded. I verified that this message was sent to TARGET TELEPHONE 2 and preserved the text messages from CS#2's phone. LOPEZ on TARGET TELEPHONE 2 then called CS#2 at approximately 9:19:40 AM. This call was received in the presence of law enforcement and was recorded. I verified that this call occurred using TARGET TELEPHONE 2 by reviewing the pen register/trap and trace data for TARGET TELEPHONE 2. During the call, LOPEZ stated that she no longer wanted to speak in call or text. LOPEZ indicated that she and CS#2 should only speak in person in the future. LOPEZ added that she is very careful and covers her tracks.

102. Based on my training, experience, and investigation into the DTO, I believe that LOPEZ's statements are consistent with LOPEZ's knowledge that she and CS#2 are discussing setting up and operating a drug involved premises and the need to speak face-to-face to thwart law enforcement's ability to investigate her crimes. I am aware through my investigation into the DTO that MCDADE has shared his knowledge of law enforcement investigative techniques with DTO members. I believe that it is likely that that LOPEZ and STAIR are aware of the possibility of a police investigation, particularly given MCDADE's arrest, and, thus, are very cautious in how they handle their drug trafficking operations.

103. Case agents reviewed call/text detail records between STAIR's telephone TARGET TELEPHONE 3 and TARGET TELEPHONE 1 for December 5, 2025. During the time LOPEZ was communicating with CS#2 on TARGET TELEPHONE 2, LOPEZ appeared to also be texting with STAIR using TARGET TELEPHONE 1. Starting at approximately 9:04:37 am, TARGET

TELEPHONE 1 texted STAIR's TARGET TELEPHONE 3. At 9:09:07 am and 9:09:21 am, TARGET TELEPHONE 1 received text messages from STAIR's TARGET TELEPHONE 3.

104. On December 8, 2025, CS#2 met with LOPEZ at S2 Real Estate to obtain the keys to 23rd Street House. CS#2 was equipped with a hidden recording device. HEISEL was also present. Based on my training, experience, prior surveillance of HEISEL, and the conversation between LOPEZ, HEISEL, and CS #2, on this date, I believe HEISEL is assisting LOPEZ in the DTO by ensuring CS #2 is not working for law enforcement and searching CS #2 for a possible wire.

> **HEISEL**: Do you mean? I I've seen you since Thanksgiving. Did you had on the, the flasher trench?
> **CS #2**: Come on, guys. With that coat, with that shit.
> <laugh>.
> **CS #2**: Why is you so obsessed with that. I'll wear it. Okay. I'll wearing a this.
> **LOPEZ**: That's his police coat. Yeah, that's why
> **HEISEL**: <laugh>. And I see the red light. That's on the top of your head.
> **LOPEZ**: That's where he wore his wire. <laugh>. That his wire.
> **HEISEL**: Jeanette....What'd you say?
> **LOPEZ**: The fuck (unintelligible) No. Okay.
> **Unidentified Female Voice**: Hey, I know, well, you know I worked at Maintenance, right? I'm a whole different department than rental. Right. So they don't communicate until they're after.
> **LOPEZ**: So, so you want a 6290 number eight or five ... you want eight? Okay, that's fine. But did you look at eight? Oh, okay. I just wanted to make sure. Okay. We're good with that, it needs a stove I think.
> **CS #2**: Really? Do I look like I need a stove?
> **LOPEZ**: you look like it, you eat a lot. Definitely. Okay. All right. No, no, no problem. Uh, but that's not the issue. The issue is they rented the 14th and Greenfield to somebody. Yes. That's the issue. I didn't, they just did it on Friday. I didn't find out..(mumble)
> **CS #2**: Why?
> **LOPEZ**: I don't know. I just went and checked it to the other there. I don't know. .... Yeah. So that's what I wanna talk to you about. Sure. So make sure he ain't got no wire Ron. Search him first <laugh>.
> **CS #2**: Who wants to see my tity's?
> **LOPEZ**: Okay.
> **CS #2**: You want to see my titty's?
> **HEISEL**: you got a hair wire, asshole, Asshole.
> **CS #2**: That like, she wants to see titties. Okay. It's not, Hey, come on now. Don't like,
> **HEISEL**: Hey, it look like you have Badger fur. <laugh>.
> **CS #2**: Hey, look, your guys not here. I wouldn't be able to do that if he was here <laugh>,
> **LOPEZ**: but, okay. So, yeah. Um, so I wanted to know, um, if you wanna look at something else? I got someone else
> **CS #2**: right now. I need to get that outta my head.
> **LOPEZ**: Okay.

**CS #2**: Scared the shit outta me.
**LOPEZ**: All right, cool. So let me get you the keys for that then. Okay? Yep. And then what's his name? Just make up a name Sam said.
**CS #2**: Just tell him Mohammad, okay.
**LOPEZ**: Write it on the application. Mohammad. I don't know. Abdul just write it. He said, that's what he told me.
**Unknown Male Voice**: Labooboo, Labooboo
**CS #2**: Fucking Asshole. What you just <laugh>?Okay. On just do it for me please. It's not like I have, listen, it's not like I have every day, all day coming in here, <laugh>.
**LOPEZ**: Really? Is that a fucking doll?
**Unknown Male Voice**: No, that's, that's a, that's an Indian name.
**LOPEZ**: Oh, well LABOOBOO it is name? Yeah. Oh, well Labooboo it is.
**HEISEL** appears to be speaking in the background to someone else and states: I did that after Thanksgiving.
**LOPEZ**: Labooboo it is. I, I don't know. Just he gonna give you the name right now. Okay.
(Unintelligible speaking - Jeanette Appears to yell something in Spanish)
**LOPEZ**: Ron, Can you get keys for 6290 number eight for, honestly,
**HEISEL**: Honestly....were you the one that had it on hold? On the board? It says hold.
**LOPEZ**: No, that's five. I wrote five, but I didn't know he chose eight. So just put eight if he needs to take or eight. He already paid all the money.
**CS #2**: I'm only put a couch.
**LOPEZ**: No problem.
**CS #2**: Couple chairs. Oh my goodness.
**LOPEZ**: Okay. Labooboo it is. All right. 6290. Is that the first name or last name? .
**CS #2**: You signed Labooboo for me.
**Unknown Male Voice**: Doll Labooboo is first name. Doll last name
**LOPEZ**: We need, we need a last name it to
**CS #2**: gimme Indian name.
(During this portion of the recording there are multiple people speaking at the same time, case agent typed only statements that were clearly heard.)
**HEISEL**: It's just put it on there, please.
**LOPEZ**: It's a doll. there you go Labooboo. Muhammed Labooboo, Labooboo Muhammed
**CS #2**: Yeah. Just put on, I put the address on there.
**LOPEZ**: Perfect. Sounds great.
**CS #2**: Alright. Anyway, Allah I'll, uh, lemme get situated.
**LOPEZ**: Alright. And Ron is, getting me the keys.
**LOPEZ**: Yes. Thank you. I you, oh, there it go. <laugh> sign the Labooboo. Really? Boo.
**CS #2**: Fuck
**LOPEZ**: yeah. Here, here, you can sign for Labooboo.
**LOPEZ**: We're happy, right?
**CS #2**: Yeah. And then, uh, excuse me, um,
**HEISEL**: (it appears he speaking again to someone else) Gabriel not even going finish there. Welcome. Just running back.
**CS #2**: What the hell is this? .
**HEISEL**: Mailbox.
**CS #2**: Oh, hey, I got a mailbox. <laugh>.
**CS #2**: Thank you guys, see you guys later, bye.

105. Based on my training and experience, and investigation into the DTO, I believe that HEISEL's conduct demonstrates his knowledge of, and active participation in, LOPEZ's criminal conduct in renting S2 properties for the purpose of drug trafficking. I believe this because (1) HEISEL is present for the interaction between LOPEZ and CS #2; (2) HEISEL did not question the need to pat down a property renter for a government wire; (3) HEISEL did not ask why a property renter would not need a stove at the rental house; (4) HEISEL did not ask why the property renter (CS#2) needed more than one rental location; (5) HEISEL voiced HEISEL's own concerns that CS#2 is cooperating with law enforcement ("Did you had on the, the flasher trench?" and "That's where he wore his wire. <laugh>. That his wire."); (6) HEISEL's statements occurred during the same discussion wherein LOPEZ also expressed concerns regarding a possible government wire ("That's his police coat. Yeah, that's why" and "That's where he wore his wire. <laugh>. That his wire.") ; (7) prior surveillance observed HEISEL at a trap house owned by S2 Real Estate and rented by MCDADE; (8) HEISEL was present while LOPEZ and CS#2 discussed CS#2 using a fake name to rent the S2 property and HEISEL encouraged LOPEZ to use the name "Labooboo" ("It's just put it on there, please."). HEISEL then appeared to obtain the key for the stash house as directed by LOPEZ for CS#2 ("Alright. And Ron is, getting me the keys."); and (9) when CS#2 questioned the smaller key provided, HEISEL noted that it is the mailbox key, at which point, CS#2 made a joke about the mailbox ("Oh, hey, I got a mailbox. <laugh>."), again demonstrating CS#2's lack of intent to use for this property for a legitimate purpose. Notably, although HEISEL and LOPEZ laughed when discussing whether CS#2 was wearing a wire, I believe that HEISEL and LOPEZ were not joking about this concern because covering a serious issue with laughter is a common tactic utilized to diffuse such situations. CS#2 advised me that CS#2 was so concerned about being caught with the recording device that CS#2 lifted CS#2's own shirt to expose CS#2's bare chest, so to discourage HEISEL from physically touching CS#2 and locating the recording device. In the moment, CS#2 attempted to make a joke of LOPEZ and HEISEL's discussion of government wires; however, CS#2

believed LOPEZ and HEISEL were genuinely concerned that CS#2 was cooperating with law enforcement. For all of these reasons, I believe that HEISEL is aware of the purpose behind LOPEZ's transaction with CS#2 and the fact that CS#2 was renting the S2 property for illegal purposes, thereby necessitating checking CS#2 for wires.

106. Throughout the subsequent months CS#2 made two more payments to LOPEZ to keep this rental and two more payments of 15% at $2,500.00. LOPEZ and CS#2 discussed the prices of kilogram quantities of cocaine, cocaine suppliers, and the rationale for the 15% fee being $2,500. During these transactions, LOPEZ stated that she also used the $2,5000 to make utility payments. At one point, LOPEZ told CS#2 that STAIR was not aware of the additional 15% payment she was receiving. These interactions will be further explained in the following portions of the affidavit.

107. Further, case agent intercepted additional communications with LOPEZ engaged in renting drug trafficking locations. On January 8, 2026, at approximately 1:40 p.m., LOPEZ, at TARGET TELEPHONE 1, received a call from Amer S. Qadan (DOB: 5/8/1997). QADAN using (414) 241-4556. QADAN was asking LOPEZ if S2 Real Estate had a property in West Allis he could rent, stating, "I need my side house." LOPEZ advised QADAN that "West Allis is the wrong place to have a stash." QADAN eventually stated, "I ain't finna sleep there…" LOPEZ advised she would let QADAN know.

108. Based on training, experience, and the investigation into the DTO, I believe QADAN was trying to rent a S2 Real Estate property for the purpose of drug trafficking. Based on my training and experience, I know drug traffickers often use the term "stash" to refer to controlled substances. Therefore, I believe the statements of QADAN ("I need my side house" and "I ain't finna sleep there…") and LOPEZ ("West Alls is the wrong place to have a stash"), are consistent with QADAN looking for a location to store controlled substances. Further, during the call LOPEZ appears to discourage QADAN from using a location in West Allis for his "stash". It is important to note that

this intercepted call came following WAPD contacting S2 Real Estate regarding possible drug complaints at Blaque Bar, located in West Allis (occurred January 5, 2026).

***Investigation into STAIR's involvement in renting places for drug trafficking:***

109. On January 19, 2026, CS #2 conducted a controlled meeting with LOPEZ at S2 Real Estate, 2925 W. Lincoln Avenue, Milwaukee, Wisconsin, at the direction of case agents. At approximately 9:44 a.m. LOPEZ, using (414) 763-0128 (an S2 Real Estate business line), called CS#2. CS#2 answered and advised LOPEZ that CS#2 would be at S2 Real Estate in a few minutes. Case agents viewed the call log on CS #2's cell phone and verified the time of this call and the telephone number from which LOPEZ called. Case agents followed CS #2 directly to S2 Real Estate. At approximately 9:56 a.m. case agents established surveillance near S2 Real Estate. At approximately 9:59 a.m. CS #2 parked in front of S2 and entered inside S2 Real Estate. CS #2 had a consensual recorded transmitter, which allowed case agents to hear the conversation between CS#2 and LOPEZ inside the business. In addition to LOPEZ, a female named Emily, an Indian Female (unknown name), that CS#2 knows to work in the office, and an Indian male (unknown name) were present. CS#2 asked LOPEZ if STAIR knew of the deal that had been worked out between LOPEZ and CS #2 for a stash house. The recording did not pick up this portion of the conversation, but LOPEZ told CS#2 that STAIR was not aware of the 15% payment CS #2 was making towards the stash house apartment located at 6290 S 23rd St, Milwaukee, Wisconsin. CS#2 stated that CS#2 needed to know this because CS#2 was planning to bring the money to STAIR and to ask STAIR to help finance the purchase. Based on the previous conversations, it is inferred that the purchase being discussed are kilograms of cocaine. LOPEZ advised CS#2 that she did not believe STAIR would do this. LOPEZ and CS#2 then agree to meet the following day, at which point CS#2 would pay the rent and 15% payment. LOPEZ advised that she took care of the electric. At approximately 10:03 a.m. CS #2 exited S2 Real Estate, entered CS #2's vehicle, and departed the area.

110. On January 19, 2026, at approximately 10:22 a.m. CS#2 placed a recorded call to STAIR at 414-732-3682 (TARGET TELEPHONE 3). During this call, CS#2 attempted to speak with STAIR about loaning CS#2 money to purchase drugs. STAIR was reluctant to speak to CS#2 about it and asked CS#2 to come to the business after 5:00 pm. Based on the investigation into the DTO, STAIR's avoidance of discussing the issue of financing the purchase of cocaine over the phone and deferring the same to after 5:00 p.m. is consistent with STAIR's caution at discussing his drug trafficking operation in the presence of uninvolved third parties.

111. During this same call, STAIR acknowledged knowing of his rental properties being used for drug trafficking because STAIR asks CS#2 about getting problem tenants out of the trailer home owned by CS#2 and held as collateral by STAIR. CS#2 said that there were communications with the person CS#2 knew was drug dealing to the tenants, and STAIR stated that he will throw the drug trafficker a couple hundred dollars if the trafficker gets the tenants out of there. The following day, on January 20, 2026, CS#2 had a controlled meeting with STAIR at S2 Real Estate during which CS#2 told STAIR he would send STAIR the phone number for the "guy" who deals with problem tenants in the trailer.

**<u>Introduction of UC – "Rickey":</u>**

112. On January 21, 2026, at approximately 5:27 pm, CS#2 sent a text message to STAIR at **TARGET TELEPHONE 3** the contact info for "Rickey - 608-546-9316" (an undercover agent, HIS TFO Said Sharif).

113. On January 25, 2026, "Rickey" ("Rick", undercover agent, herein referred as UC), using telephone (608) 546-9316, called STAIR at TARGET TELEPHONE 3. The call was made regarding STAIR's request to locate the drug-using tenants near South 27th Street and College Avenue. During the call the UC introduced himself as "Rick". During this call, UC asked STAIR to explain the way UC would be compensated for removing the problem tenants to whom he was currently providing with drugs. STAIR stated he (STAIR) would be willing to either pay money to

UC for this service of removing these tenants, or there could be a kickback by way of raised rental payments given to UC for his work in removing them. STAIR also suggested that UC could rent a place in a location that would be advantageous for a drug dealer to be. STAIR and UC conferred on how this could work in the future.

**STAIR**: Hello, this is Sam S2
**UC:** Hey, uh, Sam, this is, uh, this is Rick. I, uh, I got your number from [CS #2].
**STAIR**: Oh, okay.
**UC**: He said, he said call you that you wanna talk to the guy that he said, I could trust you. Right?
**STAIR**: Yeah. Yeah. Were you gonna help me clear those people outta there?
**UC**: Yeah, he said I should talk to talk to you 'cause I serve up those folks at the trailer.
**STAIR**: Oh, okay. Okay. Yeah, I mean, if you can move them along or whatever, I could, you know, toss you a little, a little cash, try to get it, re re-rented by someone else. Or if, if you have somebody you can place in there or something, um, you know, maybe I can give you a kickback on like the rent or whatever we collect. But it'd be nice to get someone long term that's a little more stable or whatever. But right now they're just kind of <laugh> problem people in there <laugh> and they won't, they don't pay anything.
**UC**: Yeah. Yeah. I'm good. I'm good with trying to, trying to do something like that. Would you, uh, like what are you talking, like, I guess like what's the, what's the kickback Shit? Like we talking, I don't know, like what's, I don't even know what costs to rent that shit.
**STAIR**: Yeah, it's, um, well, unfortunately we gotta pay the grounds like, uh, 600 bucks a month just to be there. And so usually we charge people at least like, you know, 1200 or 1300. And so we make, like, we don't make a lot, it's only like 700 bucks or something after we pay the lot rent. Um, but we need someone in there to kind of get the lot rent going. I don't know if you got some people that are, are pretty functional that, um, you know, maybe have a job and you know, uh, you know, still use or whatever a little bit. And, um, that might be able to refer
**UC**: Like I got some other customers that I can put there. I know we're both gonna be good.
**STAIR**: Yeah. And then I could probably, you know, either we could mark it up and you can get a little more like every month outta your, into your pocket, like a couple hundred bucks or something. Or if we just, if we can't mark it up much, then, you know, worst case you'd get like an extra hundred bucks. Yeah. Just for being a manager. <laugh>.
**UC**: Yeah, man. Sounds fucking awesome. Yeah.
**STAIR**: Yeah.
**UC**: I, so, so my guy told me to call you 'cause he said that maybe you had something else too. Like he said, he said this and then he is like, something about security. I was like, what the fuck does that mean,
**STAIR**: <laugh>
**UC**: So is that like, like, you want me to wear a uniform...?
**STAIR**: Well we had another guy that was, um, that was a provider that, uh, also did security for us. And so he would, he would know a lot of people he had to deal with

to kick out of, you know, some of the basements. And he'd have some of his staff and stuff kind of clear out people for us. And then, um, you know, uh, and then he had, you know, we gave him, uh, you know, some units that he could rent and kind of manage out of. But you know, I think he went two outta control on that. And then he, you know, he got busted <laugh> because he was having too much activity, like going in and outta these places and, you know, you can't, you can't do that. And then there's certain ones that we like, you know, like, Hey, this is gonna be a place where there's no activity, you know, that you don't bring crack heads to or, you know, you know, and just be whatever. But you don't bring all those folks over there. And he was just bringing all these folks to all the places and it just, it backfired on him.
**UC**: I got you. I know. I got you. Yeah. So you got, I mean, do you think like, like we do, you got a spot that I could look at like soon? I mean, I, I'm talking like, I, so I got, I had some shit going on in Madison. I was probably running a couple houses mm-hmm <affirmative>. And I'm, I'm kind of looking to move over here to Milwaukee area. I started, I started kind of moving shit over there. Like I, I'm kind of moving out of that area coming over here mm-hmm <affirmative>. And I'm looking to get like a, a spot and, and I was told that you're definitely the guy to talk to. So that's kind of more what to me was enticing to like mm-hmm <affirmative>. About talking to you about trying to get a spot somewhere. And from what [CS #2] said is like south side is like your, where you roll.
**STAIR**: Yeah, pretty much. So like, um, I mean, we got a couple places open around fifth place, um, that's kind of open and I think there's a lot of activity over there and um, you know, if we had somebody that managed the unit well and didn't make a mess of it, you know, and just, uh, kept people away at, you know, whenever, you know, you just don't want to draw so much attention to it. Like this other idiot did.
**UC**: Like fifth place and what, like fifth place?
**STAIR**: Uh, just south of Lincoln.
**UC**: Yeah, yeah, yeah. Like over by, uh, there's that big, that big church. Yeah,
**STAIR**: Yeah. That Basilica or whatever. <laugh>.
**UC**: Yeah. Yeah. So yeah, that's a good spot. There's a lot of people rolling over there that's like, yeah.
**STAIR**: <laugh>
**UC**: Guy can make some money
**STAIR**: <laugh>.
**UC**: So, So you thinking, um, you thinking you got a spot there like in the next like, I don't know, couple of weeks that I can maybe
**STAIR**: Look at? I mean, there's some empty places now. I mean just, you know, come on like a normal renter and you know, you can come to the office and we'll show you some places and then you can kind of just rent it out yourself or whatever, or, um, and then just make sure you don't, you know, know, you keep it under control, you know.
**UC**: But are we talking like a house or like, like this got like multi-unit or shit?
**STAIR**: This one's, uh, those are duplexes. So there's a duplex over there. There's one that's like three levels. Um, so I think the duplex is the empty one right now.
**UC**: Alright. So All right. Upper, upper, lower shit. Like, I could, could I even stay? You're saying I could stay in the upper and I could work, work outta there as long as I don't go crazy Right. And I don't Right, right. Much.
**STAIR**: Yeah, that'd be perfect actually. Then you'd be, you know, in probably a good area and then, you know, probably don't draw attention there, you know, obviously go down the road or whatever and meet people or whatever, but <laugh>

**UC**: Yeah, right.
**STAIR**: But you know, because the other guy, that's what he screwed up is they, you know, they brought him right back there and then he knew where to find him. <laugh>.
**UC:** Shit
**STAIR**: It was dumb. Yeah,
**UC**: Shit That's like 1 0 1 shit. You can't let that shit happen,
**STAIR**: <laugh>. I know, I was surprised. Are you
**UC**: So like a guy like that you give him maybe a heads up?
**STAIR**: Um, if they give us a heads up, but they don't usually give us heads up <laugh> one. I mean, yeah, I mean, I, it's funny, the, I was given this, um, um, this one guy, you know, we, he rents a bar and we want the bar to kind of work, you know, and he's some stupid reason he is dealing out of the bar and he's like the bartender and the co-owner of the bar. And it's like, I called his wife and I'm like, you realize he's gonna get, they're gonna hit him sometime this in the next couple of weeks. You know, they came ask us who's there, who's the owner, blah, blah, blah. And it's like, are are you really that stupid that you're gonna bring that to your house and or to where you work? And then, you know, I mean, it's, it's just so stupid. And then like, doing so I don't know. We're worried he's gonna get, he's gonna get in trouble next and then, you know, he's gonna ruin his family's business. You know, I'd said, you know, just give it up for a couple months or, or do it elsewhere. You know, you shouldn't be, shouldn't be doing that in these places.
**UC**: Well, that's solid shit, man, that you, I mean, you got other bars that you're looking at, like, you got
**STAIR**: No, but this one's gonna be empty soon. <laugh>, but <laugh>, no, I, I don't know. I haven't really got into that kind of stuff, but, um, I think he had, the old guy had, um, our old security guy had some contacts at some other bars and stuff that he used to kind of hang out at. And, uh, you know, that's the smarter way to do it, you know, just be a patron, you know, you don't wanna be the one running the bar or owning the bar.
**UC**: So like, I, I mean, I got, you got my head spinning a little bit. I, I gotta think about some shit, but I, um, I'd like to try to, try to talk to you maybe even this week and come, come see this place, like this duplex, and then I'm gonna work, I'm gonna work on your other shit. Um, see what we can do. And, um, yeah, man... it's
**STAIR**: Yeah, we got two places there that, you know, I mean, if we can, if we can just get some people paying the rent there, you know, then you could, you know, go collect rent and I can give you a little kickback for managing the place. And, and then whoever you want to put in there and maintain, you can, you know, at the, at the, at the park.
**UC**: Yeah. Like I put my people there and I know like, yeah, they ain't gonna get their shit unless they pay.
**STAIR**: Right, right,
**UC**: right. So it kind like works for both of us. I get it. Yeah.
**STAIR**: And then keep 'em under control so they don't draw attention. Like, I didn't one have a big fight or something. One of [CS#2] and one of [CS#2]'s units, and then the cops all came and busted the guys and got [CS#2] in trouble because there was, um, work in the building that needed to be done, and it was like a mess. SoI just gotta make sure that, you know, <laugh>, you get people to get along and don't cause drama.

**UC**: So you like Yeah, you do. You, you charge me, like, is there like a charge on me for like, like getting like a heads up? Like you, I mean, it sounds like you just want me to do some services for you every once in a while and we good, right?
**STAIR**: Yeah.
**UC**: I just wanna make sure, like, all right, all right. Yep. You know, right. This is like, yeah, you, this is next level thinking, man. <laugh> fucking, so you're a business man. Are you <laugh> he, like, he is a smart fucking business man. You should talk to him.
**STAIR**: Mm-hmm <affirmative>.
**UC**: All right. All right, man. Um, well, you got, you got my number. I'm gonna, I'm gonna be in touch. All right.
**STAIR**: Okay. Yeah. Keep me posted.
**UC**: All right. Cool.
**STAIR**: All right, thanks. Bye.
Case agents believe that during the call with the UC, STAIR confirmed that he knowingly rented his properties to drug traffickers for stash houses and trap houses and assists in providing warnings of law enforcement detection to drug trafficking renters ("And then he, you know, he got busted <laugh> because he was having too much activity, like going in and outta these places and, you know, you can't, you can't do that. And then there's certain ones that we like, you know, like, Hey, this is gonna be a place where there's no activity, you know, that you don't bring crack heads to or, you know, you know, and just be whatever. But you don't bring all those folks over there. And he was just bringing all these folks to all the places and it just, it backfired on him." and "I mean, yeah, I mean, I, it's funny, the, I was given this, um, um, this one guy, you know, we, he rents a bar and we want the bar to kind of work, you know, and he's some stupid reason he is dealing out of the bar and he's like the bartender and the co-owner of the bar. And it's like, I called his wife and I'm like, you realize he's gonna get, they're gonna hit him sometime this in the next couple of weeks. You know, they came ask us who's there, who's the owner, blah, blah, blah.").

114. In addition to explicitly explaining to the UC how STAIR would rent him properties to use for drug trafficking, case agents believe STAIR referenced the similar drug-trafficking arrangement he had with MCDADE when STAIR stated: "Well we had another guy that was, um, that was a *provider* that, uh, also did security for us." I believe that STAIR's reference to MCDADE as a dealer who provided security is consistent with STAIR's request to CS#2 to assist in finding a "dealer" to do "security" as he stated he had in the past. UC "Rickey" also said at the beginning of the call that he was in fact the dealer that "serves" the people in the trailer, which STAIR would know to be the dealer giving his tenants drugs as that was the person STAIR requested to use for this issue.

115. STAIR went on to say, referring to "security," who I believe to be MCDADE: "And so he would, he would know a lot of people he had to deal with to kick out of, you know, some of the basements. And he'd have some of his staff and stuff kind of clear out people for us. And then, um, you know, uh, and then he had, you know, we gave him, uh, you know, some units that he could rent and kind of manage out of." Based on the investigation case agents know "staff" referred to persons who were addicts purchasing drugs and would do work for S2 Real Estate through MCDADE, as well as human trafficking victims of MCDADE. These addicts often owed money to MCDADE for drug debt and would have to work to pay MCDADE.

116. Based on my training, experience, and working on drug investigations in southeastern Wisconsin, the area near South 5th Place and West Lincoln Avenue, Milwaukee, Wisconsin, is well known for having a large number of homeless addicts and individuals engaged in sex for money who are often preyed upon by others, including drug traffickers and human traffickers. Case agents believe that when STAIR refers to the good location of this rental near South 5th Place and West Lincoln Avenue, STAIR is referring to the fact that a large amount of drug users are known to frequent this area. Case agents also believe that when STAIR makes statements to UC about finding UC's own people, STAIR is referring to users STAIR believes "Rickey" (UC) sells controlled substances to. STAIR further states that "Rickey" can place some of his more "functional" people into these rental units and collect a higher rate of rent to make money. Based on the investigation, and my training and experience, I believe STAIR is referring to drug users who likely maintain full-time employment or steady income. This is further confirmed when UC states: "Like I got some other customers that I can put there. I know we're both gonna be good." He also said, "Yeah. Like I put my people there and I know like, yeah, they ain't gonna get their shit unless they pay." STAIR affirms both of these statements with comments of "Yeah" and "Right," indicating his agreement that the UC rent the property from S2 Real Estate to individuals to whom the UC would be providing

drugs and that those individuals would have to pay rent before obtaining the drugs, which is how both the UC *and* STAIR would "be good."

117. During this call, in which STAIR explicitly admits to renting properties to drug traffickers for their use in trafficking controlled substances, STAIR also references additional assistance he provides by informing the drug traffickers of impending police investigations. These statements are consistent with STAIR's conduct in relation to Blaque Bar and Bites, a West Allis bar owned by S2 Real Estate and discussed further herein.

118. Based on my training, experience, and investigation in the DTO, I believe this call explains STAIR's operation of S2 Real Estate to rent properties to drug traffickers, knowing those traffickers will be engaged in selling controlled substances or storing controlled substances at the residence, as well as his practice of insulating traffickers from law enforcement operations by providing them information in an effort to protect STAIR's investments and properties, and capitalizing upon the ability of drug dealers to assert control over the users to whom the dealer's provide illegal substances. I know from numerous previous drug investigations that drug dealers commonly ask users that owe money to them and desire more drugs do their bidding for recompense; for instance, drug traffickers will ask users at times to steal items, or drive the drug dealer in high-risk situations, or act as mules carrying drugs in high-risk situations. Drug dealers will also use the drug debt that is being held over the users' heads to force users into situations wherein the user is even ordered by them to perform sexual acts for money in some instances. I believe this ability to assert such a large amount of control over those addicted to drugs, this use of biological and psychological effects enslaving addicts to their drug dealers at times, is one reason that STAIR seeks out drug dealers to manage properties and collect money from the drug trafficker's drug customers.

119. This symbiotic relationship between STAIR as a landlord, and the drug dealers employed as his "security" or "property management," allows STAIR to collect from, attain, and

retain renters more easily, and employs a business model for drug dealers to utilize the vast S2 Real Estate housing network in a manner to help avoid law enforcement detection and investigations. That is further evidenced by the fact that STAIR will allow others to be named on the lease and gives warning to the drug dealers of law enforcement investigations of which he becomes aware based on his status as the landlord/owner of the property.

**STAIR completes rental of drug rental to UC "Rickey"**

120. On January 25, 2026, from approximately 5:24 p.m. through 6:32 p.m., STAIR, using TARGET TELEPHONE 3, exchanged a series of text messages with UC using (608) 546-9316, including:

> **STAIR**: If you're interested in checking out some of our Apartments stop at our office you can also check some of our listings
> **STAIR**: https://stworealestate.appfolio.com/listings/listings
> **STAIR**: S2 Office 414-476-6043 / 2925 w Lincoln Ave. / Text Us (414) 533-7325 rentals@s2support.com
> **UC**: My guy! We talk soon, we gonna make money

121. Based on my training and experience, and the investigation, the statement "we gonna make money" makes no sense in the context of a regular rental relationship but is consistent with the rental of a property to a drug trafficker as detailed in the prior conversation between the UC and STAIR.

122. On January 27, 2026, from approximately 11:01 a.m. through 1:45 p.m., STAIR using **TARGET TELEPHONE 3**, exchanged a series of text messages with UC using (608) 546-9316.

> **UC**: How much money you need for me to lock in that spot for February?
> **STAIR**: 795
> **UC**: Can i send cash app to lock it in?
> **STAIR**: No that's the one thing we got kicked off of we can do venmo or zel but cash app they kicked us off because we are doing too much and they want to start charging a 6% transaction fee
> **UC**: That's fine i hit you one of those soon i just need few more days
> **UC:** I got shit going on had to leave town to help move my girl family, they from mexico and ICE shit got crazy had to move them out of Minnesota, they was to close to twin cities right now, i get that other stuff done when i can this all unexpected stuff i had to get done

**STAIR**: Keep us posted if you need housing we got a couple of places plus if you kick out those guys in the trailer you guys could take over a trailer
**UC**: Thanks bro, I wish i could have done that, they got fam down bit south and they need to go where it all feel safe right now, shit be crazy

123. On January 28, 2026, from approximately 10:55 a.m. through 1:44 p.m., STAIR, using **TARGET TELEPHONE 3**, exchanged a series of text messages with UC using (608) 546-9316.

**UC**: $1600 be good for security depos and month of feb? I working on sending it your way soon
**STAIR**: Ok sounds good
**STAIR**: Did you get the squatters out of the trailer and did you have anybody else you wanted to put in there it would probably need to be like 1,200 a month or something anything over that you could pocket
**STAIR**: Or see if you can collect from them.

124. On January 29, 2026, from approximately 8:23 a.m. through 10:41 a.m., STAIR, using **TARGET TELEPHONE 3**, exchanged a series of text messages with UC using (608) 546-9316.

**UC**: Im working on it but i still out of state
**STAIR**: Ok

125. On February 4, 2026, from approximately 1:58 p.m. through 6:58 p.m., STAIR, using **TARGET TELEPHONE 3**, exchanged a series of text messages with UC using (608) 546-9316.

**UC**: I can send that money for the spot 5 th place on zell through my guy today 1600where i send it to bro
**STAIR**: This phone number.. the guy will have to apply or you.. also did you get people out of trailer home
**UC**: Im still out of state
**UC**: Im trying to send you this 1600 it asking for a email
**UC**: And zele tag id?
**STAIR**: Sstair@s2support.com

126. On February 5, 2026, case agents sent a controlled payment of $1,600 to STAIR via Zelle. This was done to reserve the S2 Real Estate property at 2474 S. 5th Place, lower unit, Milwaukee, Wisconsin, as previously arranged via STAIR and UC.

127. Through review of court authorized intercepts, case agents observed at approximately 10:17 a.m., STAIR, at **TARGET TELEPHONE 3**, received an electronic message which read,

"Zelle message from Charles Schwab Bank, SSB @ 888-403-9000. MICHAEL FLYNN sent you $1,600.00. "rent" We'll deposit this Zelle payment to your Charles Schwab Bank, SSB account. Reply HELP for help. Reply STOP to end text messages. Msg&Data rates may apply."

128. From approximately 10:55 a.m. through 11:08 a.m., STAIR using **TARGET TELEPHONE 3**, exchanged a series of text messages with UC using (608) 546-9316.

> **UC**: My guy says money is sent
> **STAIR**: Flynn?
> **STAIR**: Make sure someone applies!
> **UC**: That my guy
> **UC**: Where do we apply?
> **STAIR**: Office would be nice
> **STAIR**: Now this house will just be for folks crashing make sure no activity happens at this house or nearby we don't need drama
> **STAIR**: Or just you when you visit..
> **UC:** I got you, we be good, aint no rookie shit
> **UC**: I get some people to pick up keys tomorrow

129. Based on training and experience, I believe that STAIR's reference to "activity" and not needing "drama" refers to obvious drug trafficking of the type to draw law enforcement scrutiny, which is consistent with STAIR's comments on the first call about how the UC should take people down the street to provide them drugs so as not to draw law enforcement attention to STAIR's property.

130. On February 5, 2026, at approximately 11:50 a.m., STAIR, using **TARGET TELEPHONE 3**, called LOPEZ at **TARGET TELEPHONE 1** regarding the payment, which is further outlined below.

131. On February 6, 2026, "Jake" (UC# 2) was sent to the S2 Real Estate building to get keys for the drug house rental that was suggested to "Rick" (UC) by STAIR. UC #2 arrived at S2 Real Estate and brought a piece of paper with the name of a female to use for the rental paperwork (this is a female that was not known to LOPEZ or STAIR prior to this interaction). UC #2 spoke with LOPEZ in the office of S2 Real Estate and LOPEZ immediately called STAIR regarding this issue, which is further outlined below in the intercepted calls. UC #2 provided the number for "Rick"

(UC) and LOPEZ attempted to make two calls to "Rick" (UC), neither of these calls was completed. Eventually a female that was in the office "Jessica" made another call to the "Rick" (UC) number and "Rick" (UC) was asked to send a picture of the Wisconsin driver's license for the female that was being used for the name on the lease. There was also a request for "Rick" (UC) to provide an email for a lease to be sent. UC Rick provided a Gmail account. After these communications "Rick" (UC) was also asked to reach out to WE Energies concerning utilities account for the address. Keys were then turned over to UC #2 for 2478 S 5th Pl., Milwaukee, Wisconsin. This is the adjacent house to the original address that was suggested by STAIR to the drug dealer as being in a good area for drug business. UC #2 confirmed that the keys worked to the unit, they worked to access the lower flat at the address of 2478 S 5th Pl. Milwaukee, Wisconsin. UC #2 was also given paperwork to turn over to "Rick" (UC) for the rental.

132. At 9:52 am, LOPEZ, using TARGET TELEPHONE 2, called CS #2. After CS #2 answered the phone, LOPEZ asked, "So you introduced Rick [UC] to Sam after I told you not to?" LOPEZ repeated herself then stated again, "I told you not to do it that way and you did it anyway. So now this is the problem. Sam took some money from Rick [UC], but the problem is, um, yeah like the whole process. Remember, like, the email and all that stuff and Sam's like, 'Get the ID from Jacob [UC #2].' And Jacob's [UC #2] like, 'Hey I'm just like a messenger.' And then I called the guy Rick [UC], but Rick [UC] doesn't answer." CS #2 asked, "My guy?" LOPEZ replied, "The guy, yes. Rick doesn't answer. The problem is, is you gotta have, remember, where yours is it's electricity included so we didn't have to do WE Energies and all that shit? But this building is not. This is a duplex, so you'll have to get power on and all that shit. Did nobody think of that? Like, I did the thinking for you the last time, you get what I'm saying? So, I, I don't think…Sam's like, 'Get an ID and have him do the application.' And Jacob's [UC #2] like, 'I'm not doing that shit, 'cause I'm, I'm not here for that.' And then, um, and then, ah, the guy Rick doesn't answer, so I was like, 'I can't move forward 'cause we can't even put him in the system without…,' remember

without the fucking email and all that shit? I ain't doing that shit bro. I ain't doing no extra work I don't get paid for." CS #2 then stated that this was between STAIR and Rick [UC] and that CS #2 had nothing to do with their agreement. CS #2 stated that all CS #2 did was refer Rick [UC] to STAIR. LOPEZ said, "I'm just gonna give him his key and then they're gonna have to deal with this shit, and then, yeah. I'm not dealing with it".

133. Case agent believes that LOPEZ is telling CS#2 that she did not wish for people to go through STAIR for drug houses. LOPEZ states she did not wish for them to do things in this manner because she is not able to deal with some of the issues that arise ("remember without the fucking email and all that shit?"). Case agents know from the previous "drug stash rental" that was paid for by CS#2 that LOPEZ was taking 15% of the drug proceeds and she fabricated emails to assist CS#2 in the process. Due to the fact that CS#2 introduced STAIR to this particular drug dealer and LOPEZ was not involved in the rental, LOPEZ was upset she was not able to extort her 15% payment ("I ain't doing no extra work I don't get paid for").

134. This active rental of STAIR to drug dealers has been further corroborated throughout this investigation.

***STAIR and SINCLAIR DTO***

135. On October 21, 2025, case agents observed STAIR go to Blaque Bar. Given the location, case agents were not able to observe what STAIR did once arriving at Blaque Bar; however, he was inside for only two minutes, after which case agents observed STAIR leave Blaque Bar in his Tesla. At approximately 5:49 p.m., case agents observed STAIR pull into the side lot of S2 Reality, located at 2925 West Lincoln Avenue in the Tesla. At 5:50 p.m., STAIR exited the Tesla and walked inside S2 Real Estate carrying a red bag in his hand. Case agents had not observed STAIR with that bag prior to his trip to Blaque Bar. Based on my training, experience, and investigation into STAIR, I believe STAIR's conduct would be consistent with STAIR obtaining conducting a pickup of money or drugs at Blaque Bar, in part due to the short duration of his time

inside Blaque Bar prior to being observed with that bag. Case agents know from intercepts on TARGET TELEPHONE 3 that STAIR does not pickup legitimate rent payments from tenants, but instead requires tenants to make those payments at S2 Real Estate or through financial applications such as AppFolio, Zelle, or CashApp. Thus, it is unlikely that STAIR picked up legitimate rent proceeds from Blaque Bar on this occasion. This is also consistent with STAIR later withholding information about SINCLAIR from law enforcement.

136. On January 5, 2026, at approximately 9:09 a.m., Detective Stachula called S2 Real Estate at their primary business phone number, (414) 476-6063 and spoke with LOPEZ. Detective Stachula advised that the WAPD has been receiving complaints about Blaque Bar, 1022 South 60th Street, West Allis, Wisconsin and inquired about the identity of the owner(s). LOPEZ stated that a Jennifer PIERCE is on the paperwork, but that she knows a male is also involved. LOPEZ advised that STAIR knows the people renting the property "personally," and that Detective Stachula should speak to STAIR. While Detective Stachula was speaking with LOPEZ, at approximately 9:12 a.m., LOPEZ, using TARGET TELEPHONE 2, called STAIR at (414) 732-3682 TARGET TELEPHONE 3. Detective Stachula then advised STAIR and LOPEZ that there were numerous reports and incidents for Blaque Bar and that he [Detective Stachula] was concerned with who is on the leasing paperwork and whether someone other than Jennifer PIERCE was running the establishment. Detective Stachula and STAIR arranged to meet at S2 Real Estate at 11:00 a.m. that same day to discuss this issue.

137. After Detective Stachula ended his phone call, LOPEZ, using TARGET TELEHONE 2 continued speaking with STAIR at TARGET TELEPHONE 3. STAIR stated, "I wonder if they think they're running drugs or something out of there, or something." LOPEZ replied, "Yeah, I think they're gonna try to probably raid it. So they wanna make sure they're raiding the right place or raiding the right, um…" STAIR finished her sentence, "People." LOPEZ continued, "Yup, the right people. That's why they're asking, 'cause on there I seen a Jennifer something, but I don't

know…I never encountered her, it's always been guy." STAIR stated, "Yeah. It's definitely a guy I think it's, uh, the mom and the lady that runs it." LOPEZ replied, "Alright, fair enough." STAIR said, "I guess we'll find out." LOPEZ responded, "You might have an open bar," and STAIR said, "Yeah, great." That STAIR immediately noted that the police were likely concerned with drug trafficking at Blaque Bar indicates STAIR's knowledge of SINCLAIR's use of Blaque Bar for drug trafficking.

138. Case agents reviewed toll records for STAIR's TARGET TELEPHONE 3, for the time period after his call with Detective Stachula, but prior to the in-person meeting with Detective Stachula. At 9:19 A.M. STAIR, using TARGET TELEPHONE 3 called PIERCE at (414) 517-4339. The duration of the call was approximately 33 seconds. At approximately 9:19 A.M., STAIR, using TARGET TELEPHONE 3, sent an electronic message to PIERCE at (414) 517-4339. About thirty seconds later, STAIR, using TARGET TELEPHONE 3, called SINCLAIR at (262) 349-7108, the duration of the call was approximately 30 seconds. At 9:20 a.m., STAIR, using TARGET TELEPHONE 3, sent an electronic message to SINCLAIR at (262) 349-7108. Between 9:58 a.m. and 11:49 a.m., STAIR, using TARGET TELEPHONE 3, exchanged additional calls and text messages with PIERCE at (414) 517-4339. At approximately 9:58 AM, STAIR, using TARGET TELEPHONE 3, received an incoming call from PIERCE at (414) 517-4339, with a call duration of approximately 10 minutes, 15 seconds. At approximately 10:04 A.M., STAIR, using TARGET TELEPHONE 3, received an incoming text message from PIERCE at (414) 517-4339. At approximately 10:12 A.M., STAIR, using TARGET TELEPHONE 3, sent an outgoing electronic communication to PIERCE at (414) 517-4339, which PIERCE appeared to respond to shortly after.

139. At approximately 10:56 A.M., Detective Stachula met with STAIR at S2 Real Estate to discuss Blaque Bar. At Detective Stachula's request, STAIR provided PIERCE's telephone number of (414) 517-4339. STAIR also told Detective Stachula that he had called PIERCE. Detective Stachula explained that he would have rather not have STAIR contact PIERCE. STAIR

responded by laughing. STAIR then told Detective Stachula that PIERCE was the only name and number that he had for Blaque Bar. Detective Stachula specifically asked if anyone else was connected to Blaque Bar, and STAIR responded that he knew PIERCE's boyfriend or husband, "Wank Wonder," was involved. STAIR stated that he would not likely be able to ID "Wank Wonder." STAIR did not provide SINCLAIR's number nor inform Detective Stachula that he had contacted SINCLAIR in the same way he had contacted PIERCE between the phone call with Detective Stachula and their in-person meeting. The meeting between Detective Stachula and STAIR lasted about 15 minutes and then Detective Stachula left the location.

140. After Detective Stachula left S2, at approximately 11:49 A.M. PIERCE, using (414) 517-4339, sent an electronic message to STAIR at TARGET TELEPHONE 3. At approximately 12:29 P.M., STAIR, using TARGET TELEPHONE 3, sent an outgoing electronic communication to PIERCE at (414) 517-4339. At approximately 12:29 PM, STAIR, using TARGET TELEPHONE 3, placed an outgoing call to PIERCE's telephone (414) 517-4339, with a call duration of approximately 5 minutes, 40 seconds. At approximately 12:41 P.M., STAIR's telephone of 414-732-3682 TARGET TELEPHONE 3 received an incoming telephone call from SINCLAIR's telephone (262) 349-7108, with a call duration of approximately 5 minutes, 2 seconds.

141. Given the timing and context of these communications, case agents believe that STAIR lied to Detective Stachula about his knowledge of SINCLAIR's involvement in Blaque Bar as well as STAIR's knowledge of SINCLAIR's contact information. This obfuscation is consistent with STAIR protecting the individuals who engage in drug trafficking from his properties so that STAIR can continue to profit from those activities.

142. STAIR acknowledged that he provides such protection during the recorded conversation between STAIR and UC "Rickey." In that conversation, Rickey asked if STAIR would give a "heads up" to someone concerning a potential police investigation. STAIR described that he had done so for a male party that has bar. STAIR confirmed that he only owns one bar, making it

evident that the incident of "giving a heads up" to which STAIR was referring was STAIR's interactions with SINCLAIR about Detective Stachula's investigation. Indeed, STAIR explains to Rickey that the bar is run by a male whom STAIR was trying to warn of a police investigation, and he said of this male: "He's like the bartender and the co-owner of the bar."

143. As described previously in outlined in STAIR's above communication with UC, case agents believe STAIR notified PEIRCE and SINCLAIR regarding the ongoing drug investigating into SINCLAIR and Blaque Bar. STAIR's statements to the UC demonstrate STAIR is renting S2 Real Estate property to SINCLAIR aware SINCLAIR is engaged in drug trafficking out of the bar. Further, SINCLAIR's statements to the UC, as outlined above, verifies that STAIR will protect his drug trafficking renters by helping the drug trafficker evade law enforcement. Therefore, at the time of the communication between TARGET TELEPHONE 3 (STAIR) and SINCLAIR's telephone (262) 349-7108, STAIR lied to law enforcement to protect the identification of drug trafficking SINCLAIR, warned SINCLAIR about law enforcements investigation, and is continuing to rent the location to SINCLAIR and PERICE knowing it is being used for drug trafficking.

144. On January 23, 2026, at approximately 12:57 p.m., LOPEZ, at TARGET TELEPHONE 2, received a call from UM9043 using (414) 339-9043. While LOPEZ was on the telephone, case agents overheard LOPEZ have a side conversation with STAIR. STAIR asked, "Have you met the black guy from the Blaque Bar?" LOPEZ replied, "No." STAIR said, "No, he sent me this shot." LOPEZ advised, "That's Mercedes' cousin." STAIR said, "We'll ask Mercedes, that's it." LOPEZ stated, "Let me see. I'll ask her." Case agents know that on January 23, 2026, at approximately 11:46 a.m., West Allis Police Detective Stachula sent a picture of SINCLAIR to STAIR at TARGET TELEPHONE 3. This was pertaining to ongoing communications between Detective Stachula and STAIR regarding complaints of drug trafficking at, or out of, the Blaque Bar. Therefore, case agents believe STAIR showed this picture to LOPEZ and asked if the individual

depicted in the photograph (SINCLAIR) Detective Stachula sent was the individual from the Blaque Bar. LOPEZ advised STAIR that SINCLAIR was "Mercedes'" cousin.

145. On February 5, 2026, there were also communication between SINCLAIR's telephone (262) 349-7108, and STAIR's TARGET TELEPHONE 3. SINCLAIR called TARGET TELEPHONE 3 concerning his desire to make a payment of a sum of cash.

146. On February 5, 2026, there was an incoming call to TARGET TELEPHONE 3 from SINCLAIR using (262) 349-7108. SINCLAIR asked STAIR about the extra fees for paying in cash, and STAIR stated he believed it was $10. SINCLAIR was worried that someone told him there was a fee of $100. SINCLAIR said that he was maybe going to run the deposit to the bank, STAIR and said that he could drop the deposit at the building or the bank. Based on the investigation, case agents know SINCLAIR is renting Blaque Bar from STAIR and that STAIR has been in communication with SINCLAIR regarding the drug investigation by law enforcement into the bar and SINCLAIR, as previously described.

147. On February 5, 2026, there was then another incoming call to TARGET TELEPHONE 3 from SINCLAIR (262) 349-7108 (Target Cell Phone 9). SINCLAIR asked STAIR if there was a Tri City bank inside every Pick N Save grocery store and stated that he (SINCLAIR) is at the Pick N Save near Midtown (area of North 50th Street and West Capitol Drive). STAIR stated that he thinks that there is a Tri City bank there and says STAIR will send SINCLAIR the bank information. STAIR told SINCLAIR to tell them at the bank that he is making the deposit because they don't want cash at the office. STAIR also told SINCLAIR to use the receipt from the bank as his payment, and STAIR responded that he will put it in the system. STAIR indicated he will send SINCLAIR the number for the bank account.

148. On February 5, 2026 there was then a text message sent from TARGET TELEPHONE 3 to SINCLAIR at (262) 349-7108:

**STAIR**: "06112327 tri city. S2 Real estate."

149. Based upon the information as outlined in this affidavit, I believe the calls and text messages on February 5, 2025 between SINCLAIR((262) 349-7108) and STAIR (TARGET TELEPHONE 3) are consistent with them engaged in drug trafficking and money laundering. As described in this affidavit, STAIR has admitted to UC to renting a bar (Blaque Bar) to a drug trafficker (SINCLAIR). STAIR is aware that SINCLAIR deals drugs from the S2 Real Estate property and lied to law enforcement about STAIR's knowledge of SINCLAIR, while at the same time having contact with SINCLAIR and PIERCE, consistent with STAIR notifying SINCLAIR and others about the drug trafficking investigating and potential raid into SINCLAIR (as STAIR described to the UC). This is further consistent with STAIR's advice to the UC on how to not draw attention of law enforcement and others while renting S2 Real Estate properties for drug trafficking, as described previously.

150. On February 9, 2026, cash agents obtained the cash deposit receipt related to the above-described transaction as well as the physical bills deposited at the bank. There was two $100, 145 $20, one $50, and one $10 bill. None of the bills were connected to known controlled buys. Based on my training and experience, these small bills would be consistent with STAIR's statement of receiving rent from known drug traffickers and would be consistent with STAIR being aware of receiving drug trafficking funds and depositing those drug proceeds in this bank account with other rental income in an attempt to disguise the drug trafficking nature of the funds. Case agents also met with the MPD Officer Chris Navarrette ("PO Navarrette") and his canine "CZAR" at the WAPD garage to conduct a "dog sniff". Together, PO Navarrette and canine CZAR are a certified drug detection team. Canine CZAR alerts to the odor of a controlled substance (specifically heroin, cocaine, marijuana, methamphetamine and other controlled substances made with like components) by passively sitting and staring at the area or object emitting or containing the odor of the controlled substances he is trained to alert to. PO Navarrette and canine CZAR have received four weeks of intensive training and certification through Shallow Creek Kennels, deploying and utilizing a drug

detection canine; that this certification (July 2019) is based on guidelines set forth by the North American Police Work Dog Association (NAPWDA), which is a nationally based group in partnership with local, state, federal and international agencies including private vendors, law enforcement and first responder; that this training establishes consensus-based best practices for the use of detection canine teams by improving the consistency and performance of deployed teams, which will improve interdiction efforts as well as courtroom acceptance. PO Navarrette and canine CZAR have detected controlled substances more than 400 times in the past (including training); that in each alert drugs that canine CZAR is trained to find or items contaminated by controlled substances (drug proceeds) have been recovered; and that canine CZAR alerts have been the basis for more than forty search warrants and five vehicle sniffs.

151. On February 9, 2026, Detective Stachula placed a traffic safety cone containing the suspected drug proceeds obtained from the bank, as described above, in a garage with many other items around. PO Navarrette advised me that CZAR located and indicated to the traffic safety cone, which case agents were aware contained the suspected drug proceeds. PO Navarrette informed me that CZAR's indication denoted the presence of controlled substances or other items, such as proceeds of controlled substances, which have been recently contaminated with, or associated with the odor of one or more controlled substances that CZAR is trained to detect. Based upon the information as outlined in this affidavit, I believe this $3200 cash deposit constituted SINCLAIR's drug proceeds, and that there is probable cause to believe that STAIR knowingly accepted these proceeds into his account, which he comingled with other, legitimate, rental funds in an attempt to conceal the illicit nature of the drug proceeds STAIR obtains by renting S2 Real Estate property to SINCLAIR for drug trafficking.

**C. DTO'S USING REAL ESTATE**

152. Durning the investigation into S2 Real Estate, case agents identified multiple DTOs that were using S2 Real Estate business to further their drug trafficking business. STAIR is able to

provide unique housing benefits to those conducting illegal substance sales in the Milwaukee County area, which results in a number of different DTOs seeking out the S2 Real Estate business for their housing. There were three distinct groups identified during this investigation that STAIR allowed to use the S2 Real Estate rental business as part of their drug dealing enterprises. These groups are herein referred to as the MCDADE DTO, the LOPEZ DTO, and the SINCLAIR DTO.

**MCDADE DTO**

153. As detailed above, STAIR operates S2 Real Estate, in part, as a drug-dealing enterprise wherein he seeks out drug traffickers to employ as "security," rents properties to traffickers to use as stash houses and trap houses, and provides information to those traffickers to aid them in evading law enforcement. STAIR then conceals the proceeds of this illegal portion of his business by commingling the proceeds of his drug-trafficking enterprise with the proceeds of his legitimate rentals.

154. Case agents have identified several different trap houses that STAIR and LOPEZ allowed MCDADE to run that were owned by S2 Real Estate during 2024 to 2025. Through his relationship with STAIR and his access to the S2 Real Estate properties, MCDADE was able to change from house to house quickly enough to disrupt and confuse law enforcement investigations. Case agents have identified the following members of MCDADE DTO: BERRY, HOWELL, WILLIAMS, RINGERSMA, BOFFIL, KNEZIC, ALLEN, JONES, and ERVING.

155. As part of the investigation into MCDADE, case agents are aware that MCDADE will often use/direct others to operate his drug trafficking and other criminal conduct in an attempt to separate himself from his crimes to evade law enforcement detection. MCDADE has a history of drug trafficking offenses and has also, historically, cooperated with law enforcement to reduce his own liability. MCDADE has used his past cooperation to gain knowledge of law enforcement techniques and has used those techniques to evade law enforcement One such example was observed during the May 2025 controlled buy, outlined below.

**Fatal Overdose - KH**

156. On May 6, 2024 the WAPD investigated a fatal drug overdose at the Sunrise Apartments, 8750 W National Ave Unit 401, West Allis, Wisconsin. Officers located KH who was deceased, alone, inside of this apartment. It should be noted that this address is not associated with STAIR. Case agents observed drug paraphernalia and a white powdered substance that tested positive for fentanyl located next to KH, inside of his bedroom. A note on the desk in the bedroom contained the following: "RO 595-2360." As detailed herein, "Ro" is MCDADE's nickname and the phone number ending in 2360 is associated with MCDADE, including through recorded calls with Stacey BERRY, a woman romantically associated with MCDADE and involved in his DTO as described further below.

157. Three days prior to officers located KH deceased in his apartment, law enforcement conducted a traffic stop of a red 2015 Ford Edge, bearing Wisconsin license plate NL4442 (Edge) in the parking lot of the Sunrise Apartments (WAPD Case # 24-016978). KH was the rear passenger and Kerry HOWELL (not KH) was the driver and registered owner. HOWELL was arrested for possession of cocaine. This traffic stop time corresponds with the times of the last communications on KH's phone. The last outgoing communication was a completed call on the phone, a five-minute call to 414-595-2360 on May 3, 2024 at 2:59 a.m.

158. MCDADE had previously been observed driving the EDGE, including on August 25, 2023, when police conducted a traffic stop of the EDGE related to suspected drug activity. (WAPD Call # 23-033313). MCDADE was the driver and only pin the Edge. MCDADE had three cellular telephones and large amount of US currency. Officers did not locate any controlled substances in the Edge.

159. BERRY has also been previously associated with the Edge as she was arrested while riding as a passenger inside the Edge on May 16, 2024 in Fond du Lac, Wisconsin, (Incident # SO2403340). Also arrested was the driver, Kerry HOWELL. BERRY was found to have a small

amount of cocaine on her person and a glass crack cocaine pipe. Case agents listened to a recorded call from Milwaukee Secure Detention Facility from ID: MIKAYLA M. KORMAN from June 24, 2024: (572427371_711404_06-24-2024_10-06-53_1-414-595-2360_4722). This call begins with the female voice I recognize to be BERRY from other calls and this same female addresses a male as "Ro" (MCDADE) and the male voice then says you get your money "Stacey". Affiant knows that individuals in custody will often use other inmate's accounts to complete phone calls. During the call BERRY explained that the possession of cocaine "crumb" was "0.0" and lucky they didn't find the "Fent". Case agent knows that "Fent" is a slang term that is sometime used for fentanyl. Affiant also knows that drug traffickers will often time use persons to carry their drugs on their persons concealed in locations where law enforcement would be less likely to search. This statement is in reference to an amount of fentanyl that was on the person of BERRY and was never located by law enforcement during a search of her person. At the end of the call it appears MCDADE is speaking on speaker phone on another call and directs a male to wait for him as he at the gas station. Stacey stated that she can't wait to get home and get some money and discusses a house "on 21". MCDADE responded "we got that house", to which BERRY responds "that is right off National too". The call then ends abruptly.

160. Case agents performed surveillance on MCDADE during the months of May and June 2024. Case agents observed MCDADE move from the address of 1027 South 26th Street, Milwaukee, Wisconsin to the address of 712 South 21st Street, Milwaukee, Wisconsin. During month of July and August 2024 case agents observed that the occupants of 712 South 21st Street, Milwaukee, Wisconsin also had access to building across the street 729 South 21st Street, Milwaukee, Wisconsin. Around this same time, case agents reviewed record jail / prison calls and learned MCDADE claimed to be employed at a Real Estate company, which case agents later identified as S2 Real Estate, located at 2925 W Lincoln Ave, Milwaukee, Wisconsin. In September

2024 MCDADE moved from the location at 712 South 21st Street, Milwaukee, Wisconsin to the location of 1512 South 21st Street, Milwaukee, Wisconsin.

161. During the surveillance of all MCDADE's locations described above, case agents observed conduct, which based on my training and experience, was consistent with drug activity. Case agents also observed other individuals and vehicles that were identified as being associated with the MCDADE DTO at all these addresses.

162. For example, on September 11, 2024 at approximately 12:35 pm, case agents observed Alberto L. BOFFIL park a purple Harley Davidson, bearing Wisconsin license plate 578 XW (Harley) on the side walk directly in front of 712 South 21st Street, Milwaukee, Wisconsin. BOFFIL walked onto the front porch of 712 South 21st Street and out of view at the area where the entrance to the residence is located. At approximately 2:40 pm, case agents observed a male, identified as Eric W. Kretlow, standing on the front porch of 712 South 21st Street, Milwaukee, Wisconsin get onto the Harley and leave the area. MPD officers conducted a stop of the Harley, which was listed as stolen. Kretlow was detained and was found to be carrying a clear glass tube with a burnt end in his front right shorts pocket. Kretlow stated that he uses the tube to smoke crack cocaine and was issued a citation for drug paraphernalia (Cit. # M582CR2KS3).

163. Case agents reviewed the City of Milwaukee Assessor website and learned that MCDADE's locations, 1027 South 26th Street, 712 South 21st Street, 729 South 21st Street, 1512 South 21st Street all were owned by LLC's associated with "S2". A further check of the Wisconsin Department of Financial Institutions (WDFI) showed that all the LLC's had the listed registered agent as Sam STAIR:

- 1027 S 26th St, Milwaukee, WI – owned by "S2 REAL EST GROUP 4 LLC" since 2013-WDFI - Registered Agent "Sam STAIR",
- 710-712 S 21st St, Milwaukee, WI – owned by "S2 REAL EST GROUP 6 LLC" since 2021 – WDFI – Registered Agent "Sam STAIR";
- 729 S 21st St, Milwaukee, WI - owned by "S2 REAL EST 729 21ST LLC" since 2016 – WDFI – Registered Agent "Sam STAIR"; and

- 1512 S 21st St, Milwaukee, WI – owned by "S2 REAL EST GROUP 4 LLC" since 2019 – WDFI – Registered Agent "Sam STAIR".

164. On October 15, 2025 MCDADE was arrested as a result of a drug search warrant that was conducted at the address of 1425 West Greenfield Avenue, Milwaukee, Wisconsin. As will be further discussed in this complaint case agents also conducted controlled buys of narcotics from MCDADE from both 1512 South 21st Street and 1425 West Greenfield Avenue during the Spring of 2025. Law enforcement also seized telephones during MCDADE's arrest further confirming his connection to STAIR as both an employee and drug trafficker for the S2 Real Estate locations previously described. Also on one of MCDADE's phones was a video of MCDADE providing an amount of cocaine and Percocet pills to REGINA Stair (STAIR's wife) at their home of 11512 Woodside Dr., Hales Corners, Wisconsin in exchange for $1,000.00. In this video they discuss the price previously agreed on by MCDADE and STAIR, which is then paid for the drugs. Eric Kretlow accompanied MCDADE to that drug delivery.

165. Case agents reviewed a recorded jail call from September 16, 2025 from inmate PIN of BERRY which called telephone number 414-242-1766. BERRY speaks with a female. This conversation begins with the female telling BERRY that they are currently in "code black" and she is looking for "Pooh-Shiesty" masks for people to wear. They begin by speaking about working on a bar that was purchased by "Ro" and the long hours to fix it up. There is then a conversation about BERRY getting money placed on BERRY's books, they state that "Ro" is there but not able to put the money on the books yet, "Wally" has the money card. They then discuss the night BERRY was arrested and that BERRY should not have been there and gotten arrested. Eventually the conversation turns to a house that was recently lost by a female and BERRY states, "So wait he's not fucking the bitch from S2 no more" and the female responds to BERRY to "Shut up…Don't say it on the phone no more". The female then clarifies that the house they are speaking of is not "one of those". The female also states that she told "Ro" that she thinks he is the fall guy for S2.

166. On September 12, 2024, MCDADE was at MPD District Two and spoke with officers. MCDADE stated he knew the officers through "Jeanette" a property manager of S2 Real Estate, located at 2925 West Lincoln Avenue. MPD officers understood that MCDADE worked for S2 Real Estates in a maintenance capacity. MCDADE stated he was frustrated that police were continuing to "board up" residence, including the property 1927 South 6th Street (rear cottage), Milwaukee, Wisconsin. MCDADE stated he was going to "takeover" the lease for his sister-in-law. Case agents were aware that on September 10, 2024, MPD executed a drug-related search warrant at 1927 South 6th Street (rear cottage), Milwaukee, Wisconsin.

167. Case agents reviewed several recorded calls from BERRY's ID to 414-595-2360. During these calls, MCDADE discusses having to move locations from an address on 6th Street to 712 S 21 St, a property owned and operated by STAIR. MCDADE and BERRY also discussed "11th and Burnham" location.

**Fatal Overdose at 1512 S 21st Street.**

168. Case agents reviewed a MPD report from September 19, 2024 (Case # C2409190168 / Other Event # 24-SI2953) regarding the overdose death of Antoine Deshawn Herron at 1512 S 21 St, Milwaukee, Wisconsin. In this report it states that Kelly Kretlow (m/w, 08/14/1973) was present at the scene as well as Moses MCKNIGHT (B/M 01/03/1974), who reported doing CPR. Both of these males were allegedly walking in the area and found Herron laying near the fences behind the residence. The ME reports indicate that the male was wearing clean socks and it was believed that Herron was likely moved from inside the house. Case agent was able to see through database searches that Kelly Kretlow is brother to Eric Kretlow (m/w, 08/27/1981), who is associated with 1512 S 21 St as well as 712 S 21 St, and is known to be associated with McDade through investigation and surveillance. A search of the deceased was conducted, and there was a crack pipe located in his front left pocket, and a wallet located in his right-side rear pocket. Those inside the

residence refused to make statements and stated that the male did not live there at the residence. I requested toxicology reports from the Milwaukee County Medical Examiner's Office and learned that there were amounts of cocaine and fentanyl (as well as other opioid drugs located in the blood) and the manner of death was ruled "Acute Mixed Drug Toxicity (Cocaine, Fentanyl, Fluorofentanyl, Acetylfentanyl, and Heroin)." It should also be noted that Eric Kretlow has been documented as using his brother's name in his arrest reports related Village of Germantown PD Police Report – 25-010443, during this arrest Eric Kretlow identified himself initially as Kelly Kretlow, then later admitted to giving a false name. It is also of note that Eric Kretlow was found to be in possession of in his right front pocket: .58 grams of crack cocaine (field tested positive for cocaine), two glass crack pipes, a Newport Cigarette pack with 5 tin foil bindles containing a white powder that tested positive for heroin (total weight of .96 grams). Eric Kretlow was also driving an Acura vehicle that he stated belonged to someone he knew to "G", a gray 2005 Acura, bearing Wisconsin temporary license plate Y2520S. Wisconsin Department of Transportation (WIDOT) check of this registration shows the vehicle is linked to "Javarious Jonell Williams M/B, 06/23/1994". Eric Kretlow also listed in this report as having the address of "1512 S 21 St, Milwaukee, Wisconsin, 53206". Case agents reviewed body camera video from the officers that made contact with the alleged "Kelly Kretlow" at 1512 S 21 St, Milwaukee, Wisconsin on September 19, 2024 regarding the death of Antoine Herron. From review of the video it is apparent that Eric KRETLOW gave false information to the MPD regarding his name during his contact with them that day. This is apparent from both the fact that Eric and Kelly Kretlow have distinct differences as well as the fact that Eric KRETLOW has distinct tattoos on his neck that are visible in the video.

**BOFFIL and RINGERSMA's residence 1966 B South 11th Street, Milwaukee, Wisconsin**

169. During review of jail communication on September 15, 2024 at 1:22 PM: (607934465_487029_09-15-2024_13-22-13_1-414-595-2360_8515.mp3), there was a reference

concerning a location at "11th and Burnham" and a person named "Wally" have a credit card to make payments. Further investigation would discover that there was a residence associated with S2 Real Estate located at 1966 South 11th Street, Milwaukee, Wisconsin. A search of the City of Milwaukee Tax Assessors site revealed that 1966—B S 11th St, Milwaukee, Wisconsin was owned by "9330 W Lincoln S2 LLC" beginning at the period of September 5, 2024. A check of the WDFI revealed that the registered agent for this business was "Sam STAIR 11512 W WOODSIDE DR, HALES CORNERS, WI 53130". Surveillance at this address would eventually associate this address with Alberto BOFFIL and Walter RINGERSMA.

170. Additionally, on January 16, 2025 there was search for a wanted subject at the address of 1966-B South 11th Street, Milwaukee, Wisconsin conducted by the United States Marshals Service. Therein was located BOFFIL, RINGERSMA, and Tina L. Reichart (Activity # 25-009822). There were no arrests made during this search as the wanted subject was not present, but there were items seized during the search. Located inside the residence where these subjects were located was also found in the living room area following items:

- a Glock 17, 9mm, bearing serial number UVM851, with loaded extended magazine and a round in the chamber (listed as stolen);
- a AK-47 "Draco", .762 caliber;
- bags of marijuana;
- 2.56 grams of cocaine;
- 6.79 grams of cocaine inside 16 small baggies); and
- multiple rounds of ammunition .

171. Based on surveillance and review of jail calls, BOFFIL and RINGERSMA are still believed to be living at the residence of 1966-B S 11th St, Rear Cottage, Milwaukee, Wisconsin.

172. On January 2, 2025 at approximately 4:42 p.m. case agents conducted surveillance at the address of 1966 S 11th Street, Milwaukee, Wisconsin. Case agent observed BOFFIL exit the rear door of the residence along with another male. Shortly after case agent observed another male, which base on his characteristic appeared to be RINGERSMA exited 1966 S 11th Street, Milwaukee, Wisconsin. Case agents observed RINGERSMA threw an item in the trash bin. Shortly

after a tan Toyota SUV, bearing Wisconsin License plate AYR-2776 (Toyota SUV) exited the rear parking slab into the alley on the southside of the residence and exited the alley. Case agents identified the driver of the Toyota SUV as BOFFIL.

173. Case agents review surveillance video from Thursday April 9, 2026, at 1966 S 11th St, Rear Cottage, Milwaukee, Wisconsin. At approximately 6:53 p.m., BOFFIL came to the alley from the rear alley door of 1966 S 11th St, Rear Cottage, Milwaukee, Wisconsin, that open south at the southeast corner. BOFFIL walked south in the alley with cell phone to meet with a red 2011 GMC, bearing Wisconsin license plate ATK-2594 (GMC) and entered the front passenger seat. The GMC reversed southbound and parked facing west on West Rogers Street and BOFFIL exited the GMC and walked back towards his residence 1966 S 11th St, Rear Cottage, Milwaukee, Wisconsin. At approximately 6:57 p.m. a 2010 silver Chevy Malibu, bearing Wisconsin license plate BDF-1147 (Malibu) came to the residence. The Malibu entered the alley from the south going north and stopped near the alley slab for 1966 S 11th St, Rear Cottage, Milwaukee, Wisconsin. BOFFIL walked to the front driver's side window of the Malibu and engaged in a hand-to-hand transaction with the occupant. BOFFIL then walked to the rear door of the 1966 S 11th St, Rear Cottage, Milwaukee, Wisconsin, then back to the alley and out of the alley southbound to W Rogers St. Case agent believes that all of this behavior is consistent with narcotics transactions. Case agent knows from training and experience that drug dealers with often use furtive methods to hand over narcotics to another person for instance when inside a car and out of sight or when reaching into the window of a vehicle as BOFFIL was observed doing these types of short contacts with BOFFIL at the rear alley of 1966 South 11th Street, Rear Cottage, Milwaukee, Wisconsin.

174. Case agents reviewed jail communication on April 11, 2026 at 6:59 pm (748073444), between MCDADE and BOFFIL's telephone 262-234-8917. During this call, MCDADE and BOFFIL discuss RINGERSMA being at BOFFIL's location also.

MCDADE: "You talk to Chris?"

BOFFIL: "No He didn't answer the phone for me today. I probably have to go over there tomorrow or something"
MCDADE: "Oh, okay, okay, okay okay, Yeah now you gotta, you gotta get in touch with Chris Man so you can get over there by Vicky".
BOFFIL: "I'll get it done I swear."
MCDADE: "Where's Wally's gay ass at?"
BOFFIL: "He's upstairs"
MCDADE: "Who he with up there? Mary?"
BOFFIL: "Hey Wally, Ro says what's up?"
RINGERSMA: "What's up Ro?"
MCDADE: "What's up fag"
RINGERSMA: "Fag, cock sucker ??? Motherfucker"
MCDADE: "Alright, Imma catch you Wally."
BOFFIL: "Wally just walked out Mackayah see if you can catch him in the front"
MCDADE: "I need you to make sure you talk to Chris and Vicky"
MCDADE: "I thought he was still over there on Oklahoma, 65th and Oklahoma."
BOFFIL: "Yeah he got that house and then he got the house on um 27th and um, Layton or some shit like that. Or like College"
MCDADE: "Yeah. That's where his, that's where his mama stay at. They took over the one on 60th too. All the people from the south side be there. Hold it."
BOFFIL: "This house falling apart, I'mma get a lawsuit"

Also during this call, MCDADE discusses “Vicky” who case agent believes is a refers to ALLEN.

**MCDADE DTO Drug Seizure**

175. On March 19, 2025, MPD was called to Best Western Plus near the Airport in Milwaukee, Wisconsin. MPD recovered 2,310 grams of suspected cocaine in a hotel room. Officers determined the room was rented by RINGERSMA, who was later arrested in the hotel bar and grill area. On RINGERSMA’s person was 1.27 grams of suspected cocaine. KNEZIC was also arrested related to the cocaine seized in the hotel room. Case agents reviewed jail calls from Amber Valadez’s PIN at Taycheedah Correctional Institute from March 25, 2025 at 7:12 PM to telephone number 414-514-3794 (695974289_553878_03-25-2025_19-12-35_1-414-514-3794_8803). During the jail call Amber Valadez identifies herself to a male using telephone number 414-514-3794. In review of the jail call, case agents believe the male to be MCDADE based on the content of the jail call and review of numerous other jails calls to MCDADE. Further, case agents also located 11 previous jail calls from Valadez’s PIN to telephone number 414-595-2360. Case agents reviewed all

11 recorded jail calls and confirmed that they are all the same female's voice and the voice of MCDADE. Valadez is referred to as "Sabina" throughout many of the calls.

176. During the March 25, 2025 jail call, MCDADE stated that he has lots going on. MCDADE stated that "Wally got caught with 2 books". Based on training and experience, case agents know that it is common for drug dealers to refer to kilograms of controlled substances as books. Case agents believe MCDADE's reference to two books means 2 kilograms of drugs. Further during the call MCDADE clarifies that he was caught with "2 kilos." Valadez asked how this happened and if this was a traffic stop. MCDADE said that he (Wally) was "at the hotel with some people I know." MCDADE said that he was "going to be reimbursed in another hour or so" by some people he knows. MCDADE added that he is good. Valadez then tried to convince MCDADE to work on investing in automobiles so that MCDADE does not get in trouble. Valadez called MCDADE "Ro" during this call and spoke about her sister coming to get money to put on her books.

177. Based on the March 19, 2025 arrest of RINGERSMA with over 2 kilograms of cocaine and MCDADE's statements during the record jail call on March 25, 2025 that he was going to be "reimbursed", case agents believe MCDADE was supposed to be receiving the 2 kilograms of cocaine seized from Valadez and RINGERSMA.

**Controlled Buy March 27, 2025 1512 S 21 St, Milwaukee, Wisconsin**

178. On March 27, 2025, CS#1 called "Ro" (MCDADE) at the telephone number 414-595-2360 to arrange the controlled buy of fentanyl at 1512 South 21st Street, Milwaukee, Wisconsin. Case agents conducted surveillance and observed CS#1 arrive and enter 1512 South 21st Street, Milwaukee, Wisconsin. Once inside 1512 South 21st Street, Milwaukee, Wisconsin, CS#1 observed MCDADE. CS#1 later explained that he/she provided MCDADE with the buy money and MCDADE provided CS#1 with the suspected fentanyl. CS#1 stated that MCDADE then exited the residence.

179. Case agents observed MCDADE and RINGERSMA, previously identified as part of the investigation in the MCDADE DTO, exit 1512 South 21st Street, Milwaukee, Wisconsin. CS#1 also left the residence and met with case agents.

180. The suspected fentanyl was brought back to the station where it was weighed, and field tested positive for fentanyl. The total weight was 4.03 grams. CS#1 identified MCDADE as "Ro" using a booking photo.

**Controlled Buy May 20, 2025 1425 W Greenfield Ave, Milwaukee, Wisconsin**

181. Following the controlled buy in March 2025, CS#1 indicated "Ro" (MCDADE) texted messaged CS#1 and stated there was a new drug line, 414-541-3794. CS#1 indicated it was not uncommon for MCDADE to change drug lines.

182. On May 20, 2025, case agents met with CS#1 and made recorded calls to the number 414-514-3794 for MCDADE to arrange the purchase of fentanyl from 1425 West Greenfield Avenue, Milwaukee, Wisconsin.

183. Prior to the controlled purchase, case agents positioned themselves in the area 1425 West Greenfield Avenue, Milwaukee, Wisconsin to conduct surveillance. Case agents observed CS#1 enter the residence. Case agents recognized MCDADE's voice on the hidden recording during the time of the transaction. Hidden video during the transaction captured a black male matching the physicals of MCDADE wearing a grey sweatshirt and his hands packaging the suspected fentanyl for the sale (there is no video capturing MCDADE's face). The video then captured the CS#1 then exited the residence with the suspected fentanyl, which was observed by case agents also. Case agents then observed CS#1 walk to his/her vehicle. CS#1 was then followed to a meet location. CS#1 did not make any contact with anyone after leaving 1425 West Greenfield Avenue and prior to meeting with case agents.

184. CS#1 stated that while inside the residence there were numerous people present. CS#1 stated there were three males with pistols and extended magazine. CS#1 identified one of the

males with a pistol as "Nephew", who he identified as BOFFIL by WIDOT photo, a known associate to MCDADE from previous surveillance by case agents.

185. Case agents later reviewed the audio/video recorder footage obtained by CS#1 from the controlled purchase. Case agent heard on the hidden recording MCDADE make note of a MPD squad car that passes through the alley running east and west behind 1425 West Greenfield Avenue. MCDADE calls for people inside the residence to conduct a perimeter of the area. MCDADE can also be heard, after providing the fentanyl to CS#1, asking CS#1 "Are you doing a controlled buy?"

186. The suspected fentanyl weighed 5.8 grams and tested positive for fentanyl.

**MCDADE DTO operations at 1512 South 21st Street, Milwaukee, Wisconsin**

187. Case agents identified 1512 South 21st Street, Milwaukee, Wisconsin as an address associated with MCDADE during the investigation. As previously noted, this property is owned by S2 Real Estate and connected to STAIR. Case agents also identified other connections between MCDADE and STAIR at this property.

188. On November 27, 2024 at approximately 10:30 a.m. case agents conducting video surveillance captured a Subaru, bearing Wisconsin license plate AZD-9422 (Subaru) parked on the parking lot / drive way directly north of 1512 South 21st Street, Milwaukee, Wisconsin. Case agents also observed a Lexus bearing Wisconsin license plate ASG-8148 (Lexus) parked across the street from 1512 South 21st Street, Milwaukee, Wisconsin. Based on other surveillance during the investigation into MCDADE, case agents are aware that MCDADE has used the Lexus during the investigation.

189. Case agents reviewed WIDOT records which indicated the Subaru had a registered owner of “S2 Technologies” with address of 11512 W Woodside Dr., Hales Corners, WI 53130 (STAIR’s address). Case agents conducted surveillance at S2 Real Estate, located at 2925 West Lincoln Avenue, Milwaukee, Wisconsin on this same day. Case agents observed a red Chevrolet

Pickup Truck bearing Wisconsin license plate NL2718 (Chevrolet) running in the lot attached to the building and a male driver entering and exiting the building of S2 Real Estate. Case agents reviewed WIDOT records for the Chevrolet and determined that it had a registered owner of "S2 Technologies" with address of 11512 W Woodside Dr., Hales Corners, WI 53130 (STAIR's address).

190. On August 6, 2025, case agents conducted surveillance in the area of 1512 South 21st Street, Milwaukee, Wisconsin from approximately 11:50 a.m. to 1:20 p.m. Case agents observed numerous people coming and going from 1512 South 21st Street, Milwaukee, Wisconsin. Some of the males and females seen walking in and out of 1512 South 21st Street, Milwaukee, Wisconsin were identified as known drug users. Case agents are aware that just prior to STAIR's arrival, as described below, a female identified as Tozi Grace Topbear left the residence of 1512 South 21st Street. Shortly thereafter, Milwaukee Sheriff's Office Deputy Christopher Bacon conducted a traffic stop on this vehicle. (MCSO Cad #25-142210). No evidence of drug trafficking was revealed during the traffic stop, but there were indications of prostitution activity. Immediately after the traffic stop, at approximately 12:40 p.m., case agents observed MCDADE and RINGERSMA at the residence. Case agents also observed MCDADE exit the residence with another person. They observed MCDADE and that person walk together to the area of South 21 Street and West Orchard Street on the southeast corner. Afterward, case agents observed multiple people walking in the area in a manner consistent with a "perimeter check" that appeared consistent with checking the area for security concerns or law enforcement.[2]

191. After the perimeter check described above, case agents then observed MCDADE re-enter 1512 South 21st Street, Milwaukee, Wisconsin. At approximately 12:55 p.m. case agents observed STAIR exit a white Tesla bearing Wisconsin license plate, AEB-6163 (Tesla). STAIR

[2] This is consistent with the "perimeter check that occurred during the controlled by on May 20, 2025 at the address of 1425 West Greenfield Avenue, Milwaukee, Wisconsin. MCDADE called for a "perimeter check" of the immediate area due to a marked squad traveling through the area. This is described previously in the affidavit.

walked into the front entrance of 1512 South 21st Street, Milwaukee, Wisconsin. At approximately 1:04 p.m. STAIR was observed exiting the residence. STAIR spoke on the phone outside the residence and then re-entered. At approximately 1:11 p.m. STAIR again exited 1512 South 21st Street, Milwaukee, Wisconsin. This time, STAIR was holding a black bag in his right hand (Figures 1 and 2). STAIR was observed speaking with MCDADE prior to re-entering his Tesla and leaving the area to the north. At 2:05 p.m., STAIR was observed at 1425 West Greenfield Avenue, Milwaukee, Wisconsin, as further described below.



(Figure 1)



(Figure 2)

192. On September 23, 2025, MPD executed a state search warrant at 1512 South 21st Street, Milwaukee, Wisconsin. Prior to the search warrant, MPD officers conducted a traffic stop of Javarius WILLIAMS, who was observed leaving 1512 South 21st Street. WILLIAMS was on a Facetime call at the time of the traffic stop. Officers searched WILLIAMS and located $1991.85 in various small denominations, consistent with drug sales. Inside WILLIAMS vehicle was a plastic, designer baggy which contained a green leafy substance suspected to be marijuana which later tested positive for THC and weighed 1.7g.

193. Within less than five minutes of WILLIAMS' traffic stop, numerous subjects, including BERRY, were observed leaving 1512 South 21st Street, and going to 1541 South Union Street, Milwaukee, Wisconsin, where MPD also executed a state search warrant.

194. Inside 1541 South Union Street, where BERRY was located after fleeing 1512 South 21st Street, officers located a "Juicy" branded backpack near her, that officers also observed carrying. Inside BERRY's backpack was $2,109.84 primarily in singles and smaller denominations, consistent with drug sales. Also located in the backpack was a clear, knotted plastic baggy which contained a grey, sandy substance which later tested positive for fentanyl and weighed .05g. Officers located a total of 7.29g of cocaine, 1.09g of fentanyl and 4.90g of THC at the residence; a black, Polymer P80 handgun bearing no serial number and equipped with a gold trigger and tan magazine; numerous digital scales; thousands of hypodermic needles; numerous boxes of baking soda (a common item used to make crack cocaine) and over a dozen nasal doses of Naloxone which is used to counter the effects of an overdose..

195. Officers located similar items at 1512 South 21st Street, Milwaukee, Wisconsin, including multiple operational digital scales, hundreds of hypodermic needles, numerous boxes of baking soda and over a dozen nasal doses of Naloxone. Officers also located identifiers for BERRY.

196. During the execution of the search warrant at 1512 South 21st Street, Milwaukee, Wisconsin., law enforcement also located notes and information consistent with drug trafficking, including a notebook located on the top of the refrigerator with the following notation: "*Stacey was to 14th…Stacey weighted up herself 3.02 grams for Lexi to dump no fronts dimes between 15 and 20 halves. 14… different scale, 2.96 grams Lexi using*."

197. Based on my training and experience, and my involvement in this investigation and as detailed further below, I believe that "Stacey was to 14th" refers to another trap house operated by MCDADE using BERRY, owned by STAIR, and located at 1425 West Greenfield Avenue, which is by 14th and Greenfield. I also know that the term "grams" is often used as weights for user amounts of controlled substances. I know that the term "front" refers to allowing dealer or users to obtain

controlled substances with an agreement to pay later. I also know the terms "dime" and "halves" are used by drug traffickers and drug users to refer to drug weights; however, the drug weight amount will change given the type of controlled substance. Based on my training and experience, the notebook is consistent with someone else being in charge of the operation (trap house) but having other DTO members engage in the drug sales and record the sale amounts.

198. Additional indicators that 1512 South 21st Street, was being used for drug trafficking located during the September 23, 2025 search warrant include:

a. The recovery of a black 9 mm polymer semi-automatic handgun (no serial number);
b. a .380 Ruger, semiautomatic handgun, bearing serial number R75-508058;
c. 615 grams of suspected marijuana (field tested positive for THC);
d. .42 grams of suspected cocaine (field tested positive); and
e. an orange pill that field tested positive for amphetamine.
f. a note within another room at 1512 South 21st Street, Milwaukee, Wisconsin that stated, "Basement Rules; Don't Touch what doesn't belong to you; 20 min sessions – add-ons must be $10 or more to obtain more session mins to stay inside; If you make a mess clean it up or you will be suspended from sessions".

199. Based on my training and experience, the items located at 1512 South 21st Street,, are consistent with a trap house, in which individuals are using the location to store and sell controlled substances and then allowing the drug users to use the controlled substances at the location and engage in commercial sex acts. Law enforcement located a second note (Figure 3), which I believe is consistent with the trap house being connected to MCDADE and BERRY.



(Figure 3)

200. Based on my training, experience, and investigation into the DTO, this sign is consistent with BERRY (Stacey), "G", and MCDADE (Ro) likely being in control of this trap house. Further, the statement "DON'T ASK ME FOR SHIT!" would likely refer to obtaining free controlled substances from the drug dealer(s) put in charge of the trap house. "G" was later identified through interviews as Javarious WILLIAMS who was also seen leaving the residence just prior to the search warrant execution and was taken into custody. Eric Kretlow also identified Javarious WILLIAMS's vehicle as "G's" vehicle when arrested in by Germantown Police Department on June 27, 2025 (Case # 25-010443). Inside that room, officers located a white loose leaf piece of paper which stated: "20 (half) w/ $20 – full"; "20 (half) w/ $10.00 / $5.00; $40 - $10 (owed) $40 full – G; and "Wall-Dog Brought $111.00 DY *he called Stacey's phone. (will bring rest by later).

201. Case agents also obtained text messages from BERRY to another individual arrested during the search warrant, which captured discussing her drug trafficking and the MCDADE DTO operations:

> 9/9/2025 6:57 PM BERRY: And bring me some more girl too, all them bags consumed half the weight of my hooper
> 9/9/2025 6:59 PM PARR: Ok
> 9/9/2025 9:28 PM BERRY: Come open this door n get this food

9/9/2025 9:28 PM PARR: Tell da door man

Through training and experience, case agent know that "hooper" is a street term used by drug traffickers to reference 3.5 grams and "girl" is slang term used for cocaine. Further, based on my training, experience, and investigation into the MCDADE DTO, I know that a door man is an essential part of a drug house and is the one who allows and restricts people from entering the residence to purchase and use narcotics in the residence.

202. Case agents had previously observed Javarious WILLIAMS at the address of 1425 West Greenfield Avenue, Milwaukee, Wisconsin alongside MCDADE as he was holding a gun hanging from his pant waistline and again observed him leaving 1425 West Greenfield Avenue, Milwaukee, Wisconsin and engaging in hand-to-hand drug transactions in a nearby alley.

**MCDADE DTO's Stash House at 1425 West Greenfield Avenue**

203. At various times between April 2025, and February 2026, United States Magistrate Judges for the Eastern District of Wisconsin have authorized the use of pen registers and trap and trace devices as well as orders for prospective precision location data (pings) for telephones identified as used by MCDADE to engage in drug trafficking. The phone numbers identified as used by the MCDADE DTO included (414) 514-3794 and (414) 439-7468. Case agents conducted physical and electronic surveillance based on electronic surveillance MCDADE's phone numbers 414-514-3794 and 414-439-7468.

204. A review of the data associated with phone numbers 414-514-3794 and 414-439-7468 show a travel pattern consistent with the phones likely being possessed together. Between July 1, 2025 and August 12, 2025, those phones were commonly and consistently, on a nearly daily basis, located near the 1400 block of West Greenfield Avenue. Indeed, the phones appeared to be communicating with towers in the area of 1425 West Greenfield Avenue, Milwaukee, Wisconsin every day from July 1, 2025 to August 12, 2025 with the exception of July 7, 2025 and July 9, 2025.

205. During the same time period, case agents have observed MCDADE in this area, specifically at 1425 West Greenfield Avenue, Milwaukee, Wisconsin.

206. On July 15, 2025 at approximately 9:15 AM a black male with no shirt walked to the front door of 1425 West Greenfield Avenue, Milwaukee, Wisconsin and knocked at the door . Moments later, three individuals emerged from a Chevy SUV, bearing Wisconsin license plate SAH 8297 (Chevy) and walked to the front door of 1425 West Greenfield Avenue, Milwaukee, Wisconsin. Case agents identified one of the males who exited the Chevy as MCDADE, one as a black male with a boonie hat, and the third as a white male in a maroon Champs t-shirt (Figure 4).



(Figure 4)

207. Case agents observed MCDADE walk onto the porch area of 1425 West Greenfield Avenue, Milwaukee, Wisconsin. Case agents observed MCDADE was carrying a firearm, with what appeared to be an extended magazine under his left arm.

208. On October 14, 2025, MCDADE was arrested by MPD at 1425 West Greenfield Avenue, Milwaukee, Wisconsin. Located on MCDADE was $2,097 and a Motorola razor smartphone determined to have telephone number (414) 460-9608 and a black Apple iPhone determined to have telephone number (414) 243-1392. Inside 1425 West Greenfield Avenue, MPD located over 140 grams of cocaine and 90 grams of fentanyl from a trash can located near the window MCDADE and others attempted to jump out of before being apprehended. When MPD executed the warrant, MCDADE and others inside the trap house at 1425 West Greenfield Avenue attempted to flee out of a window. MPD arrested MCDADE around 11:41 p.m.

209. MPD also located: a Phoenix Arms Raven .25 caliber handgun, numerous ammunition; a gray Samsung touch screen cellphone with a black case; a gray Samsung touch screen cellphone with a black and pink case; digital scales; drug paraphernalia; suspected drug ledger, and items consistent with cooking crack cocaine. Also located inside was a camera surveillance system, including DVR systems. The surveillance system located by MPD was consistent with the surveillance system CS#2 described to case agents. MPD also located a document with MCDADE's name on it in a bedroom. Law enforcement also found thousands of hypodermic needles and over a dozen nasal doses of Naloxone, which is used to counter the effects of an overdose. Based on training and experience, I believe that the items located are consistent with the residence being used as a trap house.

210. Also located in the residence with MCDADE were 11 other people including HOWELL and NOKES. Both NOKES and HOWELL have been long time associates of MCDADE. NOKES was observed at the residence previously on surveillance as well.

211. Search warrants were obtained for several phones located during the search warrant including a phone recovered from MCDADE and a phone recovered from the bathroom where NOKES was the lone occupant and taken into custody. Case agents located messages between MCDADE and STAIR consistent with drug trafficking. Officers observed text messages consistent with NOKES possessing the phones, including CashApp user name $CristalNokes1. Law enforcement also observed NOKES engaged in drug trafficking at MCDADE's trap house, 1425 West Greenfield Avenue. For example, case agents located a conversation with 414-***-8499 (Lexy) and NOKES between August 2025 and September 2025.

Received 08/09/2025 at 12:22PM UTC: **NOKES**: You good?
Sent 08/09/2025 at 12:22PM UTC: **Lexy**: Yup
Received 08/11/2025 at 1:18PM UTC: **NOKES:** Are you good over there?
Sent 08/16/2025 at 4:29AM UTC: **NOKES**: Can't hear, music to loud im not on 14th im by my mother in law crib if u need something you have to stop over here..?
Received 08/16/2025 at 4:30AM UTC: **Lexy**: Okay
Received 08/16/2025 at 4:31AM UTC: **Lexy**: Where am I going then

Sent 08/16/2025 at 4:32AM UTC: **NOKES**: How much u needed
Received 08/16/2025 at 4:32AM UTC: **Lexy**: Teenier?
Sent 08/16/2025 at 4:38PM UTC: **NOKES**: OK I'm on 10th n locust address 2843 n 10th st
Received 08/16/2025 at 5:35PM UTC: **Lexy**: You good?
Sent 08/16/2025 at 5:38PM UTC: **NOKES**: Yes ma'am same place
Sent 08/16/2025 at 6:52PM UTC: **NOKES**: OK what you needed
Received 08/16/2025 at 6:53PM UTC: **Lexy:** G
Received 08/16/2025 at 7:22PM UTC: **Lexy:** Is it buy n fly or can I sit for a min?
Sent 08/16/2025 at 7:23PM UTC: **NOKES:** I'm not on 14th lex I said im in same place I was last night
Sent 09/01/2025 at 5:48PM UTC: **NOKES:** Lexi ima need atheist hundo today I really don't want to do the most w you but at this point I feel like u tryin to test my G so what's understood ain't gotta be explained lmk asap but that Lil hundo if I have to come get you to do your dates here I will but don't let these mfkrs get in your ear about me Lexi I'm being very patient w you that shit dead now
Received 09/01/2025 at 9:54PM UTC: **Lexy**: You'll get it when you get it tonight. Ain't no one going n following me with my dates. You got me fucked up on that one. My bills came first!!!! Rent child support and phone bill not no suppose dope debt which ain't even the case.. it's on cash app it was completed. But ayy you need money that bad all you had to do was say so. Also, I will not put up with you talking to me like a "pimp" for the night.

212. Case agent knows from training and experience that drug users will often send a text message stating "you good" when inquiring about a purchase of narcotics from a drug dealer to see if the dealer if ready with the illegal substance. Case agent also recognize that the word "Teenier" in response to how much someone needs is consistent with a common amount of drugs: a "16th" = 1/16, which equates to a 16th of an ounce being 1.75 grams. Case agents also recognized that the above conversation is consistent with a drug user and drug dealer (NOKES). Case agent knows from this investigation that "14th" is used to indicate MCDADE's DTO trap house, 1425 W Greenfield Ave, Milwaukee, Wisconsin. Case agent also knows that address "2843 n 10th st" given in the text thread is associated with ALLEN, a known drug runner for MCDADE.

**Evidence on MCDADE's Phones Demonstrating STAIR's knowledge and acquiescence to drug trafficking at S2 properties.**

213. After the search warrants and MCDADE's arrests, law enforcement conducted a search of the phones located on MCDADE's person. On May 17, 2025, at 8:22 p.m., STAIR via **TARGET TELEPHONE 3** texted MCDADE's phone (414) 243-1392 with STAIR's address of "11512 W Woodside Dr, Hales Corners WI 53130." On May 18, 2025, at 12:06 a.m., STAIR via

**TARGET TELEPHONE 3** texted MCDADE "Call tomorrow, we are crashing early." Then, at 12:49 p.m., STAIR via **TARGET TELEPHONE 3** texted MCDADE, "When can you swing by?" On May 19, 2025, at 11:03 a.m., MCDADE texted STAIR via **TARGET TELEPHONE 3** "10 minutes away, Sam". STAIR responded, "I'm at the office". Case agents located a recorded video on MCDADE's phone which appeared to be dated May 19, 2025. The video captured MCDADE and two other individuals at a location, which case agents believe to be STAIR's Hales Corners residence. This belief is based, in part, upon my overall investigation into the DTO including surveillance of STAIR's residence and a review of a pilot of "American Slumlord," which is a video available on YouTube featuring STAIR and the interior of his residence. On the video, case agents also observed a female consistent with STAIR's wife. Once inside STAIR's residence, the video showed MCDADE conduct an apparent drug transaction with the female, believed to be STAIR's wife (screenshots from video Figures 5 and 6). Based on my training and experience, I believe that MCDADE provided REGINA Stair with a quantity of cocaine, based upon the appearance of the substance he provided to her.



Figure 5



Figure 6

214. Other communications on MCDADE's phone demonstrated STAIR's awareness of MCDADE DTO drug trafficking at S2 Real Estate properties. For example, on April 10, 2025, MCDADE and STAIR exchanged messages discussing moving MCDADE's "aunt" into a house for $2,000. Later that same day, MCDADE requested another place for his "aunt" and STAIR

specifically asked about drug activity at the location. STAIR acknowledged the "activity" at another house that appeared to be connected to MCDADE.

> **STAIR** (5:09 pm): Security
> **MCDADE** (7:35 pm): Sam call me
> **STAIR** (7:36 pm): Please text me
> **MCDADE** (7:37 pm): Sam do have another unit for my aunt t
> **MCDADE** (7:39 pm): I mean I do work for you or can we work it out
> **STAIR** (7:54 pm): Will it a a drug free house no activity?
> **STAIR** (7:55 pm): Way too much activity at that house today. People in and out like crazy
> **MCDADE** (7:57 pm) It wasn't my activity

215. Based on my training, experience, and investigation to date, this set of messages confirms STAIR's awareness of drug trafficking at residences owned by STAIR and utilized by MCDADE. STAIR's questioning of whether the new unit would be drug free in reference to "too much activity" taking place at the other residence is consistent with STAIR's general attempts to rent to drug traffickers who engage in trafficking in a manner meant to avoid law enforcement detection.

**MCDADE DTO While MCDADE Incarcerated**

216. Case agents have reviewed jails calls from MCDADE's PIN since MCDADE has been in custody at the Milwaukee County Jail. Case agents reviewed a jail call made on October 20, 2025, from MCDADE's PIN to telephone number (262) 234-8917. As detailed above, I am familiar with MCDADE's voice and can identify MCDADE as the inmate placing this call. During the call, MCDADE referred to the user of (262) 234-8917 as "Nephew." Based on this investigation, case agents identified "Nephew" as BOFFIL. During this call, MCDADE directed BOFFIL to contact STAIR.

217. Case agents identified and listened to a subsequent call between BOFFIL and MCDADE on October 20, 2025. In that call, MCDADE asked whether BOFFIL "talked to him?"

218. Based on the investigation into the DTO and the fact that BOFFIL contacted STAIR later in this call, I believe that MCDADE was referring to STAIR when MCDADE asked about

"…him…". BOFFIL confirmed that he had spoken with him. BOFFIL explained that STAIR discussed how there was damage to the house when "the crackhead went out the window." Based on the investigation into the DTO, this statement is consistent with when several people, including MCDADE, attempted to flee out the window of 1425 West Greenfield Avenue, Milwaukee, Wisconsin during the execution of a search warrant. Further, based on my training and experience, the term "crackhead" is often used to describe a person who uses crack cocaine. This comment by STAIR further confirms his knowledge of MCDADE's use of 1425 West Greenfield Avenue for the purpose of drug trafficking.

219. During the October 20, 2025, call between BOFFIL and MCDADE, MCDADE directed BOFFIL to call STAIR on another phone. BOFFIL did so, and case agents could hear STAIR on the recorded jail call. Based on this, I believe BOFFIL contacted STAIR using BOFFIL's phone to avoid law enforcement detection, as directed by MCDADE. STAIR stated to MCDADE, "Man, I gave you a heads up that...ah, there's so much drama going on." At that point, MCDADE spoke over STAIR and cut STAIR off stating: "Sam, Sam, quit talking over the phone." Based on my training, experience, and investigation into the MCDADE DTO and STAIR, I believe STAIR's statements about a "heads up" relate to STAIR attempting to warn MCDADE when his trap houses (specifically, 1425 West Greenfield Avenue) were being watched by law enforcement. MCDADE cutting STAIR off from continuing to discuss those warnings was, I believe, an attempt to stop STAIR from making incriminating admissions on a recorded record jail call, especially given that STAIR was called by a third-party and did not hear the warning that precedes every jail call about the call being recorded. After MCDADE stopped STAIR from discussing the warning, MCDADE and STAIR discussed other warnings on the call.

220. After concluding the conversation with STAIR, MCDADE directed BOFFIL to call "Jeanette" (LOPEZ). Case agents then heard LOPEZ on the phone.

221. During the call, MCDADE directed LOPEZ to "go somewhere where I can rap with you real quick." LOPEZ responded, "I'm by myself." During the conversation, MCDADE asked LOPEZ to talk with "dude" and indicated that MCDADE just spoke with him on the phone and says "Sam." Based on context, I believe MCDADE was referring to STAIR. MCDADE, STAIR, LOPEZ, and BOFFIL then discussed the potential of STAIR helping MCDADE with his bail. LOPEZ then stated, "he should have been 10 steps ahead." Based on training, experience, and the investigation into the DTO, I believe that LOPEZ's statement referred to STAIR warning MCDADE regarding the police coming to search 1425 West Greenfield Avenue. The three individuals then discussed the possibility of covering MCDADE's bail through getting money back from the deposit (on the S2 apartment) and selling a car.

222. Based on my training and experience, I believe this recorded jail call is consistent with STAIR, LOPEZ, BOFFIL, and MCDADE discussing their drug trafficking enterprise using STAIR's S2 properties and STAIR's attempts to warn MCDADE when MCDADE's trap houses were being watched or targeted by law enforcement.

223. Case agents reviewed additional phone calls to MCDADE DTO members, consistent with him still obtaining controlled substances and having his members engaged in drug sales. On January 9, 2026, at approximately 8:13 p.m., MCDADE called ALLEN at (262) 330-2333 from the Milwaukee House of Corrections (Jail call # 743521914 _2025018513_01-09-2026_20-13-47_1-262-330-2333). ALLEN stated, "I'm on my way to Chicago, he just told us to come on now." MCDADE told ALLEN to be safe. MCDADE then told ALLEN that he spoke to "Nephew" and told "Nephew" that he owed "Vicky" an apology. MCDADE then said that "J-Rock" was over at that lady "J-Lo" house and the "feds" ran in his house earlier and "Y'all gotta keep that nigga away from y'all." MCDADE later said that he "J-Rock" was running because he owed "Nephew" some money. MCDADE asked ALLEN if anybody had an extra phone near her and ALLEN could be heard in the background trying to get an additional phone. MCDADE asked if "old girl" gave her some money

and ALLEN stated, "Yep, she gave me U/I three hundred." MCDADE asked if she ("old girl") was at the house and ALLEN replied she was not and was at "Greenfield." MCDADE then called her a "stupid ass." Based on the investigation to date, case agents believe MCDADE sent others including, ALLEN to Chicago, IL to obtain narcotics for MCDADE. These individuals then transport the narcotics to the greater Milwaukee area for further distribution. Therefore, in this call, case agents believe ALLEN told MCDADE that she was on her way to Chicago to meet with MCDADE's source of supply ("I'm on my way to Chicago, he just told us to come on now").

224. On January 10, 2026, at approximately 9:54 a.m., MCDADE called ALLEN at (262) 330-2333 from the Milwaukee House of Corrections (Jail call # 7435301310 _2025018513_01-10-2026_09-54-46_1-262-330-2333). An unidentified male (UM) answered the phone and MCDADE asked if ALLEN was asleep. The UM advised that ALLEN was asleep and asked MCDADE if he should wake her up. MCDADE told UM to wake ALLEN up and then asked, "Y'all make it back safe?" The UM replied, "Yeah, yeah, [U/I] everything good." ALLEN then got on phone and said, "Hello." MCDADE laughed and suggested how tired ALLEN must be. MCDADE stated, "Yeah, that's good you all met him. You met him, huh? He cool?" ALLEN acknowledged, "Uh-huh." MCDADE said, "Yeah, he cool." As thingy" yet and ALLEN stated that she thought somebody put it in her closet and would look for it. Based on this call, case agents believe the UM traveled to Chicago with ALLEN to meet MCDADE's source and obtain controlled substances the previous day.

225. On January 18, 2026, at approximately 11:22 a.m., MCDADE called ALLEN at (262) 330-2333 from the Milwaukee House of Corrections (Jail call # 743939236 _2025018513_01-18-2026_11-22-10_1-262-330-2333). At approximately 9 minutes 52 seconds into the call, ALLEN asked MCDADE, "Who supposed to be goin' up north with Ra Ra?" MCDADE replied, "I don't know, shit. Who going?" ALLEN replied, "Not me." MCDADE stated, "You going to take that ride." MCDADE then stated, "Ask him, ask him who there." ALLEN was talking to somebody in

background and ALLEN stated, "Uncle Junior." MCDADE replied, "Yeah, they can go." ALLEN told MCDADE, "They gotta take a phone." At 10 minutes 58 seconds MCDADE asked, "What time they leaving today? What time they leaving?" ALLEN asked, "Huh?" MCDADE repeated, "What time they leaving?" ALLEN advised, "I don't know, I gotta get them a phone first, cause they ain't finna use my shit." ALLEN then stated, "But then again, they can, 'cause I ain't gotta do nothing but sleep all while the going up there." ALLEN then yelled in background, "Y'all can take my phone U/I." Based on the investigation thus far, case agents believe MCDADE has individuals transport narcotics to Fond du Lac County, which is north of Milwaukee. Therefore, case agents believe MCDADE inquired as to who was going to transport.

226. On January 19, 2026, at approximately 7:28 p.m., MCDADE called ALLEN's phone, (262) 330-2333, from the Milwaukee House of Correction (Jail call # 744027894 _2025018513_01-19-2026_19-28-35_1-262-330-2333). A UM answered and MCDADE identified the UM as "Uncle Junior." Durin the call case agents believed that "Brother-in-law" who is known to be HOWELL was with "Uncle Junior". The call appeared to consistent of MCDADE checking to see if "Uncle Junior" and HOWELL made their trip to meet with "Lisa" and "Bird." Eventually, "Uncle Junior" and HOWELL were able to get in contact with "Lisa" who then spoke on the phone with MCDADE. Soon thereafter, MCDADE reached the time limit on his call and the call ended. Based on the investigation thus far and recorded jail calls between MCDADE and "Lisa," case agents believe "Lisa" is a narcotics customer of MCDADE's. Therefore, case agents believe "Uncle Junior" and HOWELL took ALLEN's phone, (262) 330-2333, with them as they drove to deliver narcotics to "Lisa."

227. On January 21, 2026, at approximately 3:04 p.m., MCDADE called ALLEN at (262) 330-2333, from the Milwaukee House of Correction (Jail call # 744102904_2025018513_01-21-2026_15-04-25_1-262-330-2333). At about 9 minutes 8 seconds into the call, ALLEN said, "I gotta wait, cuz uh, this weekend I'mma send "Brother-in-Law" to Chi-Town." MCDADE acknowledged.

ALLEN continued, "Yeah, so I have to get him straight." MCDADE stated, "Ask Brother-in-Law and Uncle Junior, can they go up, go, go, go up that way [U/I] tomorrow or Friday." ALLEN asked, "Where?" MCDADE replied, "Up there where they went." ALLEN said they could not because she and "Brother-in-Law" were going to see Lola tomorrow. As mentioned previously, case agents believe "Brother-in-Law" is HOWELL, and that "Chi-Town" is a nickname for Chicago, IL. Therefore, case agents believe ALLEN informed MCDADE that HOWELL would travel to Chicago that weekend to obtain narcotics. MCDADE asked if HOWELL and "Uncle Junior" could travel to the next day or Friday to "Lisa".

**MCDADE DTO at 710 South 21st Street, Milwaukee, Wisconsin**

228. Case agents identified MCDADE DTO member BYNUM and 710 South 21st Street, Milwaukee, Wisconsin as a trap house. Case agents conducted electronic and physical surveillance and reviewed recorded jail calls, which confirmed BYNUM's drug trafficking conduct. Further, on February 13, 2026, case agents obtained a federal GPS tracking warrant for ALLEN's bronze, 2009 Nissan Murano, bearing Wisconsin temporary license plate Y5912J, also assigned Wisconsin license plate BCX-5254, VIN: JN8AZ18W99W152835 (Murano). Case agents reviewed data pertaining to the location of ALLEN's Murano, which was consistent with ALLEN engaged in drug trafficking with BYNUM at 710 South 21st Street, Milwaukee, Wisconsin.

229. As part of the investigation into the MCDADE DTO, case agents know that 710 South 21st Street, Milwaukee, Wisconsin is owned by S2 Real Estate and is a well known "trap house" formerly run by MCDADE, during the summer of 2024. Since MCDADE's incarceration, MCDADE has contacted BYNUM's telephone number 414-295-5951 over forty times. Given MCDADE's prior operation of 710 South 21st Street as a trap house as part of his DTO, MCDADE's continued contact with BYNUM during his incarceration, and case agents' observations of BYNUM conducting hand-to-hand transactions from that residence during MCDADE's incarceration, case agents believe that BYNUM took over the operation at 710 South 21st Street.

The continued operation of that location as a trap house and MCDADE's continued contact with STAIR during his incarceration further demonstrates STAIR's continued profiting from the maintenance of his properties for the purpose of drug trafficking. Case agent believes that MCDADE is continuing to profit from these S2 Real Estate owned "trap houses" that continue to engage in drug trafficking based on jail calls.

230. On February 1, 2026, at approximately 11:01 a.m., MCDADE, while incarcerated at the Milwaukee County Community Reintegration Center, placed a recorded jail call to BOFFIL (aka "Nephew" or "Neph") at (262) 234-8917. Portions of the conversation ensued as follows:

**MCDADE**: Yeah, where, where you at, Neph?
**BOFFIL**: At home.
**MCDADE**: Oh you said at the house?
**BOFFIL**: Yep.
**MCDADE**: Did you call Slim [BYNUM]?
**BOFFIL**: No, not yet.
**MCDADE**: Yeah. Yeah. Make sure you smack the fuck outta Mike, too. That's what I was tellin' you.
**BOFFIL**: I will.
…..
**MCDADE**: I'ma tell Vicky, I'ma tell Vicky to give you a couple dollars, dog. I'ma tell Vicky to give you a couple dollars.
**BOFFIL**: Yup.
…..
**MCDADE**: That's what I'm telling you. Like, where Slim, when you talk to Slim, like Slim, "Where the fuck that's at?" You gonna see, you gonna be like, "What the fuck?" They got J-Rock, he in jail for a high-speed chase, dope, um… But yeah, where Slim, where Slim gon' take you to, you're gonna be like, "What the fuck? Who house…it's a straight 'bando.
**BOFFIL**: Slim's an idiot
**MCDADE**: Yeah so, like, if like Vicky, you know, like fifteen hundred-fifteen hundred, a thousand dollars a day kinda shit. I'm like man, be careful. The police, the police, the police came over there but they was like, "We can't put y'all out, 'cause it's y'all, y'all, y'all um, squatters."

231. Case agents know that "Slim" is a nickname for BYNUM, and therefore this call confirmed that MCDADE, BOFFIL, and BYNUM all know each other. MCDADE also said he was going to have ALLEN give BOFFIL money ("I'ma tell Vicky to give you a couple dollars"). Case agents also know that "'bando" is short for "abandoned" and is a term used by MCDADE to refer to a vacant or abandoned house that he and others use to distribute narcotics from. MCDADE

described the house BYNUM distributes from as a 'bando and if BYNUM showed the house to BOFFIL, BOFFIL would be surprised at the state of the house ("where Slim gon' take you to, you're gonna be like, "What the fuck? Who house…it's a straight 'bando"). Next, MCDADE implied that BYNUM and ALLEN work together and make $1,000-$1,500 per day selling narcotics ("Yeah so, like, if like Vicky, you know, like fifteen hundred-fifteen hundred, a thousand dollars a day"). MCDADE expressed concern and told BYNUM and/or ALLEN to use caution to avoid police contact ("I'm like man, be careful").

232. On February 24, 2026, at approximately 12:51 pm case agents were conducting surveillance and observed a black male, wearing all black clothing with long black dreads and a black mask pulled down under his chin (BYNUM), exit 710 South 21st Street. The male walked to the street and met a black Acura SUV that was parked in front of 710 South 21st Street. The black male handed a person in the passenger seat a small baggie with an off-white substance. The black male was then observed receiving currency from the front passenger and placing it into his front pocket. The black male then returned to 710 South 21st Street and entered the front door. Based on my training and experience, this observation was of a hand-to-hand drug trafficking transaction. At the conclusion of surveillance, case agents reviewed a jail booking photograph of BYNUM and confirmed that the black male observed conducting the hand-to-hand drug transaction was BYNUM.

233. Also, on February 24, 2026, case agents observed BYNUM (wearing a face mask) exit the door to 710 South 21st Street, Milwaukee, Wisconsin, approach a vehicle stopped directly in front of the residence, reach into the front passenger window, and engage in another hand-to-hand transaction before returning to the door of 710 South 21st Street and re-entering the residence. Although BYNUM was wearing a face mask, case agents were able to confirm from his stature and distinct long dread locks that this was the same male observed in previous days engaging in similar

drug transactions. Based on my training and experience, BYNUM's observed conduct is consistent with a hand-to-hand drug transaction.

234. On March 8, 2026, STAIR (TARGET TELEPHONE 3) had phone contact with MCDADE, who called by way of third party from a recorded jail phone at the Milwaukee County House of Corrections where he is currently in custody. Case agents reviewed telephone tolls and MCDADE's jail records and determined that Amber VALADEZ used phone number 414-305-4012 to assist MCDADE in calling TARGET TELEPHONE 3. (Jail Call: 746382304_2025018513_03-08-2026_11-41-50_1-414-305-4012_9108). During this recorded jail call VALADEZ and MCDADE spoke about where VALADEZ is staying and she begins a conversation about person who was rumored to have told on MCDADE, which lead to his current arrest. MCDADE became animated and indicated a desire to know who was speaking about MCDADE. VALADEZ says that it was "Cut" that told her about MCDADE. MCDADE stated that those people hate him. After speaking about this matter MCDADE asks VALADEZ to make 3-way-call the number 414-732-3682 (TARGET TELEPHONE 3). MCDADE stated I need to talk to my boss "the millionaire Sam". VALADEZ made the call and the following is the call between STAIR and MCDADE:

**STAIR**: Hello?
**MCDADE**: Hello. Sam, how you doin'? You in Mexico?
**STAIR**: Yup.
**MCDADE**: Aw, you know who this is?
**STAIR**: [CHUCKLES] Yeah! [U/I] [CLEARS THROAT]
**MCDADE**: Aw, this your partner, man.
[VOICES OVERLAP]
**STAIR**: [CHUCKLES]
**MCDADE**: I'm waitin' on you to come get me, Sam. Why you won't come get me, Sam?
[VOICES OVERLAP]
**STAIR**: [CHUCKLES]
**MCDADE**: Man, you know I'm good to you, though. Why you won't come get me, man?
**STAIR:** [CHUCKLES] 'Ey! [U/I] [CLEARS THROAT] I don't know. [CHUCKLES]
**MCDADE:** Y'know I– Y'know I– Y'know I'm good for it, Sam. Like, y'know I'ma take care of bi'ness [sic], y'know you gon' get your money with interest.
**STAIR:** Yeah. [SNIFFLES]
[VOICES OVERLAP]

**MCDADE:** Like, I was your– I was your main partner, I was your guy, man.
**STAIR:** Yeah.
**MCDADE**: I don't know why you're leavin' your guy out here like this.
**STAIR**: Your number's just too high. Like, this other guy that I helped out; I only had to put in like five (5) "K." And gave him a loan.
[VOICES OVERLAP]
**MCDADE**: Yeah?
**STAIR**: Because he has, uh… He actually had retirement money 'cause the guy was so old. [LAUGHS] So, yeah, but he…
[VOICES OVERLAP]
**MCDADE**: Man, Sam, you–
[VOICES OVERLAP]
**STAIR**: Pulled from his–
[VOICES OVERLAP]
**MCDADE**: Know I'm gonna give you that money back, man. You gon' clear… I– I give you interest on that muthafuckin' money, man.
**STAIR**: [GROANS]
**MCDADE**: I'll let you clear, like, sixty (60) from me. When you…
**STAIR**: [CHUCKLES]
**MCDADE**: Y'know when I get back to court… But listen for real, Sam! Y'know when I go back to court, y'know you're gon' get your money right back. Plus, I'll give you the ten thousand (10,000)… I'll give you ten thousand (10,000) on top of the fifty (50).
**STAIR**: [GROANS] It's… Yeah, no, that's way too high. Too risky.
**MCDADE**: [SIGHS] Aw, man.
**STAIR**: Man.
**MCDADE**: [MUMBLES] I'm trynna see, man. Man, I–
**STAIR**: You gotta… That kinda sucks, how long…
[VOICES OVERLAP]
**MCDADE**: You said what?
**STAIR**: … How long they gonna… or they, they're just gonna make you stay 'til trial and then decide? That kinda sucks.
**MCDADE**: I don't know, Sam. I guess so. I don't know what the fuck they on here, man. I'ma try to put in for another bail reduction, though.
**STAIR**: Yeah, yeah. Try to get it down. I mean, if it gets down quite a bit, we could do somethin'. If you get somebody that could maybe, like…
[VOICES OVERLAP]
**MCDADE**: Okay, okay.
**STAIR**: If you can get it down to, like, ten (10), and if your sister or somebody can put in five (5), and I could put in five (5).
**MCDADE**: Okay.
**STAIR**: Or six (6) and four (4), or somethin' like that.
**MCDADE**: I'm tryna see if this lady will gone put–give you the deed to her house for me. I should know somethin' by tomorrow.
**STAIR**: Okay. [SNIFFLES] Yeah, the um… Y'know what you gotta say is, y'know, "Hey my family is here, my, y'know, everything's here. I don't know anything else. I don't know what the risk is. It's not fair to keep, uh, people in. We can't prepare ourselves."
**MCDADE**: Yeah.
**STAIR**: So, it's like, guilty without a trial.

**MCDADE**: Right.
**STAIR**: It's like focus on, I don't know… They like to hear that liberal stuff where they talk about [CHUCKLES] you know?
**MCDADE**: Yeah.
**STAIR**: Keepin'– keepin' black people down because they're in lower income areas and you give 'em a– a bail amount; white folks can bail themselves out and black folks, they're forced to sit in jail!
**MCDADE**: Right. When you– When you comin' back, Sam, from Mexico?
**STAIR**: Um, this weekend, like, on Sunday I think.
[VOICES OVERLAP]
**MCDADE**: Okay, okay, o– Next Sunday?
**STAIR**: Yeah, yeah. Next Sunday, not today, got a whole week.
**MCDADE**: A'right, Sam, think about me, man.
**STAIR**: Yeah, yeah. Keep me posted if you can get it down a bit. I mean just say, y'know…
[VOICES OVERLAP]
**MCDADE**: Okay.
**STAIR**: You should throw out some racist stuff say, you know, "This is just keeping…"
**MCDADE** Man, Sam get your ass outta here. [LAUGHS]
**STAIR**: [LAUGHS] Play the, play the black card.
**MCDADE**: A'right.
**STAIR**: [LAUGHS]
**MCDADE**: A'right Sam. I'ma keep in touch.
**STAIR**: Alright, good luck. A'right, bye.
**MCDADE**: A'right, yeah.
**STAIR**: Bye.
[END OF CONVERSATION]
**MCDADE**: Hello?
**VALADEZ**: Yeah.
**MCDADE**: Yeah, call Slim, four (4), one (1), four (4), two (2), nine (9), five (5), fifty-nine (59), fifty-one (1). (414-295-5951)
**VALADEZ**: Two (2), nine (9), five (5), fifty (50)- fifty-four (54) fifty-one (51)?
**MCDADE**: No.

MCDADE and Valadez continue the conversation about her speaking to "Cut" and VALADEZ states that "Slim" did not pick up. VALADEZ asks why he needs to speak to "Slim" and then he states it is because Slim got that number. MCDADE then asks that she call Lisa. The call ends shortly after this.

235. This call confirms that STAIR and MCDADE were "partners" and that MCDADE worked for STAIR as S2 Real Estate, as also indicated by CS#2, described above. The call also indicates that STAIR previously assisted other "partners" to get released from jail (MCDADE: I don't know why you're leavin' your guy out here like this. STAIR: Your number's just too high.

Like, this other guy that I helped out; I only had to put in like five (5) "K." And gave him a loan.) STAIR ultimately refuses to provide such a high bail price of $50,000, but agrees to something lower, while also acknowledging that MCDADE always previously paid STAIR back with interest. STAIR also provides MCDADE with advice on how to attempt to get out of jail. That advice, coupled with STAIR's agreement to assist MCDADE financially is consistent with STAIR and MCDADE being partners in the MCDADE DTO given the financial benefit that STAIR would get if MCDADE were released from custody and could continue his drug trafficking from STAIR's properties. This belief is explicitly supported by statements made during this call in which MCDADE discusses the profit STAIR made due to MCDADE's drug-trafficking from STAIR's properties prior to MCDADE's arrest (**MCDADE**: I'll let you clear, like, sixty (60) from me. When you… **STAIR**:[CHUCKLES]). STAIR's laughter here is another example of how STAIR laughs when confronted with discussions of his unlawful activities, as described above.

236. After the call with STAIR, MCDADE provided VALADEZ a the phone number for "Slim" of 414-295-5951. Subscriber information for that phone number showed it was attached to BYNUM at the address of 710 South 21st Street, Milwaukee, Wisconsin, a property owned by S2 Real Estate.

237. On March 18, 2026, at approximately 9:02 a.m., the Murano departed ALLEN's residence at 2843 North 10th Street, Milwaukee, Wisconsin. At approximately 9:24 a.m., the Murano stopped in the vicinity of 710 South 21st Street. The Murano remained in this area until approximately 9:42 a.m. Based on their investigation to date as well as intercepted recorded jail telephone calls, case agents believe BYNUM is supplied narcotics by MCDADE and MCDADE's associates. Therefore, case agents believe ALLEN, or somebody using the Murano, met with BYNUM to deliver drugs to BYNUM and/or obtain drug proceeds from him. This is further consistent with BYNUM having controlled substance for distribution, as described below.

238. On March 21, 2026, case agents established surveillance near 710 South 21st Street, Milwaukee, Wisconsin. At approximately 12:23 p.m., surveillance units observed BYNUM, who was standing on the front porch, lean over the porch's railing and conduct a suspected hand-to-hand narcotics transaction with a black male on crutches who was subsequently identified as Denzel M. JONES. D. JONES walked to a nearby blue Toyota, bearing Wisconsin license plate AYE-3620 (Toyota), and conducted a suspected hand-to-hand narcotics transaction with an occupant of the Toyota. D. JONES then walked to a nearby Kia minivan, bearing Wisconsin license plate X4021W (Kia), and appeared to conduct another suspected hand-to-hand narcotics transaction with an occupant of the Kia. As previously discussed, based on my training and experience, these quick hand to hand transactions inside a vehicle are consistent with a drug transaction. Case agents believe BYNUM retrieved the narcotics from inside 710 South 21st Street and provided them to D. JONES. D. JONES then sold these narcotics to drug customers.

239. Case agents also observed BYNUM on the second story balcony of his residence several times and they observed BYNUM walk in/out of the door to 710 South 21st Steet. Case agents observed that three separate males were making contact at 710 South 21st Steet and speaking with BYNUIM (Figure 7) as he stood on the upper balcony at approximately 12:28 PM.



Figure 7

240. BYNUM eventually exits 710 South 21st Steet and meets with some of the other males that were communicating with him from the upper porch of 710 South 21st Steet. BYNUM engages in hand-to-hand transactions with these males, which based on my training and experience was consistent with a hand to hand drug transaction (Figures 8, 9, and 10).



Figure 8



Figure 9



Figure 10

241. In addition, on March 27, 2026, at approximately 6:11 a.m., the Murano departed ALLEN's residence at 2843 North 10th Street, Milwaukee, Wisconsin. At approximately 6:27 a.m., the Murano stopped in the vicinity of 710 South 21st Street. The Murano remained in this area until approximately 6:53 a.m. Case agents again believe ALLEN, or somebody using Murano, met with BYNUM to deliver drugs to BYNUM and/or obtain drug proceeds from him.

242. On April 2, 2026, at approximately 4:14 p.m., the Murano departed ALLEN's residence at 2843 North 10th Street, Milwaukee, Wisconsin. At approximately 5:33 a.m., the Murano stopped in the vicinity of 710 South 21st Street. At approximately 6:10 p.m., the Murano returned to 2843 North 10th Street, Milwaukee, Wisconsin.. Case agents again believe ALLEN, or somebody using the Murano, met with BYNUM to deliver drugs to BYNUM and/or obtain drug proceeds from him.

243. Case agents conducted toll analysis on ALLEN's phone. From February 1, 2026, through April 3, 2026, ALLEN was in contact with BYNUM's telephone (414) 295-5951 seventy-seven (77) times, with the most recent contact on April 2, 2026 and the movement of the GPS is consistent with ALLEN's vehicle traveling to the area of the 700 block of S 21st St, Milwaukee, Wisconsin at 5:33 PM that day. Based on the above-mentioned calls and analysis of the location of ALLEN's Murano, case agents believe ALLEN remains involved in furthering MCDADE's drug trafficking network. Case agents believe ALLEN stores and distributes narcotics

at her residence, and secures drug-related proceeds at her residence. In addition, case agents believe ALLEN retrieves drug proceeds from other individuals who distribute narcotics for MCDADE including, but not limited to, BYNUM.

**LOCKETT DTO:**

244. During this investigation it was discovered by case agents that LOPEZ was engaged in drug trafficking herself, and directing her 16-year-old son J.M.L. to deliver illegal substances, as well as facilitating the acquiring of drug residences through the S2 Real Estate Business with STAIR, and ordering illegal evictions. This discovery initially made from the review of recorded jail calls from LOCKETT at the Milwaukee County House of Corrections to LOPEZ. These deliveries in part appeared to be done on LOCKETT's behalf while he was incarcerated. Through the investigation into the LOCKETT DTO, case agents have identified the following members: LOCKETT, LOPEZ, J.M.L., ABRAHAM, and ROSS.

245. Case agents reviewed a recorded jail call from November 10, 2025, from inmate LOCKETT's assigned PIN to LOPEZ's TARGET TELEPHONE 1. Case agent verified that this call occurred with TARGET TELEPHONE 1 by reviewing the pen register/trap and trace data for TARGET TELEPHONE 1. Case agents reviewed WIDOT records which indicated LOPEZ and LOCKETT both share the same address of 333 North 36th Street, Milwaukee, Wisconsin, which is owned by STAIR. J.M.L. is a minor son of LOPEZ and LOCKETT. During surveillance of the LOCKETT DTO, case agents have confirmed LOPEZ, LOCKETT and J.M.L. all reside together at 333 N 36th St, Milwaukee, Wisconsin, since LOCKETT's release from custody in January of 2026.

246. Based on training, experience, and review of the recorded jail call, case agent believes LOPEZ, LOCKETT, and J.M.L. are drug trafficking. Case agents believe LOPEZ was engaging in drug trafficking at LOCKETT's direction while he was incarcerated.

247. For example, during the recorded call on November 10, 2025, LOPEZ explained to LOCKET that "Junior" was pulled over when "Junior" was going over by "Rick."

**LOPEZ**: Nothing.
**LOCKETT:** What?
**LOPEZ:** Nothing. I had Junior go over by Rick, and go see Rick, and [unintelligible] got pulled over by the police.
**LOCKET:** What!
**LOPEZ:** Yes.
**LOCKETT:** On his way there?
**LOPEZ:** Yes.
**LOCKETT:** Oh my goodness, [unintelligible]. What man.
**LOPEZ:** Actually, what I said. They said he was going 50. I said bro. You going 50 or whatever, how you going 50 in a 30 – 30 residential lane. He like, he started arguing with the police, like, oh, show me the clock, there's no way I was doing 50, or whatever, he was like you can't even go 50 or whatever, he was, I was going 5 over the speed limit, or whatever. He was like show me the 50, he was like I don't have to tell you anything, or whatever. He was like, uh, Junior started arguing with them. He was like, step out of the car and then they called for backup, because Junior was being disorderly, or whatever. They said he arguing with the police. I said bro how you think, far that get you, or whatever, you arguing with the motherfucking police, or whatever, thinking they won't arrest your motherfucking ass.
**LOCKETT:** Who he with?
**LOPEZ:** Hun?
**LOCKETT:** Who was he with?
**LOPEZ:** By himself.
**LOCKETT:** They still got him?
**LOPEZ:** No. They released him to me …(continues)

248. Based on the recorded jail call and knowledge of LOCKETT DTO's geographic area of operations, case agents reviewed law enforcement records and identified that a traffic stop occurred on November 10, 2025, in the area of South 19th Street and National Avenue, Milwaukee, Wisconsin. Specifically, in MPD call # C2511101262, MPD officers conducted a traffic stop on November 10, 2025, at approximately 8:06 p.m. which matched details provided during the jail call of "Junior's" traffic stop - an underage driver, without a license, cited for speeding, and picked up by a mother. MPD officers stopped a black Honda, bearing Wisconsin license plate BBY-8888 (Honda). The driver of the Honda was identified as J.M.L. Case agents reviewed MPD Officer Cesar Martinez-Sanchez's body camera from the traffic stop of J.M.L. on November 10, 2025. Case agents observed that officers never obtained J.M.L.'s phone number during the traffic stop; however, case agents observed J.M.L. with two cellphones on the body camera recording. Case agents also observed that J.M.L. was on a speaker phone call with LOPEZ at the time of the stop, who J.M.L.

identified as his mother. Case agents recognized the voice of LOPEZ as the female on the speaker phone call with J.M.L. in the body camera recording. Case agents further observed, moments later LOPEZ arrived at the traffic stop location and identified herself as J.M.L.'s mother. Based on these interactions, I believe this traffic stop is consistent with LOPEZ's description of J.M.L. or "junior" being involved in a traffic stop.

249. Case agents reviewed the call detail records of LOPEZ's telephone number 414-439-8361 (TARGET TELEPHONE 1) from November 10, 2025. They observed that TARGET TELEPHONE 1 had an outgoing call to CRUZ's telephone (414) 759-8782 at 4:05 PM on November 10, 2025. Based on my training, experience, and the content of the jail call described above, I believe that CRUZ is the "Rick" that LOPEZ referenced in the jail call with LOCKETT. I further believe that LOPEZ sent J.M.L. to deliver controlled substances to CRUZ and that J.M.L. was traffic stopped before that transaction. This is consistent with the specific wording of LOCKETT's question about when J.M.L. was stopped: "On the way there?," LOPEZ's response "Yes," and LOCKETT's shocked and worried reaction: "oh my goodness." This is so because if J.M.L. was stopped on the way to deliver controlled substances to "Rick" [CRUZ], then he would have those substances in the car with him, which would explain the shock and concern expressed by LOCKETT and LOPEZ about J.M.L.'s violation of traffic laws and argumentative nature with police

> **LOCKETT:** Well that's over. Don't send him to do nothing. What if he have got in the car with some shit.
> **LOPEZ:** I know. I just didn't think it wasn't the first time I asked him it wasn't no problem or whatever. I'm like Uhhuh,
> **LOCKETT:** He shouldn't have be driving over there anyway, he ain't ready. It's hot as fuck going over there. They give him a ticket or something.
> **LOPEZ:** Yeah, they gave him a ticket for no license and speed. Yeah,
> **LOCKETT:** He's done. You can't get no license now.
> **LOPEZ:** He said as long as he get his permit then he can take it to court. They'll dismiss his ticket.
> **LOCKETT:** Fucking goof.
> **LOPEZ:** So fuck is you want. Exactly what the fuck did you speeding bro? Like you in a rush to go somewhere Monday.
> **LOCKETT:** I don't send him to do that no more. Not over there.

250. Based on my training and experience, I believe "some shit" refers to an unknown controlled substance. This belief is further based on LOCKETT's query, "what if he have got in the car with some shit?" Based on my training and experience, I believe LOCKETT was expressing concern that law enforcement would attempt to search the car during the traffic stop ("what if he have got in the car") and locate the controlled substances ("some shit") J.M.L. possessed to deliver to CRUZ. I also believe that LOPEZ has had J.M.L. deliver drugs on their behalf in the past ("…I just didn't think it wasn't the first time I asked him it wasn't no problem or whatever…"). I also believe that LOCKETT is aware that the area where J.M.L. was travelling to or from to conduct this transaction is the focus of heavy police attention ("…He shouldn't have be driving over there anyway, he ain't ready. It's hot as fuck going over there…").

251. Later in the same jail call, LOPEZ provided the phone to a younger-sounding male who case agents identified as J.M.L. Based on my training and experience, LOCKETT appears to be upset with J.M.L. for not collecting drug debts, for driving poorly and being uncooperative with police:

> **J.M.L.:** Hello?
> **LOCKETT:** Yo. Why didn't you go get my money from that [n] bro.
> **J.M.L.:** It's in, it's in the, it's in the Honda [appears to be talking to someone else]. Hello?
> **LOCKETT:** Why didn't you get my money from Sean?
> **J.M.L.** Shit, he call, he said he was calling me, I ain't never get none of his calls. And he just now called me today. And –
> **LOCKETT:** So what'd you tell him?
> **J.M.L.** Hun?
> **LOCKET:** What'd you tell him about my money he already owe?
> **J.M.L.:** Shit, I told him he can't get nothing until he pay, until he pay what he owe.
> **LOCKET:** Bro, ya'll letting this [n] hold ya'll with my money bro. I ain't never had to deal with that shit [unintelligible]. It's a whole week and the [n] ain't pay at all. How the fuck that happen?
> **J.M.L.:** I don't know. I been at that [n] job. I was at that [n] job for like 10 minutes. I was asking the people where he's at. They was talking about they didn't know where he's at. All types of stuff.
> **LOCKETT:** Bro, you know where the [n] live, bro. You scared to go to [n] house and why's you arguing with the police though?
> **J.M.L.:** Bro, I wasn't even arguing with them.
> **LOCKETT:** You are dumb bro. What the fuck, bro you let [unintelligible] get away with my money bro. I ain't never had to waste two weeks to get paid my money bro. You

supposed to been on top of that shit bro. [Unintelligible] the fuck, what you talking about, you go up there every couple of minutes go get that shit from that [n] bro. He a fucking hype [n]. He not going to sit around. You told him, he can't get none until he pay. What you think he going to do? He going to call somebody else. [N] ain't never going to pay me that motherfucking money bro. Like you scared to check [n] over the fucking money bro.
**J.M.L.:** No, I check that [n] over 100 times over bro.
**LOCKET:** You checking good enough, that [n] still paying with you.
…

252. Based on my training and experience, case agent knows drug traffickers will use "hype" to refer to someone who is addicted to controlled substances. Case agent further knows drug traffickers may provide drugs to customers up front and receive payment at a later date, this is often referred to as "fronting". Based on my training and experience, case agent believes that LOCKETT was upset with how J.M.L. was collecting LOCKETT's drug debts from a drug customer ("What'd you tell him about my money he already owe?"). Based on review of the recorded call, it appears J.M.L. may have told the drug customer that he/she would not receive additional controlled substances from J.M.L. until the drug debt was paid ("Shit, I told him he can't get nothing until he pay, until he pay what he owe."). Case agent believes that LOCKETT then explained to J.M.L. that this refusal to serve the drug customer will not stop the drug user from spending money on controlled substances or getting controlled substances. LOCKETT pointed out that the drug user will just go to another drug trafficker. ("You told him he can't get nothing until he pay. What you think he gonna do? He gonna call somebody else…"). The recorded jail call continues between LOCKETT and J.M.L. and they continue to discuss their drug trafficking.

**LOCKETT:** Yeah, man, I don't trust you to be on 19th. You going to let a motherfucker treat you bro. Then you sitting there talking about motherfucking and you ain't bro, you arguing with the police while you going to do some illegal shit, cuz you about to be fucking quiet.
**J.M.L.:** Bro, I wasn't even arguing with them, they...
**LOCKETT:** How, how you asking to see that speedy thing? They don't show nobody that shit. This is Milwaukee, Wisconsin bro. When the fuck you think they going to show you a speed radar? And you calling them bro. And you don't even know your fucking laws bro. You do not need to be driving this shit bro.
**J.M.L.**: I wasn't, I didn't even want to be driving.
**LOCKETT:** You got a motherfucking, you got a ticket, before you even got your shit.

**J.M.L.:** No, I was damn near in my room asleep all type of shit. She came in my room woke me up and told me to go over there.

253. Based on my training, experience, and investigation into the DTO, case agent believes that LOCKETT states he does not trust J.M.L. to engage in drug trafficking in the area of 19th and National given J.M.L.'s lack of ability to collect drug debts and concern over law enforcement detection ("Yeah, man, I don't trust you to be on 19th. You going to let a motherfucker treat you bro."). Also, based on my training and experience, case agent believes LOCKETT and J.M.L. discuss J.M.L. no longer doing drug transactions with a vehicle, which case agents believe means J.M.L. will use other methods to continue drug trafficking for the DTO ("You do not need to be driving this shit bro."). Based on my training, experience, investigation into the DTO, and statements made during this record jail call, case agent believes LOPEZ, J.M.L. and LOCKETT engaged in drug trafficking, while LOCKETT was in custody.

254. On November 16, 2026, at approximately 10:33 a.m., LOCKETT, while incarcerated at the Milwaukee County Reintegration Center, placed a HomeWAV video call to LOPEZ. Because this was a video call, case agents were able to positively identify LOCKETT and LOPEZ. During the conversation, LOPEZ walked to what appeared to be a bedroom in the residence. LOCKETT asked:

**LOCKETT**: Where my- where that money at? Flash that pape.
**LOPEZ**: I gotta get to it. It's all your shoes right here.

LOPEZ then showed LOCKETT several pairs of shoes and sandals until she was ultimately holding a brown cloth bag.

**LOPEZ**: Dang, you got me pulling this out. Fuck.
**LOCKETT**: Okay, that's the bag.
**LOPEZ**: That's the bag.
**LOCKETT**: Ok. That's good.
**LOPEZ**: What, you think I didn't still have the bag, sir?
**LOCKETT**: What up in it? Josie's room?
**LOPEZ**: Yep.
**LOCKETT**: He don't even sleep in there, do he at all?
**LOPEZ**: No, but he spend a lot of time in here.

**LOCKETT**: He do? That's where he be at most of the time?
**LOPEZ**: Yep.

LOPEZ eventually opened the cloth bag and removed several rubber-banded stacks of US currency. While doing so, the conversation continued:

**LOCKETT**: Ohh. Did you ever count it?
**LOPEZ**: No.
….
**LOCKETT**: Damn, I wish you get up in the trunk of that car. Ohh. Ohh…That's some hard…Yeah, you gotta stay on that nigga ass.
….
**LOPEZ**: Tell Neph, we not fucked up over here. Where Neph at?
**LOCKETT**: He somewhere over there. He playing cards. [ASIDE: Hey!] Hold on, I'll let you talk to him real quick.

At this point, another inmate housed with LOCKETT appeared next to LOCKETT and spoke with LOPEZ. Case agents recognized this individual as JOSHUA N.M. Lopez (H/M, 08-03-04) who case agents believe is LOPEZ's nephew ("Neph").

**LOPEZ**: Hey. I just wanted to tell you we not fucked up over here, Neph.
**JOSHUA**: Let's go now.
**LOPEZ**: We not fucked up over here. This just a li- this just a little bit.
**JOSHUA**: Let's go now.
**LOPEZ**: Hey, you miss...you miss the money?
**JOSHUA**: Hell yeah.
**LOPEZ**: Hey, that's what you-, that's what you guys coming home to.
**JOSHUA**: Let's go now. What you on, Aunt Jeanette?
**LOPEZ**: I had to fuck this nigga up, bro I had to fuck him up this morning Like bro don't don't play with me. I'ma come up here and tear this bitch up, bro. Y'all better have my fuckin' money.
**JOSHUA**: Who?
**LOPEZ**: The nigga at the gas station.
**JOSHUA**: Aw man.
**LOPEZ**: Nigga's gonna tell me my last shit that my son gave him basically that the shit, uh, it was trash or whatever. I said you smoked my shit, nigga, you better have my motherfuckin' money. I don't give a fuck about none of that I'ma come tear this bitch up.

JOSHUA returned the phone to LOCKETT who continued his conversation with LOPEZ:

**LOPEZ**: Yeah, I just had to show him.
**LOCKETT**: Hell yeah. That ain't shit, that's what's like in them bags. You hear me?
**LOPEZ**: Yeah.
**LOCKETT**: In the trunk of the car, that's where the real pape at. Your little bitty hands can't even hold that shit.

**LOPEZ**: I was just trying to count it while I was putting it away.
**LOCKETT**: Yeah, count it. Should be like, 40-something.
**LOPEZ**: Mmm.
**LOCKETT**: Man, I can't wait to get back. That shit just gave me so much motivation. You don't even understand.

….

**LOPEZ**: I was like, I gotta put my-, my money…I got hundreds too. I got like five hundred, worth of, worth of singles and fives and shit.
**LOCKETT**: For real?
**LOPEZ**: Yeah.
**LOCKETT**: How much, how much is all that?
**LOPEZ**: And that's why I don't even count it. I mean that's why I don't count that, 'cause, it's just...
**LOCKETT**: Messy.
**LOPEZ**: Hold on real quick.

LOPEZ then walked out of the room and, when she walked back in, LOPEZ was carrying additional bundles of US currency and placed them on the desk in front of her.

**LOPEZ**: Yeah, I just keep it in my little…you know what I'm sayin'?
**LOCKETT**: That's your little stash?
**LOPEZ**: Yeah.
**LOCKETT**: Or that go with the other stash, or that's yours?
**LOPEZ**: No this is mine.
**LOCKETT**: Oh okay. Okay.
**LOPEZ**: This is my stash.
**LOCKETT**: Oh okay. That's what's up.
**LOPEZ:** [LOPEZ counted the bundles of US currency she brought into the room.] Five. Five.
**LOCKETT**: Did you count that what you just put in that bag?
**LOPEZ**: Nuh uh.
**LOCKETT**: Why you didn't count it?
**LOPEZ**: I don't know, it was like forty-something hundred.
**LOCKETT**: Okay. Alright, yeah.
**LOPEZ**: I stopped counting after three thousand. Then I-, then it was going on, yeah, it's like forty-something hundred. Then I got five hundred of my own.
**LOCKETT**: Uh-huh. Damn, that look good. Hell yeah, man. You gotta keep it going.
**LOPEZ**: I know, I was trying. I was trying.
**LOCKETT**: I know. Shit happens.
**LOPEZ**: That's what I said. I was taking-, dealing them little odds and ends. You get what I mean?
**LOCKETT**: Uh-huh.
**LOPEZ**: Like I told Juni, all of it add up type shit.
**LOCKETT**: Yeah.
**LOPEZ**: That's why they stopped fuckin' with-, 'cause they like, "Oh I got five." Juni like, "Fuck y'all." "I got six." He like, "Fuck y'all."
**LOCKETT**: Yeah, you gotta take all that.

| | |
|---|---|
| **LOPEZ**: | You gotta take all that, bro. All that is some money. Like, all money is good money. |
| **LOCKETT**: | Hell yeah. You don't, you don't, you don't fuckin' do the drugs. So shit. |
| **LOPEZ**: | Yeah, I even got-, I even got, I wanna say, almost ten dollars in like the dollar pieces too. You know what I mean? |

255. Case agents know "pape" is short for "paper," which is a term commonly used to refer to money. Therefore, case agents believe LOCKETT asked LOPEZ to show him the money he and LOPEZ have stored at their residence, 333 North 36th Street, Milwaukee, WI. LOPEZ retrieved a cloth bag which contained the U.S. currency from a concealed area inside a child's bedroom. Case agents are aware that drug trafficking is a cash-intensive business and that drug traffickers typically conceal the proceeds of their trafficking in areas in their homes that are unlikely to be searched, like children's bedrooms. During this call, LOPEZ and LOCKETT indicated that the amount in the bedroom was a small portion of their trafficking proceeds and that there was significantly more drug proceeds in the trunk of a vehicle, likely at LOPEZ's and LOCKETT's residence, 333 North 36th Street. LOCKETT then encouraged LOPEZ to keep selling narcotics while he was incarcerated ("You gotta keep it going"). LOPEZ advised that she had been selling smaller amounts of narcotics than LOCKETT had been before he was incarcerated ("I know, I was trying. I was trying." / "That's what I said. I was taking-, dealing them little odds and ends. You get what I mean?") LOPEZ then stated that J.M.L. (aka "Juni") was not often willing to sell these smaller amounts of narcotics ("Like I told Juni, all of it add up type shit." / "That's why they stopped fuckin' with-, 'cause they like, 'Oh I got five.' Juni like, 'Fuck y'all.' 'I got six.' He like, 'Fuck y'all.' / "You gotta take all that, bro. All that is some money. Like, all money is good money.") LOCKETT agreed and said that J.M.L. was not the one using the narcotics, so J.M.L. should still be willing to sell the smaller amounts ("Hell yeah. You don't, you don't, you don't fuckin' do the drugs. So shit.").

256. On December 21, 2025, at approximately 9:06 a.m. and 9:32 a.m., J.M.L., using (872) 346-3502, called LOPEZ at TARGET TELEPHONE 1. J.M.L. advised that "Venezuela just came to the crib with a 55-inch, uh, flat screen TV in a box. I ain't gonna lie, I'm finna grab it." LOPEZ

asked, "Why?" J.M.L. replied, "He asking for, uh, a one point five." LOPEZ confirmed, "That's it?" and J.M.L. affirmed. At approximately 9:32 a.m., J.M.L. again called LOPEZ and said, "I don't think this motherfucker work." LOPEZ replied, "That's why you were supposed to fucking test the bitch before you gave him anything." LOPEZ advised that she would call "Venezuela."

257. Immediately after, LOPEZ, using TARGET TELEPHONE 1, placed several calls and ultimately a text message, at approximately 9:32 a.m., to (414) 800-0398. This text message read, "That tv don't work I want my shit back." Eventually, at approximately 1:54 p.m., LOPEZ, at TARGET TELEPHONE 1, received a call from Venezuela using (414) 800-0398. Some of this conversation was in Spanish and translated by a trained linguist. LOPEZ reiterated that she was upset the tv was broken and said, "I want my money. If you don't have the money, don't reach out." Venezuela asked, "How much? How much? How much?" LOPEZ asked in the background, "How much did you give him, Juni?" Juni replied, "Like one fifty." Venezuela said, "No, but, hey, hey listen. Listen. No, but you are saying the [STAMMERS] gram fifty. Not not, not hundred-fifty." LOPEZ responded, "You smoked? You smoked it, right?" Venezuela answered, "No, I still have some." LOPEZ said, "Okay. Bring me my stuff from earlier." At approximately 2:01 p.m., Venezuela, using (414) 800-0398, sent a text message to LOPEZ at TARGET TELEPHONE 1, which read, "Can you please calm down? I'm not taking advantage of you or anything. I told your son to check it right away, and he gave me 1.5 grams. A gram costs 50, and half a gram costs 30, so that would be 80 dollars in total..."

258. Case agents believe an individual known to LOPEZ and J.M.L. as "Venezuela," using telephone number (414) 800-0398, traded a 55" television to J.M.L. in exchange for 1.5 grams of crack cocaine. When J.M.L. told LOPEZ that the television did not work, she texted and called Venezuela indicating she wanted the crack cocaine back. While discussing what J.M.L. gave to Venezuela in exchange for the television, Venezuela confirmed, it was 1.5 grams of crack cocaine, not $150 and LOPEZ asked if Venezuela already smoked the crack cocaine, but he advised that he

did not smoke all of it. Later, Venezuela confirmed through text message that 1.5 grams he received from J.M.L. was only valued at $80. Case agents know that a gram of crack cocaine will often cost approximately $50 for street-level users.

259. On December 26, 2025, at approximately 3:35 p.m., LOPEZ, at TARGET TELEPHONE 1, received a call from ABRAHAM using (414) 301-0354. During this call, LOPEZ said, "All he likes is coke and bitches." "ABRAHAM asked, "Manuel?" LOPEZ replied, "But…Manuel. But I don't front nothing to no nigga, nigga. Nigga, I'm C.O.D., okay? Bitch, you gotta pay me." ABRAHAM asked, "Like, like Ro then?" LOPEZ said, "You know he did." ABRAHAM repeated himself, "Like Ro, then?" LOPEZ said, "That's just where the number was… He paid me every well… He paid me, he paid my kids… Hey, we was paid."

260. Based on training and experience, I know C.O.D. is an acronym used by drug traffickers to refer to "cash on delivery." I also know that drug traffickers will use the term "front" to refer to allowing drug customers to obtain controlled substances without initial drug payment. The drug customer will pay the drug trafficker at a later time either once the controlled substance has been re-sold for a profit or when the drug customers has obtained the drug debt funds by other means. Therefore, I believe this conversation was LOPEZ stating that she did not allow drug customers to pay at a later time. Case agents also know MCDADE's nickname is "Ro." Therefore, case agents believe that ABRAHAM's reference to "Ro" was a question of whether MCDADE had also paid up front for narcotics LOPEZ then implied that MCDADE had been allowed to pay for narcotics at a later time because he was a trustworthy narcotics customer who paid her and her family a lot of money.

261. On December 27, 2025, at approximately 3:53 p.m., LOPEZ, using TARGET TELEPHONE 1, called J.M.L. at (872) 346-3502. LOPEZ asked where J.M.L. was and he replied, "Uh, nineteenth, the gas station." LOPEZ said, "Uh, uh, "B" said he got twenty for some weed." J.M.L. replied, "Alright, it in my, uh, it's in my room." LOPEZ asked, "Where?" J.M.L. clarified,

"Uh, it should be on my desk. If not, look in that basket." LOPEZ said, "Uh, alright, I'll wait 'til you get to the house so you can give it to him." J.M.L. advised he was getting gas and would be on his way home.

262. Based on training and experience, case agents believe J.M.L. was not at home and LOPEZ was attempting to conduct a sale for marijuana. Further, based on the investigation into the DTO, I know LOPEZ and J.M.L refer to Brandon KING as "B." Based on training and experience case agents know "weed" is a term used by drug users and drug traffickers to discuss marijuana. Case agents believe J.M.L. had the marijuana in his room and directed LOPEZ to obtain the marijuana and sell it to "B." However, LOPEZ indicated she would wait for J.M.L. to get home.

263. On December 28, 2025, at approximately 6:14 PM, LOPEZ, at TARGET TELEPHONE 2, received a call from LOCKETT at the Milwaukee Secure Detention Facility using (414) 533-1440. During this conversation LOCKETT asked about "on 19th, you ain't hear nothing about what's going on over there?". LOCKETT asked if "dude still locked up." LOPEZ replied, "from what I know yeah, um she got till the first, or Claudia said the writ say the 2nd." LOCKETT also spoke about the "dude" in the garage and LOPEZ stated that she does not think it will be too much of a problem. LOCKETT stated, "I don't think it going be too much of a bigger problem I'm gonna have to get there and get everybody up outta there, so when its time its time." LOPEZ stated, "I don't know what that means but you just gonna have to be careful." LOCKETT then asked if maintenance people have been sent to the address. LOPEZ spoke about the current status of the building and stated, "I'm not sure what your expecting".

264. Case agents reviewed all the Wisconsin Circuit court cases related to eviction with S2 Real Estate properties and found only one that was related a property with an address on "19th Street", Milwaukee County Case Number 2025SC031604 S2 Real Estate Group 829 S 19TH ST LLC vs. Patrice D Jackson. Case agents observed in the notes the following entry related to a "writ" order for the "2nd", "*Stay of writ of restitution ordered to JANUARY 2, 2026. 2ND & 3RD CAUSES*

*OF ACTION HAVE BEEN DISMISSED."* Case agents also believe that the statement of "dude still locked up" is in reference to the recent drug trafficking arrest from the address of 829 South 19th Street, Unit #5, Milwaukee, Wisconsin (MPD Case #C2512090080 and MPD Case Number C2512010140).

265. Based on training, experience, and the investigation into LOCKETT DTO, case agents believe this call was a discussion of LOCKETT and LOPEZ's plans to resume drug trafficking at a location near 829 South 19th Street upon LOCKETT's release, which was later confirmed by on LOCKETT's rent of 829 South 19th Street, Apt 1, Milwaukee, Wisconsin and the investigation. LOPEZ advised LOCKETT on the call that there was potential for law enforcement attention on that address.

266. On December 29, 2025, at approximately 9:00 p.m., LOPEZ, using TARGET TELEPHONE 1, received a call from LOCKETT at the Milwaukee Secure Detention Facility using IC Solution's general jail number, (414) 533-1440. LOCKETT said, "Man I wonder Angie and them at, [U/I] in the alley." LOPEZ replied, "Uh, I don't know. I still be seeing them sitting outside though…I said, they still be sitting outside." LOCKETT asked, "Who, Angie and them?" LOPEZ answered, "Not Angie. Uh, I'm talking about Too Tall and them." LOCKETT said, "Okay. I'll figure it out. Man, I hope it won't be too much of a hassle trying to get all my people back, bro… Remember Kelly?" LOPEZ said, "Oh, yeah, the white lady." LOCKETT acknowledged, "Hell yeah. [U/I] like super sweating her ass." Later in the conversation, LOCKETT stated, "I might come work…I might come work for y'all for a little while too." LOPEZ reacted, "For real? Okay." LOCKETT continued, "Like I used to when I got myself, when I start grinding, I was working for you. I was needing action at work. You know what I'm saying? You was putting me in the right spots at the right time. I think I can do that [U/I] getting out of jail, about a week after I get out, work there for a couple of months."

267. Case agents believe Angie and Kelly were previous drug customers of LOCKETT's, and that LOCKETT said he hoped when he get released from incarceration he would be able to resume drug trafficking using some of his previous customers ("I hope it won't be too much of a hassle trying to get all my people back"). Case agents know from training and experience that "action" and "grinding" are terms used by drug traffickers to describe selling controlled substances to customers. Therefore, case agents believe that this call involved LOCKETT stating his plans to rent places from S2 Real Estate to engage in drug trafficking. ("I might come work for y'all for a little while too" and "Like I used to when I got myself, when I start grinding, I was working for you). Case agents believe LOCKETT indicated that he previously worked for S2 Real Estate, and that S2 Real Estate allowed him to rent residences for the purpose of selling narcotics ("I was needing action at work. You know what I'm saying? You was putting me in the right spots at the right time").

268. On January 9, 2026, at approximately 11:19 a.m., LOPEZ, at TARGET TELEPHONE 1, received a call from STAIR at TARGET TELEPHONE 3. During this call, STAIR advised, "So, Regina's been sick for, like, a week and during one of her coughing - or two weeks now – and during one of her coughing fits, I think she, uh, um, her sciatic nerve thing…pain is like really bad now, again…because of the way she's sleeping." LOPEZ replied, "Really bad, oh my gosh." STAIR asked, "Do you know anybody that we can get some, um, something for it?" In the background, STAIR asked, "What, what did you used to have for it?" A female voice replied, "Vicodin." STAIR continued with LOPEZ, "Vicodin or something?" LOPEZ stated, "Um, I can ask around for you. Otis isn't here anymore." STAIR said, "Yeah, and our other connection is in jail, too, damnit!" LOPEZ responded, "Right. Or I coulda called him. I just don't know anybody anymore." STAIR said, "I know. Oh! We should ask, uh, um, like Ricky or, um, oh, oh, um, Ricardo!" LOPEZ replied, "Yeah, I don't…no, they take really hard stuff." STAIR said, "Yeah, but they know some people, don't they?" LOPEZ advised, "Uh, I don't know. I could ask around. It

doesn't hurt to ask." STAIR said, "Yeah, maybe ask Ricky and Ricardo. Should I ask Ricky? You think Ricky would give me a heads up?" LOPEZ replied, "Yeah. Well, I mean, you could try him. He has the flu, I'm not sure he's gonna answer for you." STAIR acknowledged.

269. Case agents have identified STAIR's wife as "Regina." Therefore, case agents believe that during this call STAIR was advising that his wife needed to obtain Vicodin to address sciatic nerve pain and STAIR and LOPEZ discussed where they could procure illicit Vicodin, which is a Schedule II controlled substance. Case agents believe that LOPEZ advised that she did not have a specific connection because LOCKETT was incarcerated. In response, STAIR stated that another one of their sources of supply was also incarcerated. Based on this investigation, as described above, case agents believe this was a reference to MCDADE. STAIR then asked if he and/or LOPEZ should call Ricky CRUZ or an individual named Ricardo to obtain Vicodin for REGINA, however LOPEZ believed CRUZ and Ricardo likely did not have access to Vicodin because "they take really hard stuff." This call, like the information described above, confirms STAIR's knowledge of drug trafficking by individuals renting his properties, including LOPEZ, LOCKETT, and MCDADE.

270. Also on January 9, 2026, case agents intercepted numerous wire communications from LOPEZ, at TARGET TELEPHONE 1, regarding the building at 829 South 19th Street, Milwaukee, Wisconsin, being broken into. Case agents have also identified 829 South 19th Street, Milwaukee, Wisconsin as LOCKETT's suspected trap house based on recorded jail calls and court-authorized intercepts. Through the numerous communications with LOPEZ using TARGET TELEPHONE 1, case agents identified J.M.L., ABRAHAM, BOFFIL, and "Frog" as all being contacted to assist LOPEZ in getting the individuals who broke into 829 South 19th Street out of the building and securing the location for the purpose of resuming drug trafficking at that location after LOCKETT's release.

271. At approximately 7:07 P.M., LOPEZ, using TARGET TELEPHONE 1, called ABRAHAM using (414) 676-7540. During the call, LOPEZ told ABRAHAM about the people who

broke into 829 South 19th Street, and expressed that she was trying to keep the place secure. ABRAHAM offers to drive there, states that he would smack the guys, and they would not come close with some pistols. ABRAHAM also told LOPEZ he believes that the "white guy" let them in and smokes dope. Both parties further discuss who to send to the location.

272. Based on my training and experience the investigation, case agents believe that 829 South 19th Street was used (and is currently being used) by LOCKETT as a trap house. Based on LOCKETT and LOPEZ's conversations about LOCKETT resuming his drug trafficking activities and his statements about LOPEZ putting him in the right spots, as described above, case agents believe that LOPEZ was preparing 829 South 19th Street for LOCKETT's use for drug trafficking activities. Accordingly, case agents believe that LOPEZ's conversation with ABRAHAM, as described above related to keeping 829 South 19th Street secure pending LOCKETT's release. Further, case agents believe that to ensure that this location is available for LOCKETT to use for drug trafficking upon his release, LOPEZ knew that the squatters had to be removed.

273. At approximately 7:37 p.m. LOPEZ using TARGET TELEHONE 1 contacted BOFFIL at 262-234-8917. LOPEZ told BOFFIL to meet her at 829 South 19th Street because the building was broken into. BOFFIL replied that he would be there in 20 minutes and LOPEZ said she would be there in 10 minutes. LOPEZ then replied: "come on security, come on." Based on the investigation into the DTO, I know S2 Real Estate pays drug traffickers to act as "security," to remove unwanted individuals from S2 properties and that, in exchange, STAIR and LOPEZ provide those who serve as "security" the benefits of properties to use for drug trafficking and forewarnings about law enforcement investigations.

274. At approximately 7:41 p.m. LOPEZ, using TARGET TELEPHONE 1, called ABRAHAM on telephone 414-676-7540. LOPEZ told ABRAHAM that her and J.M.L. were going to pull up to 829 South 19th Steet and that she would call ABRAHAM if she needed him. LOPEZ stated that she and J.M.L. had bats, but that she didn't bring her "hit". Based on training and

experience, case agents believe LOPEZ was referring to not bringing her firearm ("hit") to confront the people that broke into the building.

275. At approximately 7:46 P.M., LOPEZ using TARGET TELEHONE 1 again contacted BOFFIL at 262-234-8917. In the background of the call, case agents heard LOPEZ yelling "you bitch" "you bitch" "you coming in this motherfucker" "I aint playing with you bitch". At that point the call ended. Based on interceptions described above, case agents believed this call captured LOPEZ assaulting the people who broke into 829 S 19th Street as she was attempting to secure the property for the purpose of resuming drug trafficking activities.

276. One minute later, BOFFIL called LOPEZ back. During that call, case agents heard LOPEZ shouting "I'm not playing with you motherfuckers." BOFFIL asked where LOPEZ was and she responded that she was 829. That is consistent with case agents' belief, as described above, that LOPEZ was removing squatters from 829 South 19th Street ("829"). BOFFIL asked whether she was upstairs or downstairs and LOPEZ responded she was upstairs and that "3rd party thought she was playing." LOPEZ then told BOFFIL that she was "good." Based on training, experience and the context of the call, I believe LOPEZ was telling BOFFIL that the people who broke in did not want to leave, but that the threatening situation had resolved. BOFFIL then explained that he thought he was at the right location but is not, and LOPEZ reaffirms where she is. During one of the calls between LOPEZ and BOFFIL during this incident, BOFFIL advised LOPEZ that "Wally" was driving him.

277. After LOPEZ and J.M.L. removed the "hypes" from 829 South 19th Street, as described above, LOPEZ received threatening messages regarding the incident. The parties appeared to be initially confused about where the messages came from, but on January 12, 2026 at approximately 1:23 p.m., "Mikey" Abraham LOPEZ calls LOPEZ to tell her that he knows who is sending her the threatening messages. The portion of the call relevant to that issue is transcribed below:

**ABRAHAM** What was Frog saying somebody calling you?
**LOPEZ** Oh, yeah. I don't know who it is, though.
**ABRAHAM** That's them hypes.
**LOPEZ** How did they get my number?
**ABRAHAM** Through all the other hypes that you probably fuck with.
**LOPEZ** How did they get my number and my address?
**ABRAHAM** Probably through one (1) of the other hypes you fuck with.
**LOPEZ** They don't– How do they know where I live?
**ABRAHAM** [U/I] One (1) of the hypes they know, that you fuck with, that you know– that know your spot.
**LOPEZ** Don't none of the hypes know where I live.
**ABRAHAM** I'm tellin' you, I'm tellin' you. It's one (1) of them.
**LOPEZ** No.
[VOICES OVERLAP]
**ABRAHAM** It's the only way. It makes sense. One (1) of 'em knows of you or some– one (1) of 'em. It's one (1) of 'em that you fuck with. [BACKGROUND: BANGING] A'right, girl.
**LOPEZ** That's what they sent me.
**ABRAHAM** Let me know if you, [GROANS], gotta fuck anybody up.
**LOPEZ** And me and my hypes got a good accord.
**ABRAHAM** [BACKGROUND: BANGING]
**LOPEZ** And only one (1) of 'em ever comes to my– [STAMMERS] the only that one (1) person I ever met with was "B".
**ABRAHAM** Where's the number? I– Oh, here it goes.
**LOPEZ** And then, basically they called, like, twenty (20) times, blocked. Talkin' 'bout they was outside, I said, "Bitch, you ain't outside, 'cause I'm outside, or whatever. Like, bitch, you come over here, I'ma kill your ass," is what I said, shit.
**ABRAHAM** Lemme call this number.
**LOPEZ** They're not gonna answer.
**ABRAHAM** Not even from a different phone?
**LOPEZ** And– You could try it, Sam tried callin' too, they're just gonna start [U/I] your phone. [BACKGROUND: STAIR: Uh, yeah, I mean worst case scenario–]
[VOICES OVERLAP]
**ABRAHAM** A'right, lemme try.
**LOPEZ** [BACKGROUND: STAIR: Yeah, it would be back to us.] Mm-hm, a'right.

278. During this intercepted call ABRAHAM explained to LOPEZ his belief that the only logical explanation is that the "hypes" LOPEZ and J.M.L. kicked out of 829 S. 19th St, were the ones calling and threatening LOPEZ. "Hypes" a term commonly used for drug addicts and in this instance has been used numerous times in LOPEZ's previous conversation with ABRAHAM concerning the persons who were beaten and kicked out of the 829 S. 19th St, Milwaukee, Wisconsin address by LOPEZ and J.M.L on January 9, 2026. ABRAHAM states, "Probably through

one of the other hypes you fuck with." Case agent believes that ABRAHAM means that they likely got LOPEZ's number from some of the other drug users ("hypes") that she would "fuck with", i.e. serve drugs to. In response to this LOPEZ states, "They don't– How do they know where I live?". Case agents believe this response is a tacit admission to the fact that other drug users likely do have her number, but she takes issue with the fact that they could know where she lives. LOPEZ then says that the "only that one (1) person I ever met with was 'B''. Case agents believe "B," is Brandon King with whom LOPEZ meets and conducts transactions from the rear entrance door of LOPEZ's home. This conversation further solidifies the case agents' belief that 829 S 19th St, Milwaukee, Wisconsin is a property that was used as a "trap house" in the past by Otis LOCKETT and was being prepared to resume service as a trap house upon LOCKETT's release from custody.

279. That belief is further supported by a call between LOPEZ and LOCKETT that took place on January 9, 2026, at approximately 8:49 p.m. During that call, which was between TARGET TELEPHONE 1 and 414-533-1440, LOPEZ informed LOCKETT that she and J.M.L. went to "829" and that LOPEZ caught a man and woman in the apartment near #1. LOPEZ stated that ROSS (FROG) was on his way to help at the house. LOCKETT asked if they got in his crib and LOPEZ and J.M.L. both can be heard saying "no". J.M.L. can then be heard saying it was never like this when LOCKETT was over there and that his mom doesn't really let them go over there. LOCKETT and J.M.L. then discuss their plan to be there every day once LOCKETT is released in 12 days. LOCKETT asks if J.M.L. has his "smacker dacker" (case agent believes this is referring to a firearm) on him, and J.M.L. says he does. During the call, LOPEZ states ROSS (FROG) has arrived. LOPEZ is talking about how they did a weak board up of the location and LOCKETT states he is glad they checked the "trap." This call, therefore, confirms LOCKETT and LOPEZ's prior use of the property owned by STAIR as a trap house and their plan to continue using it as such upon LOCKETT's impending release.

**Evidence of DTO's Use and Possession of Firearms in Furtherance of Drug Trafficking**

280. In addition to the evidence described above in which LOCKETT and J.M.L discuss possession of a firearm in the context of restarting drug trafficking at 829 South 19th Street, case agents have intercepted other calls indicating that LOPEZ, J.M.L., and LOCKETT maintain firearms at their residence and on their persons for the purpose of protecting the DTO.

281. For example, on January 2, 2025, at approximately 10:44 a.m., LOPEZ, using TARGET TELEPHONE 2, called Alonzo BROWN at (414) 766-8169. LOPEZ identified BROWN as "Zo," and said, "I'ma have Juni stop over there and, um, bring over these pistols. I need you to clean 'em up and get 'em together for me. They shot 'em off on New Years." BROWN replied, "Oh boy." LOPEZ continued, "I need 'em before, you know… So I'ma have him drop 'em off real quick." BROWN acknowledged, "Okay."

282. Case agents know "Juni" is a nickname used to refer to J.M.L. Therefore, case agents believe LOPEZ informed BROWN that J.M.L. was going to drop handguns off with BROWN so BROWN could clean them. Case agents believe that when LOPEZ stated that she needed them 'before, you know…' LOPEZ was referring to LOCKETT's impending release in February 2026 and their plan to continue to engage in drug trafficking for which they would need firearms for protection of the controlled substances.

283. In another call between LOPEZ on TARGET TELPHONE 2 and LOCKEET, which took place on January 9, 2026, J.M.L. and LOCKETT discussed firearms at the residence. LOCKETT stated that he was upset about "the guy" playing "with the thing," which case agents believe is a reference to an individual named Jayden playing with LOCKETT's firearms in the residence J.M.L. stated that he understood and LOCKETT states that he doesn't want to have to get released and take that thing. J.M.L. responded that he told him [Jayden] that LOCKETT would take it if it is out or around. J.M.L. also told LOCKETT that that Jayden said that he doesn't leave the house without his gun. J.M.L. further warned Jayden to not let LOCKETT see him, which based on the context of the statement, I believe was referring to Jayden's firearm. LOCKETT affirms and

says that if he hears him [Jayden] playing with it then he will ask for it. J.M.L. states he [Jayden] is cocking the gun for no reason and taking the slide off every couple of seconds. Based on these statements, case agents again believe the call was about a firearm. LOCKETT then says that they don't have a reason to have one and he just wants to make sure nothing happens before he gets home. Based on Lockett's statement, case agent believes LOCKETT is referring to J.M.L. and/or Jayden not needing a firearm and that LOCKETT wants to make sure everyone is safe at the residence.

284. During this same call LOCKETT and J.M.L. discuss how J.M.L. needs to get back into contact with someone, because J.M.L. is "ready". Based on prior court authorized intercept between LOCKETT and J.M.L. on TARGET TELEPHONE 1 and TARGET TELPHONE 2, case agents believe J.M.L. is stating he is ready to obtain additional controlled substances. J.M.L. asks LOCKETT to contact "him" because J.M.L. does not have his number. Based on my training, experience, and investigation into the DTO, I believe J.M.L. does not have the number for the drug source and is asking LOCKETT to contact the source. LOCKETT says that he has the guy's email and that they can Facetime. Based on my training and experience, I know that those engaged in criminal conduct will often use Facetime to discuss their criminal conduct, because criminal offenders often believe Facetime communication cannot be intercepted by law enforcement. Therefore, I believe, LOCKETT's and J.M.L.'s conversation is consistent with discussing contacting a drug source to obtain additional controlled substance to sell. LOCKETT also tells J.M.L. that he will be released on the 19th, which based on other court authorized interceptions, I believe refers to January 19, 2026. I further believe LOCKETT is referencing this date to let J.M.L. know that LOCKETT will take over the drug trafficking business once released.

285. On January 15, 2026, at approximately 8:51 p.m., LOPEZ, at TARGET TELEPHONE 1, received a call from LOCKET at the Milwaukee Secure Detention Facility using IC Solution's general jail number, (414) 533-1440. During this call, the two discussed LOCKETT's car and whether LOPEZ had been checking on it. She indicated that she had not been. LOCKETT

then stated: "I'on even know why I'm worried about the shizz [PH], I don' think nobody could get in that motherfucker, no way. Gotta have a key. That motherfucker still won't start up, right?" LOPEZ replied: "Nope." Then, LOCKETT continued, "Yeah, you straight then, you ain't even gotta check it, you ain't got no key, the trunk ain't gon' open." As the conversation continued, LOPEZ said, "I check to make sure the trunk is closed, that's all I gotta check." LOCKETT asked, "You can tell by just lookin' at it if it's closed, right?" LOPEZ replied, "Yup. No I touch it. I touch the hood all – I mean, the trunk all the time." Eventually LOCKETT asked, "Both of the bags was right there, wasn't they? Is they – is they pushed back towards the seat or are they just sittin' right there?" LOPEZ asked, "What?" LOCKETT repeated, "I said they pushed towards the back of the seat?" LOPEZ said, "No." LOCKETT asked, "Is right there when you open it up?" LOPEZ said, "No, they on the side." LOCKETT acknowledged and continued, "I was just really thinking about them people sayin' they gonna come pop up at the house and all that bullshit, and, ya know?" LOPEZ replied, "Yeah, they ain't – wha – how would they know about that?" LOCKETT agreed, "Should nobody know about that." LOPEZ stated, "They said they was gon' come - they said they gon' come shoot me in my head. They ain't said nothin' about comin' to get your money. Don't worry, when I'm dead, you'll know where your shit at." Toward the end of the conversation, LOPEZ said, "And, B finally texted me. I ain't heard from B in two days. I ain't have shit for him anyway. LOCKETT acknowledged and LOPEZ finished, "Tired. I'on feel like getti' up and servin' him no way."

286. This call indicates that LOCKETT stored his money, likely proceeds from his drug trafficking activity, in the trunk of an immobile car parked in their shared residence. Around April 14, 2026, case agents observed the immobile car parked at LOPEZ and LOCKETT's residence. Case agents observed an older abandoned white vehicle with brown cloth rear roof and rear windshield. This abandoned white vehicle is possibly to a late 1970's model Monte Carlo and has no visible registrations on the front or rear of the vehicle. This abandoned white has not moved from the

rear parking alley slab behind 333 N 36th St, Milwaukee, Wisconsin in the southernmost spot since surveillance began at this address during the Fall of 2025.

287. The end of the call relates to LOPEZ engaging in drug trafficking to B, who law enforcement know to be Brandon KING.

288. On January 16, 2026, at approximately 6:26 p.m., LOPEZ, at TARGET TELEPHONE 1, received a call from LOCKET at the Milwaukee Secure Detention Facility using IC Solution's general jail number, (414) 533-1440. LOCKETT asked, "Did you ever check my car?" LOPEZ replied, "Yeah, I did. It's straight." LOCKETT acknowledged. LOPEZ continued, "Everything, everything. I just didn't have time to put the cover on there because it snowed hard as a bitch today, so…" Later in the conversation, LOPEZ gave her phone to J.M.L. so he could speak with LOCKETT. LOCKETT and J.M.L. spoke about "Porky" and LOCKETT asked for Porky's phone number. J.M.L. advised Porky had two phone numbers and said they were (414) 865-4468 and 239-3023. LOPEZ then got back on the phone and LOCKETT asked, "What's going on on 19th?" LOPEZ replied, "Oh, Frog was over there today. He said that motherfucker quiet as a bitch." LOCKETT stated, "That what I'm talkin' 'bout." LOPEZ continued, "He was like, 'Shit, ain't a crackhead in sight.'" Shortly afterward, LOPEZ said, "Charles kept on callin' me, so finally I answered Charles' call on the weekend, or whatever. I'm like, 'What's going on, Money?' Or whatever. He's like, 'Man, who you done beat up?' Or whatever. I'm like, 'What you talkin' bout?' Or whatever… Wayne was over on nineteen, puttin' up blinds in unit number five and shit. And the crackhe – he, the neighbor had cane over there like, 'Man, you better be careful' or whatever. He was like, 'It was some Mexican chick and some lil mixed boy over here, or whatever, beat the brakes off uh, somebody.'"

289. Based on the prior calls, as described above, case agents believe the beginning of this call related to LOCKETT asking LOPEZ about whether she checked on the trunk to his vehicle because of the two bags of money stored inside. The call also included a discussion of the incident

from January 9, 2026 when LOPEZ, J.M.L., ROSS, BOFFIL, and RINGERSMA traveled to 829 S. 19th Street, an apartment complex owned by S2 Real Estate, to forcibly remove people from the property to prepare it for LOCKETT to resume drug trafficking upon his release. LOPEZ confirmed to LOCKETT that since the removal of the drug users, ROSS checked on the 19th Street apartment and advised that it was quiet and that the apartment was secure LOPEZ then discussed that while ROSS was installing blinds in unit 5 a "crackhead" who lives in a different unit in the building told ROSS to be careful because LOPEZ and J.M.L. battered somebody inside the apartment. The context of the call and the surrounding investigation confirm LOCKETT's intent to re-establish 829 S. 19th Street #5 as a place to store narcotics and/or a place from which to sell narcotics upon his release from incarceration.

290. While conducting surveillance, case agents have often observed numerous vehicles parked behind LOCKETT's and LOPEZ's residence, 333 North 36th Street, Milwaukee, Wisconsin. One of these vehicles had a tarp covering it. Case agents also know that narcotics traffickers often store narcotics and proceeds derived from the sales of narcotics in multiple locations. They do in the event that one of these locations is discovered by law enforcement or rival drug dealers and the items are seized, they still have access to additional narcotics and/or money that were not discovered. Therefore, and based on the above-mentioned calls, case agents believe LOCKETT and LOPEZ conceal U.S. currency derived from the sales of illegal narcotics in one or more of the vehicles they own, operate, and/or keep at their residence.

**LOCKETT DTO Drug Trafficking After LOCKETT's Release**

291. LOCKETT was released from custody on January 21, 2026.

292. On January 31, 2026, at approximately 1:25 p.m., LOPEZ, at TARGET TELEPHONE 1, 414-439-8361 received a call from ABRAHAM Lopez using (414) 888-0624. At the start of this call, LOPEZ stated, "Oh, I was gonna have Juni come bring it to you." ABRAHAM said, "Alright that's cool, I'll give him a hundred and ten." LOPEZ countered, "You ain't got to.

You can just give him the hundred." ABRAHAM acknowledged, "That's cool." Later in the call, ABRAHAM advised, "I think I'm coming down with the flu or something. Uh, like my body hurts. So, he can come over, I'ma be passed out anyway, I'm tired anyway. I just need to get… I just need to get this for my guy because he…" LOPEZ had a side conversation with somebody and was overheard saying, "'Cause he just said he's sick, bro. He don't feel good. And he already got his kids." ABRAHAM said, "Yeah, like my bones are like, my…like I'm sore and shit, I wonder [U/I]." LOPEZ advised, "I think Juni's the same way." ABRAHAM continued, "I don't got a headache or nothing, it's just, like, I'm tired you know what I'm saying? And I just slept for about two hours right now and I then I got up and my guy keeps calling me, he's gonna go out of town and he wants a zip so… He said he's going to New Orleans tomorrow. I gave all my medicine to Shaunequa, when she was sick." As the conversation continued, ABRAHAM said, "Well I'll be there in the next 45 minutes, bro… I'll be there in the next 45 minutes." LOPEZ responded, "Yeah, he's finna be on his way, you know, I'ma send him now." ABRAHAM acknowledged, "Alright." LOPEZ could be overheard saying, "Juni ready to go, Uncle Mikey be waiting on him."

293. Case agents know "Juni" is a nickname for J.M.L. and that a "zip" is coded language often used to refer to an ounce of narcotics. Therefore, in sum, case agents believe ABRAHAM asked to obtain an ounce of narcotics for somebody who was going to travel to New Orleans. LOPEZ advised that she would send J.M.L. to deliver the ounce to ABRAHAM. In exchange, ABRAHAM advised he would give J.M.L. a quantity of US currency, but LOPEZ said ABRAHAM did not need to pay that much. Based on the limited information provided in this conversation, case agents do not know if "one hundred and ten" was coded language for $1,100 and LOPEZ said ABRAHAM only needed to pay J.M.L. $1,000 ("one hundred"), or if they actually meant $110 and $100, respectively. Regardless, case agents believe J.M.L. was going to deliver an ounce of narcotics to ABRAHAM, on behalf of LOPEZ, in exchange for a quantity of US currency.

294. Case agents reviewed data pertaining to the location of a black 2013 Honda Accord, bearing Wisconsin license plate BBY-8888 (Accord) that J.M.L. is known to drive. Case agents observed that the Accord was in the immediate vicinity of LOPEZ and J.M.L. residence, 333 North 36th Street, Milwaukee, WI at approximately 1:36 p.m. At approximately 1:41 p.m., the Accord was southbound on I-794, north of East Lincoln Avenue. At approximately 1:49 p.m., the Accord was in the immediate vicinity of 3923 South Pennsylvania Avenue, St. Francis, WI. Case agents know 3923 South Pennsylvania Avenue, St. Francis, WI to be owned by S2 Real Estate. At approximately 1:55 p.m., the Accord was traveling northbound on I-794, north of East Lincoln Avenue. At approximately 2:14 p.m., the Accord was back in the immediate vicinity of his residence, 333 North 36th Street. This is consistent with J.M.L. traveling to ABRAHAM to deliver the aforementioned ounce.

295. Later on January 31, 2026, at approximately 1:56 p.m., LOPEZ, at TARGET TELEPHONE 1, received a call from ABRAHAM using (414) 888-0624. LOPEZ answered and ABRAHAM said, "I gave him an extra ten, girl." LOPEZ responded, "I told you you ain't have to do that." ABRAHAM advised, "It's cool." LOPEZ said, "He was finna come over there anyway." ABRAHAM replied, I'll make thirty bucks off it anyways, it's no big deal. My guy stays right up the block, so…" LOPEZ asked, "Is he coming to get it, then?" The conversation then switched to ABRAHAM taking medicine because he had influenza.

296. Case agents believe ABRAHAM advised that J.M.L. had just delivered the narcotics to ABRAHAM and that ABRAHAM paid J.M.L. extra money ("I gave him an extra ten, girl"). LOPEZ told ABRAHAM he did not need to pay extra ("I told you you ain't have to do that"). ABRAHAM indicated he would make money off the controlled substance anyway I'll make thirty bucks off it anyways") and that ABRAHAM's customer to whom the ounce of narcotics will be sold, lived nearby ("My guy stays right up the block, so…"). Based on my training and experience, this is consistent with ABRAHAM being engaged in drug trafficking with the LOCKETT DTO.

297. On February 1, 2026, at approximately 1:05 p.m., case agents observed ABRAHAM operating a 2012 white Chevrolet Colorado pickup truck, bearing Wisconsin license plate WE6321 (Colorado). A query of the WIDOT revealed this plate to be registered to a 2012 Chevrolet Colorado, VIN: 1GCJTBF94C8157095, to S2 Technologies LLC, 11512 W. Woodside Drive, Hales Corners, WI. Later on February 1, 2026, at approximately 4:39 p.m., case agents observed the Colorado parked in the driveway of 3923 S. Pennsylvania Avenue, St. Francis, WI. At approximately 5:57 p.m., the Colorado left this address at which time case agents followed. Case agents were subsequently able to confirm that ABRAHAM was the individual driving the Colorado. On February 6, 2026, at approximately 9:35 a.m., case agents observed ABRAHAM leave S2 Real Estate, 2925 W. Lincon Avenue, in a red Kia Stinger, bearing Wisconsin license plate AYB3067 (Stinger). On February 20, 2026, at approximately 7:15 p.m., case agents observed the Stinger and the Colorado parked in the driveway of 3923B S. Pennsylvania Avenue. On April 15, 2026, at approximately 7:15 AM case agents conducted surveillance at the address of 3923B S Pennsylvania Ave, St. Francis, WI and observed ABRAHAM exit the rear unit door and enter the Colorado.

298. On February 6, 2026, at approximately 11:55 a.m., LOPEZ, using TARGET TELEPHONE 1, sent an electronic message to (262) 825-4151. This message contained a photograph of US currency (Figure 11) and a receipt (Figure 12), consistent with LOCKETT renting 829 South 19th Street, #1, Milwaukee, Wisconsin, an S2 property. Given prior communications and the fact that LOCKETT resides with LOPEZ at a different residence, case agents believe this rental is for the purpose of drug trafficking as LOCKETT repeatedly indicated on the calls described above. On this receipt, handwritten was the following: *Date: 2/6/26; From: Otis Lockett; Nine hundred Fifty 00/100; For: 829 S. 19th #1; Signed by: Jeanette Lopez.*





(Figure 11) (Figure 12)

299. Case agents believe LOPEZ sent this photograph as confirmation that LOCKETT paid one month's rent for 829 South 19th Street #1, Milwaukee, Wisconsin, an S2 Real Estate owned property. Review of record jail calls and surveillance has demonstrated that LOCKETT DTO remains at 829 South 19th Street #1, Milwaukee, Wisconsin as of April 15, 2026.

300. Case agents believe LOCKETT is the user of telephone (414) 324-5384 because case agents intercepted court authorized intercepts from LOPEZ using TARGET TELEPHONE 1 to (414) 324-5384 and the detail shared between LOPEZ and the user of (414) 324-5384 are consistent with LOCKETT being the user. For example, on January 21, 2026, LOCKETT used (414) 324-5384 to discuss obtaining his two phones from police custody, one being (414) 324-5384. Additionally, on January 12, 2025, there was a traffic stop made by the Milwaukee County Sheriff's Office (Activity # 25-001130 - Citation / 25-007072 – Otis LOCKETT is caller) wherein police contact was made with LOCKETT and the phone number was reported for LOCKETT was (414) 324-5384.

301. On Monday February 2, 2026, there was a recorded jail call from Joshua N. LOPEZ to LOCKETT as the phone number of 414-324-5384 (744704108_2025017851_02-02-2026_11-37-35_1-414-324-5384_4108). During this call JOSHUA Lopez and LOCKETT discuss getting the drug trafficking going again at the "crib". JOSHUA Lopez is concerned because he was told "Frog is staying at the crib". LOCKETT responded that "Frog" brought his son to this location, but LOCKETT states that he has to leave. LOCKETT re-iterates that it is the first of the month and he is going to take over the location. LOCKETT then discusses that LOCKETT is slowly working to get his "line" going and tells JOSHUA that he is driving around looking for customers at the time of the call. LOCKETT acknowledges that he is not working too hard at this time though as he has only been out of jail for 2 weeks and he doesn't like working in the cold. Case agents know that "line"

refers to getting a phone number engaged in drug trafficking. In the background of this call, LOCKETT can be heard engaging in a drug trafficking transaction, directing a male to his location, picking up the male and then dropping him off after approximately two minutes, at which point LOCKETT can be heard directing the male to call him again. Based on training and experience, this interaction was consistent with a drug transaction wherein LOCKETT "trips" with the customer, which is a common practice of certain drug dealers to pick up a customer and take him to another location while serving the illegal substances out of the view of any law enforcement surveillance.

302. On February 10, 2026, case agents conducted surveillance at 333 North 36th Street, Milwaukee, Wisconsin, which is the residence shared by LOPEZ and LOCKETT and owned by STAIR. At approximately 5:28 PM (17:58:23 hrs) TARGET TELEPHONE 1 (414-439-8361) (LOPEZ) received a call from KING at 414-396-1438, a known buyer from the LOCKETT DTO. LOPEZ told KING that she did not forget about him and needed about ten minutes. Case agents believe this call relates to LOPEZ selling drugs to KING because at approximately 6:21 pm, case agents conducted surveillance in the 300 block of North 37th Street and observed KING exit the gangway on the south side of 321 North 37th Street and walk over to the rear door of 333 North 36th Street. Case agents then observed an unknown subject from 333 North 36th Street open the rear door and appear to hand KING something. KING immediately turned around and walked back toward 321 North 37th Street. A check of location data from LOCKETT'S phone 414-324-5384 on February 10, 2026, shows that at 6:13 PM and again at 6:29 PM LOCKETT's phone was in the area of 333 North 36th Street, Milwaukee, Wisconsin, which is consistent with other location data while LOCKETT was confirmed as being at the residence.

303. On February 23, 2026, there was a recorded jail call from Joshua N. LOPEZ to LOCKETT's phone number of 414-324-5384 (745767912_2025017851_02-23-2026_18-03-10_1-414-324-5384_5108). LOCKETT spoke to Joshua N. LOPEZ about his time incarceration. Joshua LOPEZ then asked if LOCKETT has been to the "crib".

**…**

**LOCKETT**: What. (Speaking over each other)
**Joshua LOPEZ**: Uh, you been on you been at the spot?
**LOCKETT**: I ain't even been over there like that, but I, I, you know what I mean? They got,
**Joshua LOPEZ:** Uh, frog still in there?
**LOCKETT**: Hell no I kicked his ass out. And I went over there and everything was all fucked up like the furniture and shit, all the shit. So I just was like, damn, I gotta get, I gotta get some more shit and all that. So I was finna, I just been procrastinating because it been cold so, you know, you know how I when it be cold and shit.
**Joshua LOPEZ:** Yeah.
**LOCKETT**: I don't be fucking with that shit.
**Joshua LOPEZ**: You aint try to get in there or ride around or nothing?
**LOCKETT**: Man, bro, I wasn't over there. They bro, they closed down the bridge right on 27th.
**Joshua LOPEZ:** Yeah.
**LOCKETT**: And they closed down the bridge on 16th. So all the traffic bro, on, on national bro. What I'm talking about. So bad, police bad bro. But I went over there a couple times. Hell yeah. I went up the state trooper all type of shit. So I went over there a couple times and I was so motherfucker scared bro. They was all over that bitch. I'm like man I can't even ride around for shit <laugh>, you know what I'm saying? And I wasn't in the right car either, so shit, that shit had me like, but hell yeah. I'm, I, I gotta get up in that motherfucking be sun. I'm just waiting, I'm just, you know what I sayin?
**Joshua LOPEZ:** Yeah.
**LOCKETT**: Pack enough paper for I can go buy some more furniture and shit.
**Joshua LOPEZ:** What though?
…

There is then a discussion of others sentences recently given including a discussion that appears to be concerning the court sentence for Jaylen HART, a child of Jeanette LOPEZ. Joshua LOPEZ asks about how "Juni"(JML) is doing as well.

**LOCKETT**: Man. I said that. I said damn, I was telling Frog he was sitting over here with me other day. I'm like man, I ain't gonna lie. He like, how much is it gonna cost me to get up in there? And I'm like man it ain't gonna happen. I just tell you.
**Joshua LOPEZ**: <laugh>
**LOCKETT**: Hell yeah. I like really need nephew back in this mother fucker.

304. Case agents know from previous familiarity with this investigation that Joshua LOPEZ had as a previous address listed in WIDOT 829 S 19th St #1, Milwaukee, Wisconsin. Case agent also knows from surveillance that the male believed to be "Frog" is ROSS, and is the registered owner of the Toyota Camry that was located parked in front of 829 South 19th Street, Milwaukee, Wisconsin on several occasions. Based on training, experience, and the investigation

into the DTO, case agents believe Joshua LOPEZ was asking LOCKETT if he was still engaged in drug trafficking out of the location of 829 South 19th Street, Milwaukee, Wisconsin (**Joshua LOPEZ**: "Uh, you been on you been at the spot?" and **LOCKETT**: "I ain't even been over there like that, but I, I, you know what I mean? They got,"). Case agents also know that LOCKETT's discussion concerning the closing of bridges is consistent with LOCKETT explaining why the drive is more difficult for him from 333 North 36th Street, to 829 South 19th Street as well. LOCKETT also explains how he had to avoid the police due to the construction. ( "And they closed down the bridge on 16th. So all the traffic bro, on, on national bro. What I'm talking about. So bad, police bad bro. But I went over there a couple times. Hell yeah. I went up the state trooper all type of shit. So I went over there a couple times and I was so motherfucker scared bro. They was all over that bitch. I'm like man I can't even ride around for shit <laugh>, you know what I'm saying? And I wasn't in the right car either, so shit, that shit had me like, but hell yeah. I'm, I, I gotta get up in that motherfucking be soon. I'm just waiting, I'm just, you know what I sayin?"). These statements are also consistent with LOCKETT being aware of the law enforcement presence as he travels to locations transporting illegal substances in vehicles and trying to avoid police contact. Based on my training and experience, I believe the above jail call is consistent with LOCKETT still being engaged in drug trafficking.

305. On March 10, 2026, at approximately 2:12 p.m., LOCKETT, at (414) 324-5384, received a call from Jaylen HART, an inmate at Dodge County Correctional Facility using IC Solution's general jail number, (920) 239-5580.

> **HART**: What you on though? You at, you at the crib, chillin'?
> **LOCKETT**: Hell yeah. I was up catching my action. I got back, smoked a little bit, passed out. I'm up now, though.
> **HART**: Hey, keep it one hundred. That shit ain't been moving how it was before you went in there?
> **LOCKETT**: It's still moving, just ain't moving as fast.
> **HART**: On what.
> **LOCKETT**: Hell yeah. Still get the shit gone. It just, it ain't, it ain't…I ain't got all the people I had it, like I had at first. And I don't be out here like that, 'cause it's cold.

306. Based on training, experience, and the investigation into LOCKETT DTO, case agents know that "action" is often coded language often used by drug traffickers to refer to dealing controlled substances. Therefore, case agents believe HART asked if LOCKETT was at home, and LOCKETT advised that he was selling controlled substances ("I was up catching my action"), then got back home, smoked, and fell asleep. HART then asked if drug-dealing was as profitable as it was before LOCKETT was incarcerated. LOCKETT confirmed he was still able to sell controlled substances, but it was just slower than before. LOCKETT further advised that he was not selling as much as he used to because it had been cold outside.

307. Case agent knows that consistent surveillance in the area of 829 South 19th Street, Milwaukee, Wisconsin has shown that ROSS is at times staying at the residence of 829 South 19th Street, Milwaukee, Wisconsin. Case agent also knows from the recorded jail calls from Joshua LOPEZ in custody at Milwaukee County House of Corrections to LOCKETT, that LOCKETT has spoken of plans to the use the "crib" for making money and referenced "Frog" (ROSS) staying at the address. Yet, LOCKETT has in the past spoken of kicking ROSS out of the residence in earlier conversations. Case agent knows from previous investigation that JOSHUA Lopez and LOCKETT were both associated with the address of 829 S 19th St #1. JOSHUA Lopez had this address of 829 S 19th St #1 as his listed WIDOT and in recent months LOCKETT made payment for the 829 S 19th St #1. The receipt for this payment was intercepted in texted photo from LOPEZ. LOCKETT has also made statements during these intercepted recorded jail call communications that he will begin to increase his drugs as the weather gets warmer and makes statements about his desires to open the "crib" or the "trap" in these calls.

**SINCLAIR DTO**

308. The SINCLAIR DTO was discovered through investigation into the S2 Real Estate property that is currently rented by SINCLAIR at 1022 South 60th Street, West Allis, Wisconsin, The Blaque Bar and Bites tavern (Blaque Bar). Case agents discovered that there was a significant

amount of drug and gun arrests that were made from vehicles and individuals associated with Blaque Bar. It was also discovered that S2 Real Estate acquired the building in June 2025. Case agents also identified jail call communications to MCDADE wherein he refers to being at Blaque Bar in Fall 2024. Through the investigation into the SINCLAIR DTO, case agents have identified the following members: SINCLAIR, L. SHEPHERD, J.S. SHEPHERD and MCKAY.

309. During the year 2024 the WAPD has received numerous calls for service related to Blaque Bar and identified SINCLAIR as the operator of the location. For example, case agents reviewed a noise complaint related to case number 24-029937, in which officers contacted SINCLAIR who informed officers he was the manager of the bar. Further, case agents reviewed SINCLAIR's publicly viewable Facebook account, which has the profile name "Wanky Wonder." There are numerous posts advertising the Blaque Bar on this account. Case agents also reviewed WAPD Report Case Number 24-044571, in which a female victim reported that "Wanky" is the owner of the Blaque Bar.

310. The following is a summary of calls for service or arrests associated with the Blaque Bar and/or Martin SINCLAIR over the past three years:

- On September 4, 2023, Alphaeous L. Strong reported he was remodeling the bar for Blaque Bar and was stopped with a Smith & Wesson 9mm Shield pistol and 2.91 grams of marijuana;
- On August 18, 2024, Tommie L. Cole departed Blaque Bar and was stopped by law enforcement with approximately 116.24 grams of fentanyl;
- On October 13, 2024, officers attempted to stop Keishon Parker in a silver Nissan Rouge, with license plate 0942FT (Fleet/Rental), which fled. Keishon M. Parker later reported the rental vehicle was stolen from Blaque Bar & Bites;
- On October 18, 2024, Malcolm Boone and Martell T. Robinson were stopped, and officers located a Glock 26 9mm pistol, approximately 6.42 grams of heroin and 12.68 grams of cocaine. Robinson advised they were coming from Blaque Bar;
- On November 3, 2024, Tia R. Hunter reported that owner of Blaque Bar, known as "Wanky"(SINCLAIR), had five females assault her and her cell phone was stolen after complaining about the cover charge;
- On April 14, 2025, Dovate T. Hamilton and Jeremy L. Sanford left Blaque Bar. A traffic stop was conducted in which officers located in their vehicle approximately 108 grams of marijuana and a Smith & Wesson 5.7mm pistol[3];

[3] This firearm was potentially link to Milwaukee Homicide C2503310102 from March 22, 2025 and additional Endangering Safety reports.

- On October 23, 2025, Antwain A. Johnson fled from officer, but was arrested and a 9mm Taurus G2C semiautomatic pistol was located. Johnson advised he was coming from Blaque Bar;
- October 24, 2025, officers stopped Deaja D. BAILEY, Tamyia M. HAYDON, Sanya M. BAKER and Kjae J. TURNER, after they left Blaque Bar. Officers located 213 grams of marijuana, $4,300, Glock 22 handgun and five cell phones;
- On January 3, 2026, officers stopped Jeremy L. Hudson, Jermaine L. Hudson and Mykael R. Hill and located approximately 7 grams of cocaine and 5.25 grams of marijuana. They had just left Blaque Bar prior to the stop.

311. Case agents have reviewed various Wisconsin Department of Corrections (WI DOC) inmates' custodial calls to SINCLAIR's telephone number of (262) 349-7108. SINCLAIR appears to be engaged in drug trafficking during these recordings. For example, on January 6, 2026, at approximately 1:05 p.m., an inmate at the Milwaukee Secure Detention Facility, utilizing the account of Malcolm L. Prince, called SINCLAIR at (262) 349-7108. During this call the inmate referred to SINCLAIR as "Wank" and "Wanky," a nickname known to be attributed to SINCLAIR. During this call, SINCLAIR began to have a background conversation with an unknown male (UM). During this side conversation, SINCLAIR stated, "When I was here for the book, you never got it." UM replied, "I really was just saving it but there's this nigga that brought me [unintelligible], he wanted 500 grams, so I bought 250 grams [unintelligible], and he called me back and he [unintelligible] for ten the day before [unintelligible] that dumb ass nigga [unintelligible]." SINCLAIR said something unintelligible but referenced "the 500." SINCLAIR continued, "Let me just, let me see what I can do, [unintelligible] my money." SINCLAIR concluded his conversation with the UM and continued his conversation with the inmate until it, too, concluded.

312. Based training and experience, case agents know "a book" is coded language commonly used to refer to a kilogram of narcotics. Therefore, case agents believe SINCLAIR was upset because he previously met with the UM to obtain a kilogram of narcotics, however the UM never got it for SINCLAIR ("When I was here for the book, you never got it"). UM advised that he saved it for other narcotics customers ("I really was just saving it") and indicated one customer

wanted 500 grams ("there's this nigga that brought me [unintelligible], he wanted 500 grams"). Case agents believe that SINCLAIR advised that he had the money for a kilogram of narcotics and would see if he could obtain it from a different source ("Let me just, let me see what I can do, [unintelligible] my money").

313. On January 28, 2026, at approximately 7:24 p.m., case agents observed a white Mercedes bearing Wisconsin license plate AHE-2136 (Mercedes) leave 5047 West Jackson Park Drive, Milwaukee, Wisconsin. Case agents previously identified 5047 West Jackson Park Drive, as SINCLAIR's and PIERCE's residence. Case agents know the Mercedes is registered to PIERCE at the Jackson Park address and is operated by PIERCE and SINCLAIR. At approximately 7:37 p.m. case agents observed this same Mercedes arrive at Blaque Bar, 1022 S. 60th Street. Two males unloaded items from the rear of the Mercedes and carried them into Blaque Bar.

314. From February 26, 2026, to the present there has been consistent cell tower communication between SINCLAIR's phone 262-349-7108 and the cell towers in the area of his home, 5047 W Jackson Park Dr., Milwaukee, Wisconsin during the hours of sleep between Midnight and 7 am. There has also been consistent surveillance showing that SINCLAIR resides at the address of 5047 W Jackson Park Dr. as case agents have observed him multiple times operating the Sonata and the Sonata has been observed pulling into the attached garage at 5047 W Jackson Dr., Milwaukee, Wisconsin.

315. Case agents also observed that on February 28, 2026, SINCLAIR's ping has also moved from the area of Jackson Park Drive to the area of 1st and Becher (Restaurant Depot) at 12:21pm. The ping started moving west at 1:22 pm. The ping moved to the Jackson Park Drive area at 1:35 pm and then to Blaque Bar at 1:51 pm. Case agents observed the Sonata, park on the north drive along Blaque Bar. SINCLAIR was observed exiting the Sonata and used keys to unlock the north door to Blaque Bar. The SINCLAIR opened the trunk and was unloading items into the Blaque Bar. SINCLAIR got back into the Sonata at 2:23 pm. Electronic surveillance of

SINCLAIR's phone reflected it appeared to remain in the area of Blaque Bar during the time the driver of the Sonata was at the bar. The Sonata left north on S. 60 St. At 2:34 pm. Electronic surveillance for SINCLAIR's phone appears to travel north on Hawley Road, consistent with the Sonata movement at 2:36 pm.

316. On January 29, 2026, case agents established surveillance at Blaque Bar. At approximately 8:15 p.m., case agents observed a blue Chevrolet Trax SUV, bearing Wisconsin license plate BBT-1168 (Trax), registered to Shayla D. Parker (DOB: 12-26-77) at 2862 N. Palmer St. Milwaukee, Wisconsin, pull up in front of Blaque Bar. A black male, wearing a ballistic vest and what appeared to be a badge around his neck, exited the front door and leaned into the front passenger window. After a short meeting, the Trax departed the area and the black male went back into Blaque Bar. Based on training and experience, this short-term contact was consistent with a narcotics transaction. In addition, on February 1, 2026, the WAPD responded to a call at Blaque Bar (WAPD case #26-004215) regarding trouble with patrons fighting and a mention of a firearm. Police contacted PIERCE, SINCLAIR, and the suspect wearing the security uniform in the above surveillance, identified as Kurtis D. LEE (M/B, 06/30/1986) in the above surveillance.

317. On February 18, 2026, case agents assisted in a state search warrant located at [redacted] Milwaukee, Wisconsin, where [redacted] was located and arrested. During a search of [redacted] case agents located 460 grams of cocaine, 150.5 grams of fentanyl, 253.05 grams of marijuana, two firearms and documents/identifiers for [redacted] On February 18, 2026, at approximately 1257 pm, [redacted] a *Mirandized* interview. [redacted] admitted to selling marijuana and denied selling cocaine; however cell phone content contradicted this statement. [redacted] Wank...Martin SINCLAIR" was the source of kilograms of cocaine. [redacted] SINCLAIR owns "The Balque Bar" on the South Side [redacted] shown a WI DOC photograph of SINCLAIR, and [redacted] this is the source of supply (SINCLAIR) of the seized drugs at

[redacted] residence. [redacted] the search of [redacted] phones. Case agents observed that [redacted] did in fact have phone contact with SINCLAIR's number, (262) 349-7108, which was saved in [redacted] phone as "Wank." The only phone contacts located in [redacted] phone are those between [redacted] and "Wank" through Facetime. These communications are consistent with drug related communications as case agents know from training and experience that many drug dealers believe that Facetime messages are difficult for law enforcement to intercept, so drug traffickers will use Facetime in hopes of evading law enforcement. Case agents know from both training and experience that some drug dealers will only communicate in this fashion, that is only using video applications, as it also allows them to see who is present with the person to whom they are communicating as well.

318. On February 6, 2026, case agents executed a federal search warrant related to the electronic surveillance of SINCLAIR's telephone (262) 349-7108. On March 8, 2026, at approximately 1:00 pm, case agents observed SINCLAIR's telephone (262) 349-7108 was in the immediate area of Milwaukee County Timmerman Airport located at 9305 West Appleton Avenue, Milwaukee, Wisconsin.

319. Prior to March 8, 2026, surveillance had been conducted on SINCLAIR, who was identified to be operating a white 2026 Hyundai Sonata, bearing Wisconsin license plate BBY-2130, registered to Taira R. Kelly of 4935 North 104th Street, Milwaukee, Wisconsin (Sonata). At approximately 1:30PM case agents checked the residence the area surrounding the airport, I observed heavy foot traffic and numerous vehicles parked at Syrs Restaurant and Lounge, located at 9316 West Appleton Avenue, Milwaukee, Wisconsin. I conducted surveillance at 9316 West Appleton Avenue and obtained a large portion of vehicle information, including license plates, parked in the Syrs parking lot. During this time the cellular device location remained in the area of Timmerman airport. At approximately 1310 on, case agents observed two black male subjects exit the bar together and walk towards a 2015 brown Hyundai Genesis, bearing Wisconsin license plates

BAX-6043, registered to Larry Allen SHEPHERD of 3635 North 39th Street, Milwaukee, WI.) (Hyundai Genesis). Both male subjects entered the Hyundai Genesis and departed the area northwest on Appleton Ave. Case agents noted that the subject, who entered the front passenger seat, matched the description of SINCLAIR having the same physical build, hair style and age. Due to obstructions, case agents were not able to positively identify him. Case agents are familiar with Larry SHEPHERD from a prior drug investigation conducted by the WAPD in 2021 (Case # 21-004204), where he was in possession of approximately 147 grams of cocaine, 474 grams of marijuana, a firearm, and $56,448 in cash.

320. At approximately 3:35 p.m. the next location for SINCLAIR's telephone was received, and the cellular device was now indicating that it was at North 76th Street and West Silver Spring Drive. This is consistent with the observations of the subject matching the description of SINCLAIR departing the Syrs Restaurant and Lounge in the Hyundai Genesis.

321. Upon identifying SINCLAIR being an associate of SHEPHERD, case agent conducted an inquiry into recent investigations involving SHEPHERD. Case agents located an open investigation in ACISS Case # 24-8758, where SHEPHERD was identified as a source of kilogram quantities of cocaine. During this investigation, in December 2024 several addresses in the Milwaukee Metropolitan Area were identified, including the address of 3261 North 30th Street, Milwaukee, WI and 2657 North 61st Street, Milwaukee, Wisconsin, all of which had connections to SINCLAIR.

322. Case agent requested Crime Analyst Nicole Johnson to verify if SINCLAIR's telephone (262) 349-7108 has been locating with the radius of the address 3261 North 30th Street, Milwaukee, WI. Electronic surveillance of SINCLAIR's telephone (262) 349-7108 indicated between February 25, 2026, to March 9, 2026, the phone had frequent stops within the radius of 3261 North 30th Street (Figure 13).

3261 N. 30th St. Milwaukee, WI



Figure 13

323. On March 9, 2026, at approximately 3:10 pm a covert surveillance camera was placed near the residence of 3261 North 30th Street, Milwaukee, WI**.** At approximately 3:37 pm, a male wearing a black Nike Tech suit (later identified as Ser Jimmie L. SHEPHERD) appears from the street and starts to walk towards the front of 3261 North 30th Street, when he stops to talk with an occupant of the Hyundai Genesis, which L. SHEPHERD was driving. L. SHEPHERD exits and L. SHEPHERD and S.J. SHEPHERD both walk to the front yard of 3261 North 30th Street. Both S.J. SHEPHERD and L. SHEPHERD were pacing back and forth in front of the residence and speaking on their cell phones. L. SHEPHERD appears to be speaking on Facetime.

324. At approximately 3:41 pm, S.J. SHEPHERD walked over to a white 2019 Mazda CX-5 SUV, bearing Wisconsin license plate ATC-9675, registered to Jaricka M. Logan of 3020 North 57th Street, Milwaukee, Wisconsin (Mazda), opens the front driver door and places an unknown item into the driver door map compartment area. L. SHEPHERD walks over to the front passenger

door of the Hyundai Genesis, where an unknown occupant is seated in the front seat. S.J. SHEPHERD walks to the front yard of 3261 North 30th Street and is observed checking the area around the residence. L. SHEPHERD is then observed with S.J. SHEPHERD walking towards the front yard. They both look into the alley way / side of the house, and then return to the Hyundai Genesis bearing front passenger door**.**

325. At approximately 3:45pm, L. SHEPHERD walks to the front porch and enters the front door leading to 3261 North 30th Street. L. SHEPHERD then exits the front door and remains at the doorway. S.J. SHEPHERD is still speaking with the occupant of the Hyundai Genesis and then handed a white grocery bag and quickly makes his way to the front door of 3261 North 30th Street where L. SHEPHERD is waiting for him. The white plastic bag is concealing a rectangular brick, consistent with a kilogram of either cocaine or fentanyl, which he is holding in his left hand (Figure 14). The unknown occupant shuts the passenger door of the Hyundai Genesis as S.J. SHEPHERD enters the front door of Hyundai Genesis with L. SHEPHERD.



Figure 14

326. At approximately 3:56 pm, both S.J. SHEPHERD and L. SHEPHERD exit the front door. S.J. SHEPHERD is observed holding a white plastic bag, now containing a small chunk

consistent with a 1/4 kilogram. S.J. SHEPHERD proceeded enter the Mazda and departed the area (Figure 15).



Figure 15

327. L. SHEPHERD remains on the porch until S.J. SHEPHERD is away. Once S.J. SHEPHERD is out of view, L. SHEPHERD walks over to the parked Hyundai Genesis and enters the front driver side door. At approximately 4:08 pm, the Hyundai Genesis departs the area returning at 4:15 pm. At approximately 4:25 pm, L. SHEPHERD exits the Hyundai Genesis and enters the front door of Hyundai Genesis**.** At approximately 4:30pm, L. SHEPHERD exits the front door and walks towards the street.

328. Based on my training, experience, and investigation into the SINCLAIR DTO, S.J. SHEPHERD's and L. SHEPHERD's conduct is consistent with obtaining a large amount of controlled substances. I believe S.J. SHEPHERD and L. SHEPHERD were checking the area to ensure law enforcement or rival drug traffickers were not present, before obtaining the large amount of controlled substances from L. SHEPHERD's Hyundai Genesis and storing the controlled

substances at 3261 North 30th Street. I further believe S.J. SHEPHERD then obtained a partition of the large amount of controlled substance and was watched by L. SHEPHERD to ensure S.J. SHEPHERD safely made his way from the residence, while not being detected by law enforcement or possibility robbed by rival drug traffickers.

329. On March 10, 2026, the covert surveillance camera remained near 3261 North 30th Street, Milwaukee, Wisconsin. Case agents observed vehicles used by SINCLAIR DTO members during this date, including a white Dodge Durango being accessed multiple times by S.J. SHEPHERD and a red 2015 Jaguar XF, bearing Wisconsin license plate BAF-5500 (registered to Aajah N. DAVIS-JOHNSON of 2846 N. 16th St. Milwaukee, WI) being present early and later int the and S.J. SHEPHERD. Case agent also observed S.J. Shepherd accessing 3261 North 30th Street.

330. On March 11, 2026, the covert surveillance camera remained at the residence of 3261 N. 30th St. Milwaukee, WI and captured the white Dodge Durango and Hyundai Genesi in the area. At approximately 2:18 pm, a black male, early 50's, wearing light colored jeans and a hooded sweatshirt with the hood up (design on back), was on his phone and walked up to the front door and entered 3261 N. 30th St. At approximately 2:48 pm, this same male exited, now with his hood down (wearing a Twin Cities baseball cap) and jogs towards the street. Within one minute the same male returns and is carrying a backpack into the front door of 3261 N. 30th St. At approximately 2:44 pm, L. SHEPHERD wearing black jeans, black t-shirt, dark winter cap and a gold chain exits the front door of 3261 N. 30th St. and walks quickly toward the street. He returns within seconds and carrying a clear cup and enters the front door.

331. At approximately 4:48 pm, case agents were conducting surveillance at 3261 North 30th Street, Milwaukee, Wisconsin. During this time Crime Analyst Nicole Johnson was monitoring locations information for SINCLAIR's telephone (262) 349-7108. Crime Analyst Johnson noticed that between the hours of 3:49 pm to 4:19 pm SINCLAIR's telephone (262) 349-7108 appeared to be in the Granville (Northwest) neighborhood, near the area of U-Haul Storage Facility located at 8626

North Granville Road, Milwaukee, WI. The locations moved from this area towards the address of 3261 North 30th Street, Milwaukee, Wisconsin. At approximately 4:49 pm, the locations were in the area of 3261 North 30th Street and remained there until 5:19 pm.

332. At approximately 4:53 pm, case agents observed SINCLAIR's vehicle, a white 2026 Hyundai Sonata, bearing Wisconsin license plate BBY-2130, registered to Taira R. Kelly of 4935 North 104th Street, Milwaukee, WI (Sonata), arrive from the north and stop in the street in front of 3261 North 30th Street and adjacent to the black Chrysler minivan, bearing Wisconsin dealer plate MV5387AL (Chrysler). SINCLAIR exited the Sonata and walked over to the Chrysler to meet with the driver. The unidentified driver of the Chrysler hands SINCLAIR an unknown amount of cash, which SINCLAIR counts and then placed into his front left pant pocket. During this time SINCLAIR left the Sonata running in the middle of the street. Unrelated vehicle traffic arrives and SINCLAIR moves the Sonata**.** SINCLAIR contacts the occupant of the Chrysler and then walks towards 3261 North 30th Street. He stops at a white 2014 Dodge Durango, later identified with Wisconsin license plate BCJ-3085, registered to Jerry G. Carson of 3384 North 40th Street, Milwaukee, WI (Durango), and speaks with an occupant(s).

333. At approximately 4:54 pm, SINCLAIR walks towards 3261 North 30th Street, opens the Chicago gate and knocks on the front door. SINCLAIR immediately turns around and looks up and down N. 30th St., which based on my training, experience, and investigation into SINCLAIR DTO is consistent with counter surveillance, looking for law enforcement or possible rival drug traffickers. SINCLAIR then turns around and enters the front door of 3261 North 30th Street.

334. At approximately 4:59 pm, the black male, late 20's, wearing a cream-colored hooded sweatshirt (hood up) exits 3261 North 30th Street and walks towards the street. He is followed by SINCLAIR and S.J. SHEPHERD who is holding two small boxes in his right hand. SINCLAIR is speaking with S.J. SHEPHERD and appears to be providing S.J. SHEPHERD some instructions. Case agents observe SINCLAIR walk towards the Chrysler, L. SHEPHERD enter the driver seat of

the Durango and the black male, late 20's, wearing a cream-colored hooded sweatshirt (hood up) walk towards a white SUV parked in the east side of the street. SINCLAIR returns to the Sonata and open the driver's door, where he again engages in a conversation with the occupant(s) of the Chrysler. At approximately 5:02 pm the Chrysler departs north on North 30th Street (occupied by at least three individuals), while SINCLAIR enters the Sonata. SINCLAIR moves a few parking spots closer to 3261 North 30th Street and parks. S.J. SHEPHERD departs the area.

335. At approximately 5:04pm, SINCLAIR exits the Sonata and appears to be on a Facetime call. He walks towards the residence of 3261 North 30th Street, checks the Chicago gate, which is locked and he knocks on the door, where someone eventually opens the gate and SINCLAIR enters the residence.

336. At approximately 5:15 pm, the black male, 30's, average build, long dreads, wearing winter cap, blue athletic pants with white stripes and dark colored hoodie (Chicago written on front in white letters) exits 3261 North 30th Street. Case agents observe that this male is clutching a tan plastic baggie containing a large circular bulge and is reaching into his left pant pocket and he approaches a tan Ford 4DR sedan with no front or rear license plate. Based on my training, experience, and investigation into the SINCLAIR DTO, this tan plastic baggie with a large circular bulge would be consistent with a large amount of controlled substances. He conducts a Y-turn and departs the area south on N. 30th St. At approximately 5:21pm, SINCLAIR exits 3261 North 30th Street enters Sonata and departs the area. At approximately 5:33 pm, the black male, (Chicago written on front in white letters) returns in the Ford sedan and enters the front door of 3261 N. 30th St., with a white bag, that appears to contain food, in his hand.

337. At approximately 8:50 pm, the Durango arrives and parks in the street and appears to be talking to other occupants of parked vehicles. At approximately 8:57 pm, a 4DR sedan was waiting pulled up alongside the Durango, where the driver of the Durango conducted a quick hand to hand transaction with the front passenger of the sedan. At approximately 9:00 pm the driver of the

Durango, who is consistent with S.J. SHEPHERD (but it is dark and hard to observe) exits, and walks to a vehicle parked in front of 3261 North 30th Street and returns to the Durango. The Durango performs a Y-turn, stops by the vehicle the driver previously met with and departs the area.

***Search Warrant at SINCLAIR DTO Drug House***

338. On March 16, 2026, law enforcement executed a state search warrant at 3261 North 30th Street, Milwaukee, Wisconsin (lower and upper).[4] On March 19, 2026, at approximately 12:13 pm, case agents were monitoring electronic surveillance at 3261 N. 30th St. and 3261 A N. 30th St. Milwaukee, WI. Case agents observed MCKAY exit the front door of 3261 N. 30th St. (lower) with two plastic garbage bags. She walked to the back (south side of house)discarded the bags, walked over to the Durango, known to be utilized by S.J. SHEPHERD, opened the front driver side door, got into the Durango and then exited. MCKAY then walked over to a silver 2008 Audi A6 Vin # WAUDH74FX8N010659 (no plate) registered to Anthony G. KENNEDY 01/02/1997 of 2709 N. Teutonia Ave. # 310 Milwaukee, Wisconsin parked in front of the residence. MCKAY removed a black backpack (with colored designs on front) and a grocery bag from the trunk. She took both of these items into the front of 3261 N. 30th St. Milwaukee, WI. At approximately 12:34 pm, S.J. SHEPHERD was observed exiting the front door of 3261 N. 30th St. Milwaukee, WI carrying a clear plastic bag. He entered the Durango, remained parked at the location until approximately 1:26pm, and departed the area. At approximately 2:06 pm, the Durango returned and parked in front of 3261 N. 30th St. Milwaukee, WI. and no one exited the Durango. At approximately 2:22 pm, a gold minivan with tinted windows arrived from the north and parked in the street. A black male (thin build, wearing black athletic pants and tan sweatshirt) appeared from the passenger side of the Durango and walked to the driver side of the minivan. The driver door of the Durango opened and the male walking, looked back, before entering the front passenger side of the minivan. The minivan

[4] It should be noted that both the Durango and the Hyundai Genesis were listed on the state search warrant for 3261 North 30th Street Milwaukee, WI and a copy was left at the residence. Therefore, case agents believe S.J. SHEPHERD, L. SHEPHERD, and SINCLAIR are aware of a drug investigation and attempting to evade law enforcement

departed the area south on N. 30th St. and shortly after the Durango left north on N. 30th St. Based on the investigation case agents determined MCKAY resided in the upper unit with her children.

339. Upon the execution of the search warrant, the lower unit appeared to be vacant and in the process of being remodeled. There was clothing inside one of the bedrooms closets, but it was otherwise very sparse. The water heater in the basement was overflowing, the washing machine was filled to the top with stagnant water and a foul odor, and a deep freezer contained rotten meat. It did not appear the basement was being utilized for any fashion, and undisturbed cobwebs were everywhere. Law enforcement located items inside the lower and upper unit consistent with drug trafficking. In the lower unit:

- clear lid for a WeighMax digital scale;
- empty vacuum-seal bag section (positive for cocaine residue);
- empty plastic baggie (positive for cocaine residue);
- a Blazer 9mm round;
- a Blazer .40 S & W round

In the upper unit:

- approximately 1,002 grams of suspected cocaine, in a compressed brick with pressed letters "BD," wrapped layers of plastic, saran wrap, and tape, found inside of the black Cookies bag;
- approximately 88.91 grams of suspected fentanyl, a white hard/pressed substance, found inside the black bank bag in the kitchen pantry;
- approximately 65.89 grams of suspected fentanyl, a gray hard/pressed substance, found inside the black bank bag in the kitchen pantry;
- approximately 35.77 grams of suspected fentanyl, a red/purple hard/pressed substance, found inside the black bank bag in the kitchen pantry;
- approximately 23.58 grams of suspected fentanyl, a dark purple hard/pressed substance, found inside the black bank bag in the kitchen pantry;
- approximately 65.42 grams of suspected fentanyl, a brown powder substance, located in two plastic baggies inside of an air fryer in the southwest corner of the kitchen closet;
- approximately 85.46 grams of suspected THC, found in an open vacuum seal bag underneath the kitchen stove;
- four Oxycodone Hydrochloride 30 mg pills (blue, round, with "M 30" inscriptions), found in a knotted plastic sandwich baggie in a black container above the shower;
- approximately 286 grams of suspected THC from a large, knotted plastic baggie, found in the southeast room (adjacent to the living room), on the second shelf of a built-in cabinet;
- a large black sifter with metal wire and suspected cocaine residue, found on the counter in the kitchen pantry on top of a cabinet;
- a black Raw MyWeigh digital scale with suspected cocaine residue, found on top of the kitchen stove;

- a Curevana digital scale  and WeighMax digital scale, both with suspected cocaine residue, found in the kitchen drawer to the left of the sink;
- a digital scale with suspected THC and cocaine residue, found in a shoe box in the top left shelf of a living room TV stand (east wall);
- a black Superior Balance digital scale with suspected cocaine residue found inside the outer front driver's windshield of a Toyota Camry, bearing Wisconsin license plate AWJ9668;
- a medication bottles containing Metformin (500mg), and Hydrochlorothiazide (12.5mg), prescribed to L. SHEPHERD in July 2024, found in a cardboard box in the southwest kitchen pantry;
- several documents and photographs of L. SHEPHERD, found in a cardboard box in the southwest kitchen pantry; and
- a black Apple iPhone with a broken front screen and a rear protective case with a photograph of two males one believed to be either Ser Jimmie SHEPHERD or Larry SHEPHERD, found in a green Crown Royal bag, inside of a black plastic bag.

340. Case agents obtained information that L. SHEPHERD has a scheduled probation/parole meeting on March 23, 2026, 10:00 a.m. Per WI DOC, L. SHEPHERD did not show for this visit and later called his agent. L. SHEPHERD advised his agent that 3261 North 30th Street, Milwaukee, Wisconsin belonged to his father, Larry SHEPHERD Sr. L. SHEPHERD reported that his brother (S.J. SHEPHERD) stays at the location and L. SHEPHERD was only there working on the house. The agent rescheduled the visit for March 25, 2026, at 11:30 a.m.

***S.J. Shepherd's and L. Shepherd's Locations***

341. During the investigation into the SINCLAIR DTO, case agents observed the S.J. Shepherd would often spend time in multiple vehicles near residences associated with significant others or family members. Case agents are aware that some drug traffickers will often attempt to evade law enforcement detection, by changing locations with loved ones/family and change different vehicles often. Case agent identified S.J. SHEPHERD and L. SHEPHERD appeared to use two additional addresses, 4358 North 65th Street, Milwaukee, Wisconsin and 8501 North 107th Street, Milwaukee, Wisconsin.

*4358 North 65th Street*

342. During the investigation into S.J. SHEPHERD, on March 14, 2026, case agents observed the Durango S.J. SHEPHERD was observed using parked, running and occupied across

from 4358 North 65th Street, Milwaukee, Wisconsin. Case agents review MPD records which indicated S.J. SHEPHERD has used the address of 4358 North 65th Street, Milwaukee, Wisconsin for his home address

343. On March 20, 2026, at approximately 1:23 a.m., a commercial camera captured the Durango parked on the street in front of 4358 North 65th Street, Milwaukee, Wisconsin (one night after the search warrant at 3261 N. 30th St. and the seizure of a controlled substances and firearms).

344. On March 22, 2026, at approximately 9:30 am, case agent conducted surveillance at 4358 North 65th Street, Milwaukee, Wisconsin and observed the Durango was parked outside of 4358 N. 65th St. Milwaukee, WI. At approximately 1153 a.m., case agents observed a black female, identified as Sierra Adams[5], exited the residence of 4358 North 65th Street, Milwaukee, Wisconsin and enter the driver seat of the Durango. This female departed the area in the Durango. Case agents reviewed law enforcement records and identified Adams as a known associate of S.J. SHEPERD.

345. On March 23, 2026, at approximately 7:06 pm, case agent were conducting surveillance at 4358 North 65th Street, Milwaukee, WI and observed the Durango arrive to the location. A short time later a red 2015 Jaguar XF, bearing Wisconsin license plate BAF-5500, registered to Aajah N. DAVIS-JOHNSON of 2846 North 16th Street, Milwaukee, WI (Jaguar) arrived. Case agents had previously observed the Jaguar parked in front of 3261 North 30th Street, Milwaukee, Wisconsin and observed from automate license plate readers (ALPS) the Jaguar was also parked in the area of 8447 North 107th Street, Milwaukee, Wisconsin, which is near 8501 North 107th Street, Milwaukee, Wisconsin. From law enforcement records Aajah DAVIS-JOHNSON is suspected to be the daughter of L. SHPEHERD. The Durango and Jaguar pulled up window to window and handed something off to each other. A black female exited the Durango and entered the

[5] Milwaukee County Case Number 2023CM001417 V. Sierra Z. Adams as her listed address as 4358 North 65th Street, Milwaukee, Wisconsin.

front passenger door of the Jagur. At approximately 7:45pm, the female exited the Jaguar and entered the front door of 4358 North 65th Street, Milwaukee, Wisconsin.

346. On April 14, 2026, case agents observed a red Chevrolet Equinox, bearing Wisconsin license plate APA-8120, registered to Sheila Adams of 4358 N. 65th St. Milwaukee, WI (identified as being the mother of Sierra Adams) (Equinox) arrive at 4358 North 65th Street, Milwaukee, Wisconsin. Sierra ADAMS from video surveillance) with three juveniles exit and enter the front door of 4358 N. 65th St. Milwaukee, WI. A short time later Sierra ADAMS and another unidentified black female exited 4358 North 65th Street. Milwaukee, WI and departed in the Equinox.

347. On April 14, 2026, the Equinox was parked in front of 4358 North 65th Street, Milwaukee, Wisconsin. The Durango was located parked in front of 6310 W. Bobolink Ave. Milwaukee, WI (near 4358 North 65th Street, Milwaukee, Wisconsin) and appeared to be unoccupied.

348. During the investigation, case agents has also identified the Durango, operated by S.J. SHEPHERD and used to engage in drug trafficking, has been located near 4358 North 65th Street, Milwaukee, Wisconsin on April 13, 2026, at 10:08 pm and on April 3, 2026, at approximately 2:43 am over the past few weeks.

349. Case agents have also reviewed law enforcement records which show S.J. SHEPHERD has provided the address of 4358 North 65th Street, Milwaukee, Wisconsin in the past. I know that from my training and experience that people involved in large scale drug trafficking will commonly conceal contraband and proceeds of drug trafficking at locations trusted by them, to close associates or to persons they are in relationships with. From this investigation S.J. SHEPHERD is aware that law enforcement executed at search warrant at 3261 North 30th Street, Milwaukee, Wisconsin and seized a large amount of controlled substances and firearms. The first location S.J. SHEPHERD was tracked to after the search warrant is the address of 4358 North 65th Street, Milwaukee, WI, which is associated with one of his Sierra Adams. Adams has been observed

meeting with the Jaguar SUV, which has been used by L. SHEPHERD, in front of 4358 North 65th Street, Milwaukee, WI. In addition to this, the Durango was then utilized by Adams for a brief period of time and kept at 4358 North 65th Street, Milwaukee, Wisconsin and now appears to be back in possession of S.J. SHEPHERD (as further described below) showing that he continues to have access to the residence of 4358 North 65th Street, Milwaukee, Wisconsin.

*8501 North 107th Street*

350. From law enforcement records the Hyundai Genesis has been parked in the lot adjacent to 8447 North 107th Street, Milwaukee, Wisconsin seven times over the past thirty days. In addition, the Jaguar was parked in this same location on one occasion over the past thirty days.

351. 8501 North 107th Street, Milwaukee, Wisconsin and 8447 North 107th Street, Milwaukee, Wisconsin are both in the Granville Neighborhood, is a frequent location for SINCLAIR's telephone (262) 349-7108. On March 24, 2026, case agents conduct electronic surveillance on SINCLAIR's telephone (262) 349-7108. At approximately 5:05 pm, SINCLAIR's telephone (262) 349-7108 was indicating in the neighborhood surrounding the area of North 27th Street and West Burleigh Street, Milwaukee, Wisconsin. SINCLAIR's telephone (262) 349-7108 appeared to move towards the City of West Allis, before case agent was able to locate any known vehicles operated by SINCLAIR. At approximately 5:50 pm, SINCLAIR's telephone (262) 349-7108 indicated it was in the area of South 74th Street and West Lincoln Avenue. I am familiar with PIERCE owning the Just Like Mommy Child Care at 7330 West Lincoln Avenue, West Allis, Wisconsin. Case agent responded to 7330 West Lincoln Avenue, and at approximately 5:53 pm, case agent observed the Sonata exiting the west parking lot. Case agent was unable to conduct a follow of the Sonata at this time.

352. At approximately 6:27 pm, SINCLAIR's telephone (262) 349-7108 was indicating it was heading towards Timmerman Airport and the Granville Neighborhood, which was suspected to the in the area of 8501 North 107th Street, Milwaukee, Wisconsin. Case agent responded to the area

from the South Side of Milwaukee, however SINCLAIR's telephone (262) 349-7108 departed the area and headed back south prior to arrival.

353. At approximately 6:52 pm, case agent arrived in the area and observed the Jaguar backed into a parking spot in front of the address 8501 North 107th Street, Milwaukee, Wisconsin. At approximately 6:59 pm, L. SHEPHERD exited the driver seat of the Jaguar and walked towards the door leading towards the address 8501 North 107th Street. Case agents reviewed law enforcement records for the address of 8501 North 107th Street. Case agents observed 8501 North 107th Street is affiliated with Teresa M. Davis. Teresa Davis is known as the mother of MCKAY who was present during the search of SINCLAIR DTO stash house, 3261 A N. 30th St. Milwaukee, WI. During the search MCKAY admitted to being related to Teresa Davis aka Teresa McKay.

354. On March 29, 2026, at approximately 8:39 am, case agents conducting surveillance at 8501 North 107th Street observed a black unregistered Jaguar SUV (Jaguar SUV) parked in the parking spot in front of 8501 North 107th Street and the Durango parked just south of the black Jaguar SUV.

355. On April 2, 2026, at approximately 9:30 am, case agents observed the Jaguar SUV parked in the parking spot in front of 88501 North 107th Street. On April 4, 2026, at approximately 744 am, case agents observed the Jaguar SUV parked in the parking spot in front of 8501 North 107th Street. On April 6, 2026, at approximately 2:00 pm, case agents observed the Jaguar SUV parked in the parking spot two spaces north of the front of 8501 North 107th Street. There was a white Mercedes Crossover, backed in with no front plate (Mercedes Crossover), parked in the space one north of the front of 8501 North 107th Street. The Mercedes Crossover had not been observed at the location on prior spot checks.

356. On April 8, 2026, in the early morning hours, case agents observed the Jaguar SUV parked in the parking spot in front of 8501 North 107th Street, Milwaukee, Wisconsin. At approximately 3:06 pm a black female appeared from the location of the doorway to 8501 N. 107th

St and walked to the trunk area of the Jaguar. She appeared to be speaking with someone from the entrance way leading to 8501 N. 107th St. At approximately 3:07 pm, a black male wearing a black jump suit, white under shirt and baseball cap exited the area of the door leading to 8501 N. 107th St. This male matched the description of L. SHEPHERD and got into the driver seat of the Jaguar SUV with the female in the passenger. They then left the area in the Jaguar SUV.

357. At approximately 5:04 pm, the Jaguar SUV returned, the driver was L. SHEPHERD Jr. L. SHEPHERD and the unknown female exited the Jaguar SUV and walked towards the door to 8501 North 107th Street. L. SHEPHERD appeared to hand the female keys. L. SHEPHERD returned to the Jaguar, but then they both walked to the entry wat to 8501 North 107th Street.

358. On April 9, 2026, at approximately 6:00 am the Jaguar SUV and the Mercedes Crossover were parked out front of 8501 North 107th Street. At approximately 11:25 a.m., a black unidentified female, carrying a large purse, exited from the stairs case leading to 8501 North 107th Street and entered the Mercedes Crossover and departs the area. At approximately 3:00 pm, a green mid-size Mazda SUV with one black male (driver) and one black female (passenger) arrives and parks just south of 8501 North 107th Street. The driver exits and goes up the stairs leading to 8501 North 107th Street and returns to the Mazda SUV about two minutes later and speaks to the female passenger. At approximately 3:03pm, the passenger exits and goes up the stairs leading to 8501 North 107th Street. At approximately 3:24pm, both the driver and passenger exit the stairs leading to 8501 North 107th Street. The driver is carrying a plastic grocery bag, which based on my training and experience appeared to contain approximately one pound of marijuana (shape and texture of bag). They depart the area in the Mazda SUV. At approximately 3:33 pm, L. SHEPHERD exited the walkway from 8501 North 107th Street and walks towards the Jaguar SUV. He is carrying a plastic grocery bag inside his left hand. He departs the area in the Jaguar SUV. At approximately 5:30pm, the Durango arrives and parks just south of 8501 North 107th Street. A short time later S.J. SHEPHERD is observed exiting the driver seat of the Durango and obtaining a garbage bag that

appeared to contain clothing. A front passenger (M/B, 20's, thin, wearing blue jeans and having a distinct limp) exits and walks with S.J. SHEPHERD. They both walk towards the front door leading to 8501 North 107th Street. At approximately 5:53 pm, S.J. SHEPHERD and the unidentified male exit from the walkway from 8501 North 107th Street. S.J. SHEPHERD obtains an unknown item from the rear passenger side compartment and goes back to the doorway of 8501 North 107th Street. He immediately returns and departs the area in the Durango.

359. On April 10, 2026, case agents conduct surveillance of 8501 North 107th Street, Milwaukee, Wisconsin. At approximately 6:40 am the Durango was observed backed into a parking spot just south of 8501 North 107th Street, with the running lights on. The running lights turn off at approximately 7:10 am. The Jaguar SUV and the Mercedes Crossover were also parked out front of 8501 North 107th Street. At approximately 11:53 am, L. SHEPHERD was observed exiting the walkway from 8501 North 107th Street carrying a large black bag and goes to the driver door of the Jaguar SUV. L. SHEPHERD opens the driver's door and places the bag inside the Jaguar SUV. He then goes over to Durango and speaks with the occupants, who appeared to remain inside the Durango for numerous hours. At approximately 11:55 am, L. SHEPHERD departs the area in the Jaguar SUV. At approximately 12:01 pm, the Durango departs the area.

360. Based on my training and experience in drug investigations, I know that people engaged in the trafficking of controlled substances often store their controlled substances at their residences, in the residences of co-conspirators, or other locations under the trafficker's control, for several reasons including (1) by storing controlled substances at the trafficker's residence or other properties under their control, the trafficker maintains proximity and access to the controlled substances allowing them to quickly restock, package, and distribute their controlled substances; (2) a trafficker's residence (or other property under their control) provides security and privacy from public view allowing the trafficker to go undetected by concerned citizens and law enforcement; and (3) storing controlled substances, cash proceeds, and operational tools like ledgers and cell phones at

their residence (or other locations under their control) allows drug traffickers to use their residences/properties as an efficient command center.

## <u>D. STAIR's Money Laundering Activities</u>

361. As described throughout the above affidavit, STAIR maintains properties for the purpose of drug trafficking by, among other things, renting properties to drug dealers as stash houses and trap houses, providing drug traffickers of advance notice of police investigations into their trafficking at these properties, advising drug traffickers of ways to avoid law enforcement detection, and employing drug traffickers as "security" to provide, among other things, unlawful evictions at S2 properties.

362. Based on the recorded calls described above, including those with MCDADE and Rickey, STAIR benefits financially from renting his properties to drug traffickers. Indeed, STAIR explained to Rickey, for example, that renting to a trafficker could ensure that he collects rent from drug-addicted tenants placed there by the trafficker. Similarly, MCDADE noted in his call with STAIR from jail that MCDADE had been the source of thousands of dollars in profit for STAIR. Additionally, LOPEZ's interactions with CS#2 indicate that employees of S2 charge additional fees to drug traffickers who rent S2 properties for the purpose of drug trafficking and that such fees are charged as a percentage of the trafficker's profits. LOPEZ and LOCKETT themselves run a drug trafficking operation from STAIR's property at 829 19th Street, and records described above show LOPEZ's payment to STAIR for that property. Law enforcement agents have similarly compensated STAIR for the rental of drug-involved premises including those premises rented by CS#2 and Rickey in the undercover operations described above. And the investigation has revealed that STAIR allows drug traffickers like SINCLAIR to deposit proceeds of their drug trafficking directly into his bank accounts (as described in the above incident in which a drug-detection canine alerted to the cash deposited by SINCLAIR into STAIR's account).

363. Law enforcement agents have conducted a financial investigation into STAIR. That investigation has revealed that STAIR receives payments via several methods, including personal checks, cashier's checks, money orders, Zelle transfers, CashApp transfers, and AppFolio, which S2 uses to process online rent payments. AppFolio is an electronic application that allows for the receipt, transfer, and tracking of financial transactions. Based on case agents' investigation in this case, STAIR uses the AppFolio application as a way of keeping books and records.

364. The financial investigation has revealed that STAIR's S2 Real Estate businesses deposit payments, including "legitimate" rent payments as well as proceeds of drug trafficking into multiple bank accounts.

365. Most checks and money orders are deposited into TriCity Bank account ending in # x2329, held under S2 Real Estate Group 2 LLC. Rental income received through AppFolio, Zelle, and CashApp is primarily deposited into Charles Schwab account ending in # x0260, which operates under Sam P. Stair.

366. STAIR frequently transfers funds, typically by depositing checks or conducting electronic transfers, from both the x2329 and x0260 accounts into a Charles Schwab account ending in # x8151, which operates under Sam P. Stair. STAIR is the signatory on all three (x2329, x0260, and x8151) accounts.

367. Because STAIR receives "legitimate" rent payments as well as proceeds of drug trafficking into both x2329 and x0260 accounts and subsequently transfers most of the money from those accounts, except for what is used for business expenses, to account x8151, STAIR comingles the funds he receives from his legitimate rental business with the funds he receives for properties he rents for the purpose of drug trafficking.

368. Based on case agents' training and experience, individuals involved in drug trafficking enterprises benefit from the cover of legitimate businesses, like STAIR's S2 real estate rental business, because it allows them to conceal the illicit nature of the drug-trafficking proceeds

by making it appear that the funds they are receiving are proceeds of legitimate enterprises, such as the rental of real property. All three accounts are, therefore, involved in the money laundering.

369. By comingling funds received from traffickers like MCDADE, SINCLAIR, CS#2, "Rickey," LOPEZ, LOCKETT, and others with rental income received from non-drug-trafficking renters, STAIR is able to conceal the source and nature of his illicitly obtained funds. This makes it more difficult for law enforcement to trace the proceeds of STAIR's unlawful enterprise to maintain premises for the purposes of drug trafficking in violation of 21 U.S.C. § 856.

370. In an effort to compare the percentage of STAIR's deposits that relate to his rental of properties for the purpose of drug trafficking, case agents created a list of properties owned by STAIR that were associated with drug overdose deaths, search warrants executed in which indicators of drug trafficking occurred, properties known to be used by the MCDADE DTO, the LOCKETT DTO, and the SINCLAIR DTO, and properties that were otherwise associated with drug-trafficking based on physical surveillance or police reports. Those properties included the following addresses:

- 2319 W Michigan St, Milwaukee, WI 23233-1887 (associated with numerous calls for service related to drug trafficking and a search warrant executed for the same on unit 206).
- 2327 W Michigan St, Milwaukee, WI 53233-1859 (confirmed overdose)
- 729 S 21st St, Milwaukee, WI 53204-4101 (confirmed overdose and a report that the subject in Unit 1 was selling drugs)
- 829 S 19th St, Milwaukee, WI 53204-1100 (**Target Location 4)** (associated with complaints related to drug trafficking and discussed at length herein as the location of the LOCKETT DTO's drug trafficking enterprise)
- 1412 W Greenfield Ave, Milwaukee, WI 53204-2764 (associated with drug trafficking investigations in 2013, 2021, and 2022)

- 2900-2902 S 9th Pl, Milwaukee, WI 53215 (associated with drug trafficking investigations in 2015 and 2021)
- 2301 W Michigan St, Milwaukee, WI 53233-1840 (associated with a welfare complaint of a citizen in a car running for a long time with a subject not moving inside)
- 1208 S 15th Pl, Milwaukee, WI 53204-2258 (associated with a drug trafficking investigation in 2007)
- 1517 S 23rd St, Milwaukee, WI 53204-2502 (associated with a drug trafficking investigation in 2021)
- 2224 S 16th St, Milwaukee, WI 53215-2681 (associated with a drug trafficking investigation in 2024 and 2025)
- 1836 W Becher St, Milwaukee, WI 53215-2610 (associated with a drug trafficking investigation in 2023)
- 816 W Greenfield Ave, Milwaukee, WI 53204-2879 (citizens reported one subject face down and one sleeping with needs around them)
- 1512 S 21st St, Milwaukee, WI 53204-2612 (described above as a location from which MCDADE engaged in drug trafficking with STAIR's knowledge and acquiescence).
- 1027 S 26th St, Milwaukee, WI 53204-1947 (associated with a drug overdose)
- 1130 W Washington St, Milwaukee, WI 53204-2249 (associated with a complaint about drug dealing at the location)
- 1320 S 22nd St, Milwaukee, WI 53204-1903 (associated with a complaint about drug dealing at the location as an ongoing issue)
- 754 S Layton Blvd, Milwaukee, WI 53215-1260 (associated with a drug overdose)
- 508 W Maple St, Milwaukee, WI 53204-3505 (associated with drug trafficking investigations in 2008, 2015, 2017, 2019, and 2020)

- 1425-1427 W Greenfield Ave, Milwaukee, WI 53204-2765 (associated with numerous complaints regarding drug trafficking and described above as one of the properties from which MCDADE was engaged in drug trafficking with SINCLAIR's knowledge and acquiescence)
- 4635 S 23rd St, Milwaukee, WI 53221-5418 (associated with drug trafficking investigations in 2022 and 2024)
- 2237-2239 S Muskego Ave, Milwaukee, WI 53215-2545 (Rear unit associated with drug trafficking investigation in 2021)
- 2229 S 10th Pl, Milwaukee, WI 53215-2756 (associated with a drug trafficking investigation in 2025)
- 710-712 S 21st St, Milwaukee, WI 53204-1147 (associated with numerous reports of drug dealing and with drug trafficking investigations in 2009, 2010, 2020, and 2025)
- 1966 S 11th Street, Milwaukee, WI **(Target Location 6)** (described above as associated with MCDADE's DTO engaged in drug trafficking with STAIR's knowledge and acquiescence)
- 1022 S. 60th Street, West Allis, Wisconsin (**Target Location 9**) (described above as The Blaque Bar from where SINCLAIR operates his DTO)

371. After identifying these "drug-associated premises" case agents conducted a financial analysis to determine which payments into STAIR's accounts could be attributed to these drug-associated properties. Agents did so by reviewing memo lines on checks and money orders and/or the entries in AppFolio that identified the source of the fund transfers or deposits. The following is a summary of that analysis.

372. In 2024, the total rent from all sources according to STAIR's AppFolio ledger was $5,746,094.85. The total rent received from online rent payments was $1,958,777.93 according to AppFolio. During this time period, the Tri City account ending in x2329 received $2,661,608.81 in

checks, cashier's checks, and money orders and $20,705.00 through AppFolio transfers. The Charles Schwab account ending in x0260 received $1,194,637.84 in checks, cashiers' checks and money orders. It received $1,997,983.02 in AppFolio transfers, $166,206.87 in Zelle transfers, $148,604.79 in Cash App transfers and $588,445.51 from an unknown source titled "S2 Real Estate – A Net Settle."

373. Based on the AppFolio ledger, of the payments received in 2024, $ 480,167.42 (or 8.36% of proceeds) was associated with the drug-associated premises.

374. Charles Schwab account ending in #x8151 received $872,000 in checks from Tri City account x2329 and received $4,060,806.28 in transfers from Charles Schwab account ending x0260. $3,779,095.53 of transfers were sent back to Charles Schwab account ending x0260, resulting in net transfers of $281,710.75 to Charles Schwab account ending in x8151.

375. In 2025, the total rent from all sources according to STAIR's AppFolio ledger was $6,308,033.72. The total rent received from online rent payments was $2,705,028.66 according to AppFolio. During this time period, the Tri City account ending in x2329 received $3,600,381.90 in checks, cashier's checks, and money orders and $95,336.00 through AppFolio transfers. The Charles Schwab account ending in x0260 received $669,997.81 in checks, cashiers' checks and money orders. It received $2,758,492.91in AppFolio transfers, $279,472.60 in Zelle transfers and $721,988.91 from an unknown source titled "S2 Real Estate – A Net Settle."

376. Based on the AppFolio ledger, of the payments received in 2025, $ 982,891.96 (or 15.58% of proceeds) was associated with the drug-associated premises.

377. Charles Schwab account ending in #x8151 received $791,000.00 in checks from Tri City account #2329 and received $4,244,168.46 in transfers from Charles Schwab account ending x0260. $3,542,014.74 of transfers were sent back to Charles Schwab account ending x0260, resulting in net transfers of $702,153.72 to Charles Schwab account ending in x8151.

378. In 2026, between January 1 and January 31, the total rent from all sources according to STAIR's AppFolio ledger was $571,735.96. The total rent received from online rent payments was $253,093.44 according to AppFolio. During this time period, the Tri City account ending in x2329 received $399,982.21 in checks, cashier's checks, and money orders and $15,684.37 through AppFolio transfers. The Charles Schwab account ending in x0260 received $40,878.31 in checks, cashiers' checks and money orders. It received $239,286.74 in AppFolio transfers, $40,494 in Zelle transfers and $68,137.36 from an unknown source titled "S2 Real Estate – A Net Settle."

379. Based on the AppFolio ledger, of the payments received in January 2026, $225,201.06 (or 24.30% of proceeds) was associated with the drug-associated premises.

380. Charles Schwab account ending in #x8151 received $100,000.00 in checks from Tri City account #2329 and received $310,692.00 in transfers from Charles Schwab account ending x0260. $ 221,924.65 of transfers were sent back to Charles Schwab account ending x0260, resulting in net transfers of $88,767.35 to Charles Schwab account ending in x8151.

381. The increase in percentages of illicit proceeds over time is consistent with STAIR's increased involvement with various DTOs as described above.

382. STAIR's use of three bank accounts and his comingling of his illicit proceeds with his legitimate proceeds constitutes money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

383. The TriCity Account ending in x2329 and the Charles Schwab Accounts ending in x0260 and x8151, and the funds contained therein, are accounts and funds involved in money laundering and contain proceeds of drug trafficking in violation of 21 U.S.C. § 856.

**Vehicles, Basements and Outbuildings**

384. I know based upon my training and experience that controlled substances and evidence of narcotics trafficking can be secreted in any part of a residence including garages, storage areas related to the premises, vehicles on and associated with the premises, and on persons engaged in drug trafficking within the residence; that through personal training and experience in

investigating drug trafficking, affiant knows controlled substances are frequently stored with drug proceeds and other drug paraphernalia at drug traffickers residences; that the execution of a search warrant usually results in the seizure of such items of personal property as utility bills, canceled mail envelopes, bank statements, keys, photographs, videotapes, and other items or documents which establish the identities of persons residing in or having control of the premise; and that these items can be stored in various locations accessible to the target residence including vehicles and garages. Therefore, I believe it is reasonable to believe that an individual engaged in drug trafficking would conceal evidence related to drug trafficking in multiple areas associated with their residence including vehicles, garages and basements. I also know that people involved in drug trafficking often conceal evidence of their crimes including electronic devices such as cellular telephones on their persons.

**Computers, Electronic Storage and Forensic Analysis**

385. As described above and in the Attachment B, this application seeks permission to search for records that might be found on **Target Locations,** in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive, cellular telephone, or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

386. *Probable cause.* I submit that if a computer, cellular telephone, or storage medium is found on **Target Locations**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

387. *Forensic evidence.* As further described in Attachment Bs, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in **Target Locations** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and

malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of

how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

388. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

389. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant

and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

**BIOMETRIC UNLOCK**

390. The warrant I am applying for would permit law enforcement to obtain from the display of physical biometric characteristics (such as fingerprint, thumbprint, facial, or iris characteristics) to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

(A) I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to use.

(B) If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

(C) If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

(D) If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device through his or her irises. For example, Samsung offers an Iris Scanner, which uses the biometric information of an individuals' irises to identify the user.

393. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in

some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

394. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

395. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered within a certain period of time. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

396. Due to the foregoing, with respect to Target Subjects located in **Target Locations** during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of this warrant, it is requested that law enforcement personnel may (1) press or swipe the fingers (including thumbs) of the person to the fingerprint scanner of the device found at the premises; or (2) hold the device in front of the person's

face to activate the facial and/or iris recognition features, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant

**CONCLUSION**

397. Based on the foregoing, I believe there is probable cause to believe that the Target Subjects have committed violations of federal law, including the Target Offenses. I further submit that there is probable cause to believe that located at the Target Locations described in Attachment A, there is evidence of the DTO's crimes, as detailed more specifically in Attachment B, such that a warrant issue authorizing the search of the same. I also submit that there is probable cause to seize the Target Accounts because those accounts are involved in money laundering and contain proceeds of drug trafficking in violation of 21 U.S.C. § 856.